IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRIPLAY, INC. and TRIPLAY, LTD., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 13-1703 (LPS) |
| | ) | |
| WHATSAPP INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT WHATSAPP'S OPENING BRIEF IN SUPPORT
OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

OF COUNSEL:

Douglas E. Lumish
Richard G. Frenkel
Natasa Pajic
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA  94025-1008
(650) 328-4600
doug.lumish@lw.com
rick.frenkel@lw.com
natasa.pajic@lw.com

Kyle A. Virgien
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-65438
(415) 391-0600
kyle.virgien@lw.com

April 7, 2014

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Defendant
WhatsApp Inc.*

## TABLE OF CONTENTS

I.     NATURE AND STAGE OF PROCEEDINGS ...................................................................1

II.    SUMMARY OF ARGUMENT .........................................................................................1

III.   STATEMENT OF FACTS ................................................................................................2

       A.     The Parties .............................................................................................................2

       B.     The '475 Patent .....................................................................................................3

IV.    LEGAL STANDARDS .....................................................................................................5

       A.     Motion To Dismiss ...............................................................................................5

       B.     Patent-Eligible Subject Matter..............................................................................6

V.     ARGUMENT.....................................................................................................................7

       A.     The '475 Patent Claims Are Directed To The Abstract Idea Of Converting
              And Forwarding Messages ....................................................................................8

       B.     The '475 Patent Claims Only Add Insignificant Elements That Do Not
              Convert The Abstract Message-Conversion Idea To A Patent-Eligible
              Application.............................................................................................................9

              1.     Appending Well-Known, General Purpose Computer Technology
                     To The Claims Does Not Make Them Patent-Eligible.............................11

              2.     The Additional Limitations Do Not Make The Claims Patent-
                     Eligible ......................................................................................................15

       C.     The Claims Also Fail The Machine-Or-Transformation Test ...............................16

VI.    CONCLUSION.................................................................................................................17

## TABLE OF AUTHORIES

**CASES**

*Accenture Global Servs. GmbH v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Cir. 2013) ............................................................. passim

*Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*,
    687 F.3d 1266 (Fed. Cir. 2012) ............................................................. passim

*Bilski v. Kappos*,
    130 S. Ct. 3218 (2010) ........................................................................... passim

*buySAFE, Inc. v. Google, Inc.*, No. 11-cv-1282,
    --- F. Supp. 2d ----, 2013 WL 3972261 (D. Del. July 29, 2013) ..................... 5, 13, 15

*CyberFone Sys. v. CNN Interactive Group, Inc.*, Nos. 2012-1673 and 2012-1674,
    --- Fed. App'x ----, 2014 WL 718153 (Fed. Cir. Feb. 26, 2014) .................... 9

*CyberFone Sys., LLC v. Cellco Partnership*, 885 F. Supp. 2d 710 (D. Del. 2012) ...................... 9

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) ............................................................. passim

*Dealertrack, Inc. v. Huber*,
    674 F.3d 1315 (Fed. Cir. 2012) ............................................................. passim

*Fort Props., Inc. v. Am. Master Lease LLC*,
    671 F.3d 1317 (Fed. Cir. 2012) ............................................................. passim

*O'Reilly v. Morse*,
    56 U.S. (15 How.) 62 (1854) ................................................................. 7

*Parker v. Flook*,
    437 U.S. 584 (1978) ............................................................................. passim

*UbiComm, LLC v. Zappos IP, Inc.*, No. 13-cv-1029,
    2013 WL 6019203 (D. Del. Nov. 13, 2013) ............................................. 5, 7

**STATUTES**

35 U.S.C. § 101 ............................................................................................ 6, 7, 17

**RULES**

Fed. R. Civ. P. 12(b)(6) .................................................................................. 5

## I.    NATURE AND STAGE OF PROCEEDINGS

Plaintiffs TriPlay, Inc. and TriPlay, Ltd. (collectively "TriPlay") brought this action

against Defendant WhatsApp Inc. ("WhatsApp") on October 15, 2013, alleging infringement of

U.S. Patent No. 8,332,475 ("the '475 patent"). (D.I. 1, 4.) After TriPlay served its Complaint on

February 14, 2014, WhatsApp's time to respond was subsequently extended to April 7, 2014.

(D.I. 5.) As a result, the action is still in its earliest stage.

The '475 patent seeks to cover the abstract idea of converting messages from one layout

to another. Because such abstract ideas fall outside the statutory scope of patentable subject

matter under the threshold requirement of 35 U.S.C. § 101, WhatsApp respectfully requests that

the Court dismiss the Complaint with prejudice pursuant to Federal Rule of Civil Procedure

12(b)(6).

## II.    SUMMARY OF ARGUMENT

The Supreme Court has warned time and again that, under § 101, "abstract ideas" and

"mental processes" may not be removed from the public domain and owned as private property.

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293, 1301 (2012); *Bilski

v. Kappos*, 130 S. Ct. 3218, 3226 (2010). Such fundamental concepts are "'part of the

storehouse of knowledge ... free to all ... and reserved exclusively to none.'" *Bilski*, 130 S. Ct. at

3225 (citation omitted); *see Mayo*, 132 S. Ct. at 1301. For example, a party cannot own as

private property "the concept of hedging risk" (*Bilski*, 130 S. Ct. at 3222), or the "concept" of

"processing information through a clearinghouse" (*Dealertrack, Inc. v. Huber*, 674 F.3d 1315,

1333-34 (Fed. Cir. 2012)). And that principle cannot be circumvented merely by expressing an

idea as a series of routine steps, implementing it on a general-purpose computer, or embellishing

it with other inconsequential activity. *Mayo*, 132 S. Ct. at 1294; *Bilski*, 130 S. Ct. at 3230.

The '475 patent is directed to a classic abstract idea—the concept of converting messages from one layout to another. That idea has long been performed by humans using pen and paper across a wide range of fields such as publishing (*e.g.*, organizing text for a book or newspaper), advertising (*e.g.*, arranging content to fit a billboard), architecture (*e.g.*, scaling a blueprint larger or smaller), or law (*e.g.*, conforming a document to a court's layout requirements). It is irrelevant that the '475 patent purports to break down the message-converting claims into discrete steps. So did the patents in cases like *Bilski* and *Dealertrack.* It is irrelevant that the claims refer to "general purpose computer" components ('475 patent at 10:1-2) because simply implementing an abstract concept on a computer—without disclosing any new hardware or specialized programming—does not transform a naked idea into a concrete invention. *Mayo,* 132 S. Ct. at 1300-01. And it is irrelevant that the patent appends other inconsequential steps, such as gathering historical data. As the Supreme Court admonished in *Mayo,* allowing patentability to turn on the addition of "well-understood," "routine," and "obvious" steps would elevate form over function, and reward the *deftness of the draftsman,* not the ingenuity of invention. *Id.* at 1294, 1298.

TriPlay's patent is invalid on its face as a matter of law for lack of patent-eligible subject matter, and the Court should dismiss TriPlay's Complaint in its entirety.

## III.   STATEMENT OF FACTS

### A.   The Parties

Plaintiff TriPlay, Ltd., an Israeli corporation based in Israel, owns the '475 patent. (D.I. 4 ¶ 12.) Plaintiff TriPlay, Inc., a Delaware corporation based in New York, became the exclusive licensee on October 1, 2013. (*Id.*) TriPlay brought the present lawsuit on October 15, 2013. (D.I. 1, 4.)

Defendant WhatsApp, a Delaware corporation based in California, offers software products that allow hundreds of millions of users to send messages and other content between different types of devices, such as iPhones and Android devices. In February 2014, Facebook, Inc. announced its agreement to acquire WhatsApp.

## B.    The '475 Patent

The '475 patent, entitled "Messaging System and Method," was issued on December 11, 2012. (Ex. A.) The '475 patent claims a monopoly on converting and passing messages between different types of devices—*i.e.*, "ubiquitous messaging between different types of communication devices via different communication protocols, adapting the sending/receiving message in accordance with the capabilities of the destination communication device and the communication media." ('475 patent at 8:54-58; *see, e.g., id.* at cl. 1.)

The specification gives a general overview of "[t]he problem of cross-platform messaging" and surveys the numerous existing systems that "were developed to provide a solution." (*Id.* at 1:20-22; *see id.* at 1:23-5:6) The specification then describes what it calls a "novel" way of performing the "concept" of converting and passing messages from one device (the "originating communication device") to another device (the "destination communication device"), consisting of three basic steps: (1) "receiv[ing]" from the sender a message in a certain "layout"; (2) "adapt[ing]" the message so that it can be displayed on the destination device; and (3) "transmit[ting]" the converted message to the destination device. (*Id.* at 5:22-45.) The specification describes these steps multiple times, couching them, variously, as a "method," a "system," a "service center" or software (called a "client" application). (*See id.* at 5:22-45, 6:36-59, 7:1-18, 7:63-8:9, 8:10-31.) The specification sometimes labels the component that performs the receiving and transmitting steps the "access block," and the component that performs the conversion step the "media block." (*Id.* at 5:27, 5:32.) The specification provides additional

3

optional functionality, such as sending the message to multiple communication devices, using a

"database ... to store historical information" about the messages, and "processing data related to

receiver's preferences [and] sender's preferences." (*E.g.*, *id.* at 5:46-50, 5:67-6:1.)

The specification advises that the claims can be implemented on any "general purpose

computer" (*id.* at 10:1-2), but does not describe any specialized, much less new or improved,

hardware or software for doing so. (*See id.* at 9:67-10:46.) To the contrary, the specification

admits that "the processes/devices ... are not inherently related to any particular electronic

component or other apparatus"—they can be implemented using "*any* kind of ... device with

messaging communication capabilities" and "*any* other type of media suitable for storing

electronic instructions." (*Id.* at 10:5, 10:12-16, 10:28-30 (emphases added).) Also, the

specification states, the processes and devices can use "*any* network" to "facilitat[e] messaging

between communication devices." (*Id.* at 11:60-61 (emphasis added).) And the specification

provides that the processes can be implemented using "*any* ... programming language" (10:23

(emphasis added)), but does not explain what particular programming would be necessary.

The claims are no more specific. The '475 patent has 14 independent claims (1, 9, 12,

17, 23, 28, 31, and 36-42) and 28 dependent claims. The independent claims (whether drafted as

methods, systems, service centers, software or storage devices) each perform the three basic

steps of the message conversion concept—*i.e.*, receiving a message from one device, converting

its layout to ensure compatibility with the destination device, and then sending it to the

destination device. For example, claim 12 provides:

> A method of message communication via a messaging system
> between one or more originating communication devices assigned
> to a sender and one or more destination communication devices
> assigned to a receiver, the method comprising:

4

a) before delivery to the receiver, obtaining by a messaging system a message having initial characteristics comprising, at least, a message format and an initial message layout;

b) selecting a message layout and converting at least said initial message layout to said selected message layout to form an adapted message layout in accordance with at least one criterion selected from a group comprising:

i) criterion related to message communication capabilities of the destination communication device with regard to message communication capabilities of the originating communication device;

ii) criterion related to message displaying capabilities of the destination communication device with regard to message communication capabilities of the originating communication device; and

iii) criterion related to communication media between originating and destination device; and

c) facilitating delivery of the adapted message to the receiver.

The dependent claims (2-8, 10-11, 13-16, 18-22, 24-27, 29-30, and 32-35) recite additional features—including, for example, sending to multiple devices, obtaining historical information, and processing the historical information based on the sender's or receiver's preferences.

## IV.    LEGAL STANDARDS

### A.    Motion To Dismiss

Whether a claim recites patentable subject matter is a question of law. *See, e.g.,* *Accenture Global Servs. GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013); *Dealertrack*, 674 F.3d at 1333. As such, the issue may be resolved on a motion to dismiss. Fed. R. Civ. P. 12(b)(6); *see, e.g., UbiComm, LLC v. Zappos IP, Inc.*, No. 13-cv-1029, 2013 WL 6019203, at *2, *6 (D. Del. Nov. 13, 2013) (Andrews, J.) (granting Rule 12(b)(6) motion); *buySAFE, Inc. v. Google, Inc.*, No. 11-cv-1282, --- F. Supp. 2d ----, 2013 WL 3972261, at *1-2 (D. Del. July 29, 2013) (Stark, J.) (granting Rule 12(c) motion).

**B.     Patent-Eligible Subject Matter**

Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101.  The Supreme Court's recent § 101 decisions reinforce two long-held and overriding legal principles that control the disposition of this motion.

First, the Supreme Court has long recognized that § 101 "contains an important implicit exception" for "laws of nature, natural phenomena, and abstract ideas." *Mayo*, 132 S. Ct. at 1293 (quotation marks and citations omitted); *see also Bilski*, 130 S. Ct. at 3226.  Abstract ideas are not patentable, because they are "'basic tools'" in the "'storehouse of knowledge'" that are "'free to all ... and reserved exclusively to none.'" *Mayo*, 132 S. Ct. at 1293 (citations omitted); *Bilski*, 130 S. Ct. at 3225 (citation omitted).  Subject matter falling within this exception is not patentable as a matter of law. *Id.*

Second, the Supreme Court's unanimous decision in *Mayo* underscores that this principle cannot be circumvented through "'draftsman's art,'" or by trying to dress up an abstract idea with inconsequential steps. *Mayo*, 132 S. Ct. at 1294 (quoting *Parker v. Flook*, 437 U.S. 584, 593 (1978)).  A patentable application of an abstract idea must "contain other elements or a combination of elements, sometimes referred to as an 'inventive concept,'" so as to "do significantly more than simply describe" the abstract idea. *Mayo*, 132 S. Ct. at 1294, 1297. Simply taking an abstract idea and adding steps or structures that are "well-understood," "conventional," or "already in use" contributes nothing inventive. *Id.* at 1294, 1298-99; *see also Flook*, 437 U.S. at 590.  For example, simply implementing an abstract principle using well-known computer components is "not a patentable application of that principle." *Mayo*, 132 S. Ct. at 1301; *see also Flook*, 437 U.S. at 594; *Gottschalk v. Benson*, 409 U.S. 63, 64 (1972).

6

Without meaningful limits to an abstract idea, a patent effectively preempts the idea itself and claims a monopoly over a range of inventions that the patentee never conceived, much less contributed to the state of the art. *Bilski*, 130 S. Ct. at 3231; *O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 112-14 (1854). Therefore, it is settled that merely limiting the application of an abstract idea to a particular "field of use or adding token postsolution components" does not convert the idea to a patent-eligible invention. *Bilski*, 130 S. Ct. at 3231. These principles apply regardless of whether a claim is drafted as a method, system, or otherwise. *See, e.g., Flook*, 437 U.S. at 593; *Benson*, 409 U.S. at 67-68.

Several recent Federal Circuit decisions, applying this precedent, have held method, system, and other claims patent-ineligible, and thus invalid. *See, e.g., Accenture*, 728 F.3d at 1345; *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011). The Federal Circuit has also frequently reiterated that implementing an unpatentable abstract idea on a computer, or in a computer environment, does not convert it into patent-eligible subject matter. *See, e.g., Accenture*, 728 F.3d at 1345; *Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1280 (Fed. Cir. 2012); *Dealertrack*, 674 F.3d at 1333; *Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1323 (Fed. Cir. 2012); *CyberSource*, 654 F.3d at 1375. Likewise, this Court has held claims ineligible because they involved an abstract idea and the recited computer components added nothing meaningful to the claims. *See, e.g., UbiComm*, 2013 WL 6019203, at *4-6.

## V.   ARGUMENT

The '475 patent does not claim patent-eligible subject matter under 35 U.S.C. § 101. Under well-established Supreme Court and Federal Circuit precedent, the patent is directed to a quintessential abstract idea—converting and forwarding messages—and simply implementing it

using conventional computer components and adding token post-solution activity does not make it patent-eligible.

### A.    The '475 Patent Claims Are Directed To The Abstract Idea Of Converting And Forwarding Messages

The '475 patent claims involve the age-old abstract idea of converting and forwarding messages. (*E.g.*, '475 patent at Abstract, 8:54-58, cl. 1, 12.)  Each of the claims includes receiving a message, converting its layout so that it can be properly displayed at its destination, and then sending the converted message to the destination. *See Dealertrack*, 674 F.3d at 1333 (examining claims in their "simplest form" to identify "'basic concept'" at issue (quoting *Bilski*, 130 S. Ct. at 3231)).  But humans have done this on paper for centuries in fields such as printing, publication, advertising, and architecture—whether it be transcribing ancient texts, organizing content for a newspaper, arranging photographs for a school yearbook, adapting ad copy for a full-sized billboard, or scaling down blueprints for a building permit.  And, for example, this is what legal professionals do in adjusting a draft document's layout (margins, font, and so on) before submitting it to a court or what an accountant does in arranging income information on a 1040 form before filing it with the IRS.  The fundamental concept of converting messages (or information) to another layout is a "'basic tool[]'" in the "'storehouse of knowledge'" that is "'free to all ... and reserved exclusively to none.'" *Mayo*, 132 S. Ct. at 1293 (citations omitted); *Bilski*, 130 S. Ct. at 3225 (citation omitted).

The concept of converting and forwarding messages is even more abstract than the ideas underlying claims previously held invalid by the Supreme Court, the Federal Circuit, and this Court.  The Supreme Court has held abstract and patent-ineligible, among other things, claims for hedging risk in the energy market (*Bilski*, 130 S. Ct. at 3226), converting numbers from binary coded decimal form (*Benson*, 409 U.S. at 67-68), and computing alarm limits when

performing catalytic conversion (*Flook*, 437 U.S. at 590). Similarly, the Federal Circuit has held

abstract computer-based claims for generating tasks in an insurance organization (*Accenture*, 728

F.3d at 1346), managing a stable value protected life insurance policy (*Bancorp*, 687 F.3d at

1280), processing credit applications through a clearinghouse (*Dealertrack*, 674 F.3d at 1333),

managing real estate investments for tax deferred exchanges (*Fort Props.*, 671 F.3d at 1323),

detecting fraud in internet credit card transactions (*CyberSource*, 654 F.3d at 1375), and

categorizing and storing data (*CyberFone Sys. v. CNN Interactive Group, Inc.*, Nos. 2012-1673

and 2012-1674, --- Fed. App'x ----, 2014 WL 718153, at *2 (Fed. Cir. Feb. 26, 2014)).

In each of those cases, the courts recognized that, although broken into a series of steps,

the underlying ideas were nonetheless abstract concepts and mental processes. For example, in

*Dealertrack*, the claims broke down the patent-ineligible abstract clearinghouse concept into a

series of common-sense steps including (1) "receiving data from one source," (2) "selectively

forwarding the data," and (3) "forwarding reply data to the first source." 674 F.3d at 1333. And,

in *CyberFone*, the claims broke down the patent-ineligible abstract categorical data storage

concept into the steps of (1) "collecting information in classified form," (2) "separating" the data,

and (3) "transmitting" it according to its classification. 2014 WL 718153, at *2, *affirming*

*CyberFone Sys., LLC v. Cellco Partnership*, 885 F. Supp. 2d 710 (D. Del. 2012). The

fundamental message conversion concept at issue here, which is similarly broken down into the

basic steps of receiving a message, converting the message's layout, and transmitting the

converted message, is no less abstract and no more patent-eligible.

### B.   The '475 Patent Claims Only Add Insignificant Elements That Do Not Convert The Abstract Message-Conversion Idea To A Patent-Eligible Application

As discussed, the prohibition on patenting an abstract idea cannot be circumvented

simply by attempting to "limit" the idea to a particular technological environment or by adding

insignificant steps—lest "patent eligibility 'depend simply on the draftsman's art.'" *Mayo*, 132

S. Ct. at 1294 (quoting *Flook*, 437 U.S. at 593); *see Mayo*, 132 S. Ct. at 1300 ("simply appending

conventional steps, specified at a high level of generality, to ... abstract ideas cannot make

[them] patentable").  Such inconsequential and cosmetic steps, the Supreme Court has repeatedly

cautioned, do not change the fact that a patent is drawn to an abstract idea.

In *Mayo*, the Court held that a diagnostic method consisting of administering a drug for a

class of diseases and measuring the resulting metabolite levels was not patent-eligible because

the claims were nothing more than a series of "conventional," or "well-understood" limitations

appended to an otherwise unpatentable principle (the natural correlation between patient

metabolite levels and drug efficacy).  *Mayo*, 132 S. Ct. at 1294, 1298.  The Court drew upon its

prior precedents, each of which compels the same result in this case.  For example, in *Bilski*, the

abstract idea of hedging did not become patentable by limiting it "to use in commodities and

energy markets," or adding "'well-known random analysis techniques.'"  *Mayo*, 132 S. Ct. at

1300-01 (quoting *Bilski*, 130 S. Ct. at 3231).  Likewise, in *Flook*, the abstract idea of using a

formula to compute an updated alarm limit did not become patentable merely by confining it to

the petrochemical field, appending the "'well known'" "'use of computers for automatic

monitoring-alarming,'" or adding other "'post-solution activity' that is purely 'conventional or

obvious.'"  *Mayo*, 132 S. Ct. at 1299 (quoting *Flook*, 437 U.S. at 590, 594).  And, in *Benson*, the

abstract idea of converting binary coded decimal numbers to pure binary did not become

patentable "simply [by] implementing [it] on a physical machine, namely a computer."  *Mayo*,

132 S. Ct. at 1301 (discussing *Benson*).  Applying these holdings, the Court held that the patent

in *Mayo* was invalid because the claims appended to a natural law steps that "add nothing

specific ... other than what is well-understood, routine, conventional activity, previously

engaged by those in the field." *Id*. at 1299.

The same result follows here: the abstract message-conversion concept does not become

patentable simply by (1) implementing the steps using "general purpose computer" components

without providing any specialized hardware or software or (2) adding other "well-understood,"

"conventional," or "already in use" activity or "token" post-solution components. None of these

limitations makes the claims "significantly more" than the abstract idea itself. *See id*. at 1294.

### 1.    Appending Well-Known, General Purpose Computer Technology To The Claims Does Not Make Them Patent-Eligible

It does not matter that the specification states that the message-conversion idea can be

implemented using any "general purpose computer" components. ('475 patent at 10:1-2.)  Nor

does it matter that some claims are drafted as a "system," a "service center," or a computer

program on a "computer readable medium" or a "storage device"—all configured to perform the

same basic steps of receiving, converting, and sending messages. (*See id*. at cl. 1, 9, 23, 28, 31,

36, 37-40.)  The Supreme Court has made clear that engrafting such general-purpose computing

components onto abstract ideas does not make those ideas patent-eligible.  In *Mayo*, the Court

specifically reaffirmed its prior holdings in *Benson* and *Flook* that implementing an unpatentable

idea on a computer is "not a patentable application of that principle." 132 S. Ct. at 1301; *see id*.

at 1299.  And the generic computer components recited in the '475 patent do not meaningfully

limit the claims any more than did the general purpose computers in *Benson* and *Flook*.

The Federal Circuit's recent precedent compels the same result.  For example, the claims

in *Accenture* were directed to a computer system for generating tasks to be performed in an

insurance organization by (1) storing information on insurance transactions in a "database,"

(2) using "software" to determine what tasks need to be accomplished for that transaction, and

(3) assigning the tasks to authorized individuals. 728 F.3d at 1338. The claims recited multiple software and hardware components—including a server, several databases, an "event processor," a "task engine," a "task assistant," and a "client component" that "transmits and receives data." *Id.* at 1344-45. Nevertheless, the court held the claims patent-ineligible because they were merely "generic computer components" and "generalized software components arranged to implement an abstract concept on a computer." *Id.* at 1343, 1345.

Similarly, the claims in *Bancorp* were directed to computerized systems and methods for managing a life insurance policy including steps of (1) generating a policy, (2) calculating fees and other values, and (3) storing the policy unit value. 687 F.3d at 1270-72. The court held claims ineligible even though "[t]he[ir] plain language ... require[d] particular computing devices, such as a 'generator,' a 'calculator,' and 'digital storage'" because appending such general components does not "salvage an otherwise patent-ineligible process." *Id.* at 1274, 1277.

Likewise, in *Dealertrack*, the court held the information-clearinghouse claims ineligible even though they referred to a computer because they were "silent as to how a computer aids the method, ... or the significance of a computer to the performance of the method." 674 F.3d at 1333. The fact that a computer might act "as an obvious mechanism for permitting a solution to be achieved more quickly—*i.e.*, through the utilization of a computer for performing calculations"—was insufficient because the computer did not "impose a meaningful limit on the scope of [the] claim." *Id.* (quotation marks and citation omitted). *See also Fort Props.*, 671 F.3d at 1322-24 (claims for "investment tool" not patent-eligible despite requiring "computer");

*CyberSource*, 654 F.3d at 1373-74 (claims for detecting fraud in internet credit card transactions not patent-eligible despite reciting computer components).[1]

In all of these cases, the computing devices did not meaningfully limit the claims because either (i) the claims did not "specify how the computer hardware and database are specially programmed to perform the steps claimed" and the computer could be programmed to perform them in different ways (*see, e.g., Fort Props.*, 671 F.3d at 1323-24; *Dealertrack*, 674 F.3d at 1333); or (ii) the claims fundamentally did not need a computer at all (*see, e.g., CyberSource*, 654 F.3d at 1373). It is not enough that a computer, programmed in some unspecified way, might be able to do the tasks "'more quickly.'" *Dealertrack*, 674 F.3d at 1333 (citation omitted); *see also buySAFE*, 2013 WL 3972261, at *2 (same). Stated simply, unpatentable ideas cannot be transformed into patent-eligible inventions "by merely requiring a computer to perform the method." *CyberSource*, 654 F.3d at 1376.

Here, the computer components do not meaningfully limit the claims for both of the above reasons. First, even less than in the Federal Circuit cases discussed, the claims here do not recite or require any specialized hardware or programming. To the contrary, the specification admits that the method can be implemented on any "general purpose computer"—or indeed "*any* kind of ... device with messaging communication capabilities*"—using "*any* ... type of media suitable for storing electronic instructions" and configured to send messages over "*any* network." ('475 patent at 10:5, 10:12-16, 10:28-30, 11:60 (emphases added).) The specification also does

---

[1] And the list of computer-implemented claims found invalid only continues to grow. *See, e.g., Compression Tech. Solutions, LLC v. EMC Corp.*, No. 2013-1513, --- Fed. App'x ----, 2014 WL 904426, at *1 (Fed. Cir. Mar. 10, 2014); *Smartgene, Inc. v. ABL*, No. 2013-1186, --- Fed. App'x ----, 2014 WL 259824, at *5 (Fed. Cir. Jan. 24, 2014); *see also CLS Bank Int'l v. Alice Corp. Pty*, 717 F.3d 1269, 1273 (Fed. Cir.) (en banc) (per curiam), *cert granted* 134 S. Ct. 734 (2013) (oral argument held Mar. 31, 2014). The Supreme Court opinion in *CLS Bank* is expected before the end of the current Supreme Court term, which ends on June 30, 2014.

13

not purport to explain what programming would be necessary to implement the concept and instead admits that the processes can be implemented using "*any … programming language.*" (*Id.* at 10:23 (emphasis added).)  Reciting such generalized hardware and software components does not make patent-eligible the abstract concept of converting messages from one layout to another.  *See, e.g., Benson*, 409 U.S. at 64-68; *Accenture*, 728 F.3d at 1338, 1344-45; *Bancorp*, 687 F.3d at 1274-78; *Fort Props.*, 671 F.3d at 1323-24; *Dealertrack*, 674 F.3d at 1333.

Second, the underlying concept of converting and forwarding messages or information can be implemented without a computer at all.  As discussed, all of the basic steps can be, and long were, performed by humans with pen and paper, in countless fields and endeavors.  (*See supra* at § V.A)  That fact itself conclusively establishes that the claims fundamentally do not need a computer in the first place, and thus that the references to computers do not meaningfully limit the claims.  *See CyberSource*, 654 F.3d at 1373.  Likewise, it is clear that the claims redrafted as systems, software, service centers, or storage devices are also not patent-eligible because they simply perform the same patent-ineligible methods.  In *CyberSource*, the Federal Circuit held that a human performable abstract fraud-prevention method did not become patent-eligible merely by recasting it as a "computer readable medium containing program instructions" for performing the same method because the computer did not play a significant part.  654 F.3d at 1373-74.  Similarly, in *Accenture*, the Federal Circuit held that patent-ineligible methods directed to generating tasks to be performed in an insurance organization do not become patent-eligible by implementing essentially the same steps as a computerized "system."  728 F.3d at 1341-46.  The same is true here.  Simply using computers to perform the otherwise unpatentable abstract message-conversion idea more quickly or efficiently does not make it patent-eligible.

14

*See Bancorp*, 687 F.3d at 1278; *Dealertrack*, 674 F.3d at 1333; *buySAFE*, 2013 WL 3972261, at
*2.

### 2.    The Additional Limitations Do Not Make The Claims Patent-Eligible

The additional limitations recited in the independent and dependent claims also do not
make them patent-eligible because they only append routine features, field-of-use limitations, or
token extra-solution activity.

In the independent claims, apart from breaking the abstract message-conversion idea into
three basic steps and appending general purpose computer components, the only other features
are routine criteria for converting the messages.  Specifically, the independent claims provide
that the message is converted based on the destination device's capability to receive or display
the message or based on the communication channel over which the message is sent.  (*See, e.g.*,
'475 patent cl. 1, 12.)  But anyone would use those criteria to ensure that the message is
compatible with the recipient and with the means of transmission.  Moreover, ensuring
compatibility is itself nothing more than a well-understood abstract concept.  Thus, including
such criteria does not make the claims patent-eligible. *See, e.g.*, *Mayo*, 132 S. Ct. at 1294, 1298-99.

Similarly, the dependent claims only add well-understood steps, routine data-gathering,
or other token post-solution activity.  For example, several of the dependent claims provide that
"obtaining historical information ... related to the message communication by the sender and/or
receiver," "processing" that information "with the help of one or more algorithms," and
"estimating" which of the recipient's destination devices is preferred.  ('475 patent cl. 2, 10, 13,
24, 32.)  Other dependent claims further enumerate the types of historical information, such as
the receiver's or sender's preferences (*id.* at cl. 5, 16, 27, 35), the general types of algorithms
used to process the historical information, such as "predictive algorithms" or "learning
algorithms" (*id.* at cl. 4, 15, 26, 34) and criteria to use in "estimating" the preferred destination

15

device (*id.* at cl. 3, 11, 14, 25, 33). And the other dependent claims likewise specify inconsequential limitations. (*See id.* at cl. 7-8, 18-22, 29-30.) The patent does not, and could not, assert that any such steps are inventive and nothing in those limitations requires any specialized hardware or software. All of them are "well-understood, routine, conventional activity," mere data-gathering, or token post-solution limitations activity that does not make the claims patent-eligible. *See, e.g., Mayo*, 132 S. Ct. at 1294, 1298-99; *Bilski*, 130 S. Ct. at 3230; *Flook*, 437 U.S. at 589-90; *Dealertrack*, 674 F.3d at 1334.

C.     **The Claims Also Fail The Machine-Or-Transformation Test**

The '475 patent claims also fail both prongs of the so-called "machine-or-transformation test"—which, although not the "sole test," can be "a useful and important clue, an investigative tool, for determining whether some claimed inventions are [patentable] processes under § 101." *Bilski*, 130 S. Ct. at 3227. First, the patent claims are not tied to "a particular machine." *Dealertrack*, 674 F.3d at 1333-34. It is settled that "[s]imply adding a 'computer aided' limitation to a claim" does not make it tied to a "particular machine." *Id.* As discussed, the '475 patent at root does not require a computer at all, or at most recites only generic computer devices and software concepts. (*See supra* at § V.A, V.B.1.) Indeed, the patent stresses that the methods and devices "are *not inherently related to any particular* electronic component or other apparatus." ('475 patent at 10:14-16 (emphasis added).) That is the type of incidental use of a machine that the Federal Circuit has repeatedly found wanting. *See, e.g., CyberSource*, 654 F.3d at 1373, 1375; *Dealertrack*, 674 F.3d at 1333-34.

Second, the claims do not "transform[] a particular article into a different state or thing." *CyberSource*, 654 F.3d at 1369 (quotation and citation omitted). The Federal Circuit has made clear that "[t]he mere manipulation or reorganization of data … does not satisfy the transformation prong." *CyberSource*, 654 F.3d at 1375; *see also Bancorp*, 687 F.3d at 1273

(claim failed transformation prong because it did "not transform the raw data into anything other than more data").  The claims here, which are directed only to such data manipulation, do not involve a qualifying transformation.

The fact that the patent claims fail the machine-or-transformation test is itself compelling evidence that the '475 patent is invalid.  Regardless, even if the test were satisfied, the claims would still not be patent-eligible because the machine-or-transformation test does not "trump[]" the abstraction analysis.  *Mayo*, 132 S. Ct. at 1303.

## VI.    CONCLUSION

For the foregoing reasons, WhatsApp respectfully requests that the Court grant its motion to dismiss the Complaint because the '475 patent claims are invalid for failure to claim patent-eligible subject matter under 35 U.S.C. § 101.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

OF COUNSEL:

Douglas E. Lumish
Richard G. Frenkel
Natasa Pajic
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA  94025-1008
(650) 328-4600
doug.lumish@lw.com
rick.frenkel@lw.com
natasa.pajic@lw.com

Kyle A. Virgien
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-65438
(415) 391-0600
kyle.virgien@lw.com

April 7, 2014

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Defendant*
*WhatsApp Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2014, I caused the foregoing to be electronically filed

with the Clerk of the Court using CM/ECF, which will send notification of such filing to all

registered participants.

I further certify that I caused copies of the foregoing document to be served on April 7,

2014, upon the following in the manner indicated:

Gregory E. Stuhlman, Esquire                    *VIA ELECTRONIC MAIL*
Eve H. Ormerod, Esquire
GREENBERG TRAURIG, LLP
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
*Attorneys for Plaintiffs*

Michael A. Nicodema, Esquire                    *VIA ELECTRONIC MAIL*
Douglas R. Weider, Esquire
Jason H. Kislin, Esquire
GREENBERG TRAURIG, LLP
200 Park Avenue
Florham Park, NJ 07932
*Attorneys for Plaintiffs*

Jack B. Blumenfeld (#1014)