## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRIPLAY, INC. and TRIPLAY, LTD., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 13-1703-LPS |
| | ) |
| WHATSAPP INC., | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Presently pending before the Court is Defendant WhatsApp Inc.'s ("Defendant") motion

to dismiss for failure to state a claim, filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure (the "Motion"). (D.I. 7) Defendant argues that the claims of Plaintiffs TriPlay, Inc.

and TriPlay, Ltd.'s (collectively, "Plaintiffs") United States Patent No. 8,332,475 (the "'475

patent") are directed to non-patent-eligible subject matter under 35 U.S.C. § 101 ("Section 101").

(D.I. 8 at 1) For the reasons that follow, the Court recommends that Defendant's Motion be

GRANTED as to claim 12 of the '475 patent, and DENIED without prejudice as to the remaining

claims of the '475 patent.

## I.    BACKGROUND

### A.    Factual Background

Plaintiff TriPlay, Ltd. is an Israeli corporation and is the owner of the '475 patent. (D.I. 4

at ¶¶ 3, 12) Plaintiff Triplay, Inc., a Delaware corporation, is the exclusive licensee of the patent.

(*Id.* at ¶¶ 2, 12) The '475 patent is entitled "Messaging System and Method," and was issued on

December 11, 2012. ('475 patent at 1)[1]

---

[1]    A printout from the United States Patent and Trademark Office's ("PTO") website
of the text of the '475 patent was attached as an Exhibit A to Plaintiffs' Amended Complaint.

The specification of the '475 patent states that "[t]his invention relates to a field of electronic messaging and, in particular, to cross-platform messaging." ('475 patent, col. 1:5-6) At the time of patenting, the "versatility of contemporary electronic messaging services [wa]s growing and giving rise to new message formats and new devices with messaging capabilities." (*Id.*, col. 1:10-12) The specification lists examples of "[e]merging message formats" such as "MMS (Multimedia Message Service)" that complemented "traditional messaging services (e.g., e-mail, Short Message Service, instant messaging, etc.)." (*Id.*, col. 1:12-16) The adoption of these new messaging capabilities sometimes resulted in a situation where communication devices supported "different and not always compatible message and communication formats." (*Id.*, col. 1:16-19) The specification described this as "[t]he problem of cross-platform messaging[.]" (*Id.*, col. 1:20)

As a solution to this problem, the patent sets forth various systems and methods for converting the layout and format of messages from one electronic device, such as a cellular phone, to another, such as a personal computer. (*Id.*, col. 10:32-35; *see, e.g. id.*, cols. 5:22-8:60 (describing "aspects" of the invention)). These systems and methods generally involve adapting or converting the layout and/or format of a message based on criteria relating to the communication or display capabilities of the destination device, or to the communication media between the originating and destination devices. (*See, e.g., id.*, cols. 5:22-45, 6:36-59, 7:1-19, 7:30-53, 16:24-30) Changes to the layout of a message may include, for example, truncating a

(D.I. 4, ex. A) A more complete version of the '475 patent, which includes the patent's figures, was attached as Exhibit A to Defendant's opening brief. (D.I. 8, ex. A) References to the "'475 patent" in this Report and Recommendation will refer to the column and line numbers of Exhibit A to Defendant's opening brief, which is the version of the document that the parties relied upon at oral argument.

portion of the message, substituting text for graphical elements of the message, or a reduction in the quality of an image. (*Id.*, cols. 21:22-22:12) Message formats subject to adaptation or conversion may include "text (including rich text), video format (e.g. MPEG family, WMV family, 3GPP, etc.), audio format (e.g. AMR family, MPEG audio layers, AAC, MIDI, etc.), image format (e.g. JPEG, GIF, BMP[,] etc.), and others." (*Id.*, col. 12:18-21)

The patent specification recognizes that electronic messaging devices existed in the prior art, (*id.*, col. 10:27-42), and that various prior art "transcoding functionalities" existed to enable conversion of a message from one format or layout to another, (*id.*, col. 16:24-34). Likewise, the networks (or combinations of networks) upon which such messages are sent were known in the prior art. (*Id.*, col. 11:40-43) All told, the specification includes a list of 18 specific prior art systems addressing "the problem of cross-platform messaging[.]" (*Id.*, cols. 1:20-5:18).

The patent has 42 claims, including 14 independent claims and 28 dependent claims. The independent claims cover variations of the idea of using criterion relating to the capabilities of the destination device, or to the communication media, in order to convert a message from an originating device. Claim 1, for example, reads as follows:

> **1.** A system for message communication via a communication media between one or more originating communication devices assigned to a sender and one or more destination communication devices assigned to a receiver, the system comprising:
>
> a) an access block configured to receive, directly or indirectly, from at least one originating communication device a message having initial characteristics comprising, at least message format and an initial message layout, and to transmit the message to at least one destination communication device;
>
> b) a media block operatively coupled to said access block and

3

configured to select, before transmitting, at least one
message format and a message layout for each of the at
least one message formats fitting to each of said at least one
destination device, and to then convert at least said initial
message layout to the selected message layouts, said
selection and conversion being done in accordance with at
least one criterion selected from a group comprising:

   i)   criterion related to message communication
capabilities of the destination communication device
with regard to message communication capabilities of
the originating communication device;

   ii)   criterion related to message displaying capabilities of
the destination communication device with regard to
message communication capabilities of the originating
communication device; and

   iii)   criterion related to the communication media.

(*Id.*, col. 23:6-34) Claim 12 is a method claim variation of the same idea:

**12.** A method of message communication via a messaging
system between one or more originating communication devices
assigned to a sender and one or more destination communication
devices assigned to a receiver, the method comprising:

   a)   before delivery to the receiver, obtaining by a messaging
system a message having initial characteristics comprising,
at least, a message format and an initial message layout;

   b)   selecting a message layout and converting at least said
initial message layout to said selected message layout to
form an adapted message layout in accordance with at least
one criterion selected from a group comprising:

       i)   criterion related to message communication
capabilities of the destination communication device
with regard to message communication capabilities of
the originating communication device;

       ii)   criterion related to message displaying capabilities of
the destination communication device with regard to

> > message communication capabilities of the originating
> > communication device; and
>
> > iii)  criterion related to communication media between
> > originating and destination device; and
>
> c)  facilitating delivery of the adapted message to the receiver.

(*Id.*, cols. 24:55-25:12)  The dependent claims include additional limitations, such as the use of

multiple communication devices assigned to a single receiver, (*id.* at claim 2), messages having

layouts based on templates with unique identifiers (*id.* at claim 6), and interactive messages (*id.*

at claim 7).

According to the Second Amended Complaint, WhatsApp infringes the '475 patent by

using and selling the "WhatsApp Messenger System," a cross-platform messaging product which

is alleged to infringe at least claims 1 and 12 of the '475 patent.  (D.I. 46 at ¶¶ 19-20)  Exhibit C

to that Complaint sets forth Plaintiffs' allegations of infringement in some detail, including a

description of the WhatsApp Messenger "app," which "is available for iPhone, Blackberry,

Android, Windows Phone and Nokia," and allows users to exchange messages between their

devices "without having to pay for SMS."  (D.I. 46 at ex. C ["Infringement Chart"], at 1

(emphasis omitted))  Plaintiffs' Infringement Chart alleges that the WhatsApp Messenger app

uses a server as an intermediary to receive messages, to convert the layout of a message to one

that is suitable for the recipient's mobile devices, and then to transmit the messages to the

recipient's mobile devices.  (*Id.* at 33, 35-36, 45-46, 52-60)

## B.    Procedural Background

Plaintiffs commenced this action on October 15, 2013, and filed their Amended

Complaint on October 16, 2013.  (D.I. 1, 4)  Defendant filed the instant Motion in lieu of

5

answering, (D.I. 7), and briefing was completed on the Motion on May 15, 2014.[2] The Motion

was referred to the Court for resolution by Chief Judge Leonard P. Stark on May 20, 2014. (D.I.

19) Oral argument was held on October 17, 2014. Both before and after oral argument, the

parties filed several notices of supplemental authority. (D.I. 21, 22, 24, 27, 28, 30, 34, 35, 40, 42,

43, 50, 51) As the law relevant to the Motion has continued to develop substantially since the

completion of briefing, the Court has considered the full content of these notices in resolving the

Motion.

## II.     APPLICABLE LEGAL STANDARDS

### A.     Articulation of the Standard of Review

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss the

plaintiff's complaint based on the failure to state a claim upon which relief can be granted. Fed.

R. Civ. P. 12(b)(6). The sufficiency of pleadings for non-fraud cases is governed by Federal Rule

of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the

pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss

pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true,

to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(internal quotation marks and citation omitted). In assessing the plausibility of a claim, the court

must "'construe the complaint in the light most favorable to the plaintiff, and determine whether,

under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Fowler v.*

---

[2]     A Second Amended Complaint, referenced above, was filed on March 6, 2015,
adding infringement allegations relating to a second patent. (D.I. 46 at 1) The parties stipulated
that the time to answer the Second Amended Complaint would be extended until 21 days after
the issuance of this Report and Recommendation. (D.I. 48 at 1)

6

*UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

Here, the Motion filed pursuant to Rule 12(b)(6) is used to assert an affirmative defense. In such cases, dismissal is permitted only if the well-pleaded factual allegations in the complaint, construed in the light most favorable to the plaintiff, suffice to establish the defense. *See Jones v. Bock*, 549 U.S. 199, 215 (2007); *Kabbaj v. Google, Inc.*, Civ. No. 13-1522-RGA, 2014 WL 1369864, at \*2 n.2 (D. Del. Apr. 7, 2014); *see also Genetic Techs. Ltd. v. Agilent Techs., Inc.*, 24 F. Supp. 3d 922, 927 (N.D. Cal. Mar. 7, 2014).

Patentability under Section 101 is a "threshold inquiry" and a question of law. *In re Bilski*, 545 F.3d 943, 950-51 (Fed. Cir. 2008), *aff'd, Bilski v. Kappos*, 561 U.S. 593 (2010). Yet this question of law is also one that "may be informed by subsidiary factual issues[.]" *CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 715 (D. Del. 2012) (citing *In re Comiskey*, 554 F.3d 967, 976 (Fed. Cir. 2009)). Certain members of the United States Court of Appeals for the Federal Circuit have recently suggested that "any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence." *CLS Bank Int'l v. Alice Court Pty. Ltd.*, 717 F.3d 1269, 1304-05 (Fed. Cir. 2013) (Rader, J., concurring-in-part and dissenting-in-part).[3]

---

[3]     In their briefing, Plaintiffs rely heavily on the Federal Circuit's decision in *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335 (Fed. Cir. 2013) ("*Ultramercial II*"), a case in which the Federal Circuit considered a district court's dismissal of a patent infringement complaint on Section 101 grounds, pursuant to Rule 12(b)(6). (*See, e.g.,* D.I. 11 at 1, 13) Plaintiffs cite *Ultramercial II, inter alia*, for the propositions that "lack of subject matter eligibility must be proven by clear and convincing evidence" and that a patent claim can only be found to be patent-ineligible subject matter at the pleading stage if the "'*only* plausible reading of the patent [is that there is] clear and convincing evidence of ineligiblity.'" (*Id.* at 13 (internal quotation marks omitted) (emphasis in original)) *Ultramercial II* recited these standards while

7

However, even assuming that the "clear and convincing" evidence standard is applicable

to Section 101 challenges,[4] it would apply only to the resolution of factual disputes, not to the

resolution of pure issues of law. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2242-43

(2011) (analyzing the burden on validity challenges brought under 35 U.S.C. §§ 102 & 103,

noting that these challenges involve "factual questions[,]" and concluding that invalidity defenses

must be proven by clear and convincing evidence); *see also id.* at 2253 (Breyer, J., concurring)

---

also concluding that "it will be rare that a patent infringement suit can be dismissed at the
pleading stage for lack of patentable subject matter[,]" and that a Section 101 analysis, "while
ultimately a legal determination, is rife with underlying factual issues." 722 F.3d. at 1338-39
(noting that such factual issues might include those relating to a determination of whether the
patent embraces an abstract idea, or whether "'genuine human contribution'" is required that
amounts to more than "'a trivial appendix to the underlying abstract idea,' [which was] not at the
time of filing 'routine, well-understood, or conventional[]'") (citations omitted).

     *Ultramercial II* was subsequently vacated by the Supreme Court of the United States,
without consideration of the merits, in light of the Supreme Court's decision in *Alice Corp. Pty.
Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014). *See WildTangent, Inc. v. Ultramercial, LLC*, 134
S. Ct. 2870 (2014). It therefore lacks precedential effect. *See Genetic Techs. Ltd. v. Bristol-
Myers Squibb Co.*, — F. Supp. 3d —, 2014 WL 5507637, at *4 (D. Del. Oct. 30, 2014); *Loyalty
Conversion Sys. Corp. v. Am. Airlines, Inc.*, — F. Supp. 3d —, 2014 WL 4364848, at *10 n.5
(E.D. Tex. Sept. 3, 2014) (Bryson, J., sitting by designation). The Federal Circuit then issued a
new decision in the *Ultramercial* case, reversing its prior decision and finding that the claims at
issue there did not cover patent eligible subject matter. *Ultramercial, Inc. v. Hulu, LLC*, 772
F.3d 709, 711-12 (Fed. Cir. 2014) ("*Ultramercial III*"). In that new decision, the Federal Circuit
did not set out in detail an articulation of the standard of review for a Section 101 challenge at
the pleading stage. Nor did the Federal Circuit comment on whether the typical Section 101
challenge is in fact often likely to be "rife with factual disputes." *Id.* at 711-17 (concluding
simply that "[b]ecause the [patent-in-suit's] claims are directed to no more than a patent-
ineligible abstract idea, we conclude that the district court did not err in holding that the [patent-
in-suit] does not claim patent-eligible subject matter."). Subsequently, in *Content Extraction &
Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1345-1349 (Fed. Cir. 2014),
the Federal Circuit again affirmed a dismissal under Section 101 at the Rule 12(b)(6) stage
without discussion of any disputed issues of fact.

     [4]      In a concurring opinion in *Ultramercial III*, Judge Mayer concluded that in no
circumstance should any presumption of eligibility attend the Section 101 inquiry. *Ultramercial
III*, 772 F.3d at 720-21 (Mayer, J., concurring).

(noting that "the evidentiary standard of proof applies to questions of fact and not questions of law" and that "[m]any claims of invalidity rest . . . not upon factual disputes, but upon how the law applies to facts as given" such that where "the ultimate question of patent validity turns on the correct answer to legal questions [including] how [a legal standard] appl[ies] to the facts as given [then the clear and convincing] standard of proof has no application."). Thus, this standard would be inapplicable in the Section 101 context if there are no disputed issues of fact that bear on the ultimate question of subject matter eligibility. *Cf. Genetic Technologies Ltd. v. Bristol-Myers Squibb Co.*, — F. Supp. 3d —, 2014 WL 5507637, at *15 (D. Del. Oct. 30, 2014); *Calif. Inst. Of Tech. v. Hughes Commc'ns Inc.*, — F. Supp. 3d. —, 2014 WL 5661290, at *2 n.6 (C.D. Cal. Nov. 3, 2014).[5]

## B.  Need for Claim Construction

There is no hard-and-fast rule that a court must construe terms in the claims at issue before it performs a Section 101 analysis. *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012) ("[W]e perceive no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under [Section] 101.") On the other hand, the Federal Circuit has also noted that "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a [Section] 101

---

[5]      Additionally, it is less than clear how the "clear and convincing" standard would apply at all in the Rule 12(b)(6) context, where to the extent that there are disputes of fact, those facts are already construed in the light most favorable to Plaintiffs. *See Modern Telecom Sys. LLC v. Earthlink, Inc.*, No. SA CV 14-0347-DOC, 2015 WL 1239992, at *7-8 (C.D. Cal. Mar. 17, 2015) (holding that the clear and convincing evidence standard is not applicable to a motion to dismiss under Section 101, and stating that "[b]ecause, ordinarily, no evidence outside the pleadings is considered in resolving a motion to dismiss or a motion for judgment on the pleadings, it makes little sense to apply a 'clear and convincing evidence' standard—a burden of *proof*—to such motions") (emphasis in original).

analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Id.*

When assessing Rule 12 motions seeking dismissal on Section 101 grounds, courts have taken different approaches regarding the issue of claim construction. In those cases where it was not necessary to engage in claim construction in order to address the Section 101 legal issue (or where a plaintiff did not sufficiently articulate why it was necessary to do so), the courts have simply gone on to resolve the motion without construing claim terms. *See, e.g.*, *Cogent Med., Inc. v. Elsevier Inc.*, — F. Supp. 3d —, 2014 WL 4966326, at *3 (N.D. Cal. Sept. 30, 2014) (finding that a claim construction analysis was "not necessary" in order to determine that certain claims were not eligible for patenting under Section 101); *Open Text S.A. v. Alfresco Software Ltd*, Case No. 13-cv-04843-JD, 2014 WL 4684429, at *3 (N.D. Cal. Sept. 19, 2014) (same, where "the parties have not sought construction of any terms . . . and this lack of dispute over the proper construction of the asserted claims confirms that it is unnecessary to engage in claim construction before addressing validity under Section 101"); *cf. Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 992 (Fed. Cir. 2014) (holding that a patent claim was subject matter ineligible under Section 101 where the district court did not engage in claim construction, and where the plaintiff "d[id] not explain which terms require construction or how the analysis would change"). Alternatively, where the meaning of a key claim term was clearly disputed—but where even if plaintiff's proposed construction was adopted, the motion would still be well taken—courts have adopted plaintiff's proposed construction for purposes of the motion and have gone on to resolve the motion in defendant's favor. *See Genetic Technologies Ltd. v. Lab. Corp. of Am.*, Civil Action No. 12-1736-LPS-CJB, 2014 WL 4379587, at *5-6 (D.

10

Del. Sept. 3, 2014) (citing cases); *cf. Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) (concluding at the Rule 12(b)(6) stage that "even when construed in a manner most favorable to [defendant], none of [defendant's] claims amount to significantly more than the abstract idea [at issue]") (internal quotation marks and citations omitted).

Yet in other such cases, where the parties disputed the appropriate construction to be given to key claim terms, courts have declined to rule on Rule 12 motions prior to engaging in claim construction. *See Data Distribution Technologies, LLC v. BRER Affiliates, Inc.*, Civil No. 12-4878 (JBS/KMW), 2014 WL 4162765, at \*8 (D.N.J. Aug. 19, 2014) (denying without prejudice a Section 101 motion at the pleading stage and reserving a decision until after *Markman* where, *inter alia*, the patent-in-suit contained 100 claims, the plaintiff failed to propose relevant claim constructions and the parties did not agree as to the meaning of key claim terms); *see also Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, — F. Supp. 2d —, 2014 WL 4364848, at \*4 (E.D. Tex. Sept. 3, 2014) (Bryson, J., sitting by designation) (noting that the Court waited to resolve a Rule 12(c) motion implicating Section 101 until after a *Markman* hearing was held, so as to ensure that "there [we]re no disputed issues of claim construction that would affect the proper analysis of the patentability of the asserted claims"). A denial of such a motion without prejudice may amount to a decision that there are possible constructions of key claim terms that, if adopted, could render the claims subject matter eligible. *See Data Distribution Techs*, 2014 WL 4162765 at \*8, \*15 (noting that, with key claim constructions disputed, defendant could not meet is burden to show that the claims were subject matter ineligible).

11

## III. DISCUSSION

Defendant moves to dismiss Plaintiffs' Complaint on the basis that the '475 patent is drawn to non-patent-eligible subject matter under Section 101. (D.I. 8 at 1)

Before moving forward with its analysis, the Court addresses a threshold issue. With its Motion, Defendant seeks a ruling that all 42 claims of the patent-in-suit are not directed to patent-eligible subject matter. However, in arguing the Motion's merits, Defendant has focused primarily on claims 1 and 12 of the '475 patent—the two claims clearly asserted in the Amended Complaint, (D.I. 4 at ¶ 21), and the Second Amended Complaint, (D.I. 46 at ¶ 24). Indeed, in its briefing, Defendant barely touched upon the 40 remaining claims, addressing the subject matter eligibility of some of them in little more than half a sentence. (*See, e.g.*, D.I. 8 at 15-16 (addressing, in one brief paragraph, claims 2-5, 7-8, 10-11, 13-16, 18-22, 24-27, 29-30, and 32-35)) Defendant has suggested that the Court need not separately (i.e., on a claim-by-claim basis) evaluate whether every claim of the patent is subject matter eligible. Instead, it argues that so long as the Court analyzes one claim that is "sufficiently similar" to others, then if the Court determines that this examined claim is not subject matter eligible, it may summarily make the same determination as to the other similar claims. (D.I. 17 at 5-6 (citing cases))

In the present case, the Court declines to address claims other than claims 1 and 12. Defendant provided little analysis as to whether claims 1 and 12 are, in fact, representative of the remaining claims—and, as described above, there are real differences among those claims. And from a procedural and practical perspective, a process in which a defendant seeks to have large groups of claims ruled subject matter ineligible after giving negligible attention to them strikes the Court as unfair and fraught with the potential for problematic decisionmaking. In the end, as

12

the moving party, Defendant bears the burden to demonstrate that its asserted Section 101 defense is well taken as to each claim. In the absence of significant discussion regarding claims other than claims 1 and 12, the Court finds that Defendant has not carried its burden as to those claims. Therefore, below, the Court will address only claims 1 and 12—the two claims that are clearly asserted in the litigation and to which Defendant has, in fact, put forward substantial argument.[6]

With that as prologue, the Court will now turn first to the general framework for a Section 101 analysis, and will then apply the relevant principles to asserted claims 1 and 12 of the '475 patent.

### A. Patentable Subject Matter

Patent-eligible subject matter is defined in Section 101 of the Patent Act:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101. In choosing such expansive terms "modified by the comprehensive 'any,'" Congress plainly contemplated that the patent laws would be given wide scope." *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980).

---

[6] *See, e.g., Genetic Techs.*, 2014 WL 5507637, at *4 n.5 (reviewing a Rule 12(b)(6) motion as to the issue of patentable subject matter, and addressing only the single clearly asserted claim, where the motion involved all claims of the patents-in-suit); *Genetic Techs.*, 2014 WL 4379587, at *3 n.4 (addressing, in reviewing a Rule 12(b)(6) motion as to the issue of patentable subject matter, the one clearly asserted claim that received the "lion's share" of the parties' focus); *Tuxis Techs., LLC v. Amazon.com, Inc.*, Civil Action No. 13-1771-RGA, 2014 WL 4382446, at *1, n.1 (D. Del. Sept. 3, 2014) ("Claim 1 is the only claim that received any significant attention during the briefing and oral argument. Therefore, the Court's invalidity determination is confined to that claim.").

13

Yet while the scope of Section 101 is broad, there is an "important implicit exception [to it]: [l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (internal quotation marks and citation omitted); *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012). "'Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, [because] they are the basic tools of scientific and technological work.'" *Prometheus*, 132 S. Ct. at 1293 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

The Supreme Court of the United States, however, has also recognized that "too broad an interpretation of this exclusionary principle could eviscerate patent law." *Id.*; *see also Alice*, 134 S. Ct. at 2354. This is because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Prometheus*, 132 S. Ct. at 1293; *see also Alice*, 134 S. Ct. at 2354. To that end, it has explained that "an *application* of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." *Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (emphasis in original); *see also Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948) ("If there is to be invention from [a discovery of a law of nature], it must come from the application of the law of nature to a new and useful end.") (internal quotation marks omitted).

In terms of the process used to analyze patent eligibility under Section 101, the Federal Circuit has explained that a court should first identify whether the claimed invention fits within one of the four statutory classes set out in the statute. *Ultramercial III*, 772 F.3d at 713-14; *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir.

14

2013). The court must then assess whether any of the judicially recognizable exceptions to

subject matter eligibility apply, including whether the claims are to patent-ineligible abstract

ideas. *Ultramercial III*, 772 F.3d at 714; *Accenture Global Servs.*, 728 F.3d at 1341.[7]

In *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347, 2354 (2014), the

Supreme Court confirmed the framework to be used in order to distinguish patents that claim

laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible

applications of those concepts:

> First, we determine whether the claims at issue are directed to one
> of those patent-ineligible concepts. . . . If so, we then ask, "[w]hat
> else is there in the claims before us?" . . . To answer that question,
> we consider the elements of each claim both individually and "as an
> ordered combination" to determine whether the additional elements
> "transform the nature of the claim" into a patent-eligible
> application. . . . We have described step two of this analysis as a
> search for an "'inventive concept'"—*i.e.*, an element or
> combination of elements that is "sufficient to ensure that the patent
> in practice amounts to significantly more than a patent upon the
> [ineligible concept] itself."

*Alice*, 134 S. Ct. at 2355 (quoting *Prometheus*, 132 S. Ct. at 1294-98) (citations omitted;

alterations in original); *see also Parker v. Flook*, 437 U.S. 584, 594 (1978). Since *Alice*, the

Federal Circuit has recognized that "[d]istinguishing between claims that recite a patent-eligible

invention and claims that add too little to a patent-ineligible abstract concept can be difficult, as

the line separating the two is not always clear." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773

F.3d 1245, 1255 (Fed. Cir. 2014).

---

[7]      There is no dispute that since claim 1 is a system claim and claim 12 is a method
claim, they both fall within a Section 101 statutory class. The dispute here is about whether the
claims are drawn to a patent-ineligible abstract idea, and so the Court will focus its analysis on
that issue.

### B.     Analysis

#### 1.     *Alice's* step one:  Are the claims directed to an abstract idea?

The first step of the analysis set forth in *Alice* is to determine whether the claims are

"directed to [a] patent-ineligible concept[]" (here, an abstract idea).  *Alice*, 134 S. Ct. at 2355.  In

this case, this threshold issue was in vigorous dispute.

In *Alice*, the Supreme Court provided guidance as to when a claim is "directed to" a

patent-ineligible abstract idea.  "The 'abstract ideas' category embodies 'the longstanding rule

that [a]n idea of itself is not patentable.'"  *Alice*, 134 S. Ct. at 2355 (quoting *Gottschalk*, 409 U.S.

at 67) (certain quotation marks omitted) (alteration in original).  The abstract idea can be, but

need not amount to, a "'preexisting, fundamental truth'" about the natural world "that has always

existed[,]" or a "method of organizing human activity" (such as a "longstanding commercial

practice").  *Id.* at 2356-57 (quoting *Bilski*, 561 U.S. at 599) (internal quotation marks and

citations omitted); *DDR Holdings*, 773 F.3d at 1256; *cf. CLS Bank*, 717 F.3d at 1286 (explaining

that a claim directed to an abstract idea is one directed to a "disembodied concept . . . a basic

building block of human ingenuity, untethered from any real-world application") (internal

quotation marks and citations omitted).  The *Alice* Court found that beyond this, it did not need

to "labor to delimit the precise contours of the 'abstract ideas' category[,]" as there was "no

meaningful distinction" between the abstract idea at issue in the claims there (regarding the

concept of intermediated settlement) and those at issue in its prior decision in *Bilski v. Kappos*,

561 U.S. 593 (2010).

Defendant here has expressed the alleged abstract idea in several ways, but the common

thread amongst those articulations has been that the claims attempt to patent the abstract idea of

16

"converting and forwarding messages." (D.I. 8 at 8; *see also* D.I. 33, Transcript of October 17, 2014 Oral Argument ("Tr.") at 11 (Defendant's counsel describing the abstract idea at issue as "taking any kind of message, converting it to a different layout depending on where you're sending it, and sending it there"))[8] According to Defendant, the "independent claims [of the '475 patent] each perform the three basic steps of the message conversion concept—i.e., receiving a message from one device, converting its layout to ensure compatibility with the destination device, and then sending it to the destination device." (D.I. 8 at 4)

Plaintiffs, in contrast, argue that the claims do not implicate an abstract idea at all. (D.I. 11 at 16) Instead, they argue, the '475 patent "claims a purely technological, computerized solution to a purely technical problem, an intermediary messaging system with specific functionality for addressing differing electronic messaging layouts and formats between originating and destination devices."[9] (*Id.*); *see DDR Holdings*, 773 F.3d at 1255 (affirming

---

[8]    In its opening brief alone, Defendant included at least four similar, though slightly different, expressions of what was the alleged abstract idea at issue as to claims 1 and 12. (*See, e.g.*, D.I. 8 at 2 ("converting messages from one layout to another"); *id.* at 3 ("converting and passing messages between different types of devices"); *id.* at 8 (the "age-old abstract idea of converting and forwarding messages"); *id.* at 9 ("The fundamental message conversion concept at issue here . . . is . . . broken down into the basic steps of receiving a message, converting the message's layout, and transmitting the converted message . . . .")) Defendant's reply brief characterized the idea as "the abstract concept of converting and sending messages," (D.I. 17 at 8, 9), and its "Reply Regarding Supplemental Authorities" phrased the idea as "converting and forwarding messages or information[,]" (D.I. 28 at 1).

[9]    Plaintiffs devote a section of their answering brief to describing a similar patent application that was filed by Defendant, and argue that the '475 patent claims raise no "[a]bstractness [c]oncerns" because they cover "the same solution to the same problem" as the patent application that Defendant previously filed. (D.I. 11 at 11-12, 16 (emphasis omitted)) Plaintiffs have cited no authority for the proposition that the content of a previous patent application filed by Defendant is relevant to whether the '475 patent's claims are patent eligible, simply by virtue of the fact that the application was filed. *See McRO, Inc. v. Atlus U.S.A.*, No. SACV 13-1870-GW(FFMx), 2014 WL 4772196, at *7 (C.D. Cal. Sept. 22, 2014) (rejecting as

patent eligibility where "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks"). Plaintiffs emphasize that "the problem of facilitating cross-platform *electronic* messaging did not even exist before the Information Age," and that it therefore cannot be an "age-old 'abstract idea[.]'" (*Id.* (emphasis in original)) These technical features, Plaintiffs argue, "cannot be divorced from computers or machines[,]" and "[t]he entirety of the invention outlined in the '475 patent is tied to the functioning of machines, namely the intermediary messaging system and the originating and destination devices that communicate with the intermediary messaging system." (*Id.* at 17-18) Plaintiffs' argument then, at its core, is that the claims are inextricably tied to electronic messaging, and that fact alone takes the claims out of the realm of those "directed to" an abstract idea. (D.I. 11 at 18 ("Indeed there are no electronic messages at all without computers. Nor can electronic messaging be done in the human mind or by using a pen and paper."))

In cases like this, the *Alice* step one analysis can turn on how far a court goes in peeling back a claim's limitations while trying to divine what the claim is "really" directed to. In the Court's view, the recent Federal Circuit case that most clearly explains the process that a court should use in applying step one to claims like these is the decision in *Ultramercial III*. That case dealt with claims relating to "a method for distributing copyrighted media products over the Internet where the consumer receives a copyrighted media product at no cost in exchange for viewing an advertisement, and the advertiser pays for the copyrighted content." *Ultramercial III*,

---

irrelevant a counter-argument made in a Section 101 dispute that sought to compare the challenged patents to the challenger's patents, and stating that "it is hard to fault anyone for seeking patents that may turn out to be invalid where the applicable standards are shifting and uncertain.").

772 F.3d at 712.  The representative claim at issue involved eleven steps, which the Federal

Circuit characterized as follows:

> (1) receiving copyrighted media from a content provider; (2)
> selecting an ad after consulting an activity log to determine
> whether the ad has been played less than a certain number of times;
> (3) offering the media for sale on the Internet; (4) restricting public
> access to the media; (5) offering the media to the consumer in
> exchange for watching the selected ad; (6) receiving a request to
> view the ad from the consumer; (7) facilitating display of the ad;
> (8) allowing the consumer access to the media; (9) allowing the
> consumer access to the media if the ad is interactive; (10) updating
> the activity log; and (11) receiving payment from the sponsor of
> the ad.

*Id.* at 714-15.

The Court determined that these claimed steps "recite[] an abstraction—an idea, having

no particular concrete or tangible form." *Id.* at 715.  Despite the fact that some of the steps

involved acts such as receiving or displaying information, or implicated the use of the Internet,

the Federal Circuit held that the claims were ultimately directed to an abstract idea:

> The process of receiving copyrighted media, selecting an ad,
> offering the media in exchange for watching the selected ad,
> displaying the ad, allowing the consumer access to the media, and
> receiving payment from the sponsor of the ad all describe an
> *abstract idea, devoid of a concrete or tangible application.*

*Id.* at 715 (emphasis added).  In coming to this conclusion, the Federal Circuit looked to the

claim as a whole, and found that "[a]lthough certain additional limitations, such as consulting an

activity log, add a degree of particularity, the concept embodied by the *majority of the limitations*

describes only the abstract idea of showing an advertisement before delivering free content." *Id.*

(emphasis added); *see Hewlett Packard Co. v. ServiceNow, Inc.*, Case No. 14-cv-00570-BLF,

2015 WL 1133244, at *5-6 (N.D. Cal. Mar. 10, 2015) (applying the "majority of the limitations"

language from *Ultramercial III* to hold that a claim was directed to an abstract idea).

Like the patent at issue in *Ultramercial III*, the "majority of the limitations" of the claims at issue in the '475 patent describe only an abstract idea: the idea of converting and forwarding messages, so that the messages are sent in a format and layout in which they can be received by a recipient. That is, taking claim 12 for example, the claim involves obtaining a message having a certain format and layout (step a); converting that prior layout to one that relates to the recipient's particular messaging capabilities, or to the nature of the communications media that exists between the sender and recipient (step b, performed according to steps i, ii or iii); and then sending the adapted message to the recipient (step c).[10] Similar to the claims in *Ultramercial III*, each of these steps represents an abstraction, lacking any concrete or tangible application, and their articulation accounts for much of the claim's language and limitations overall.

More specifically, steps a and c recite the act of obtaining a message and "facilitating delivery" of that message. These steps do not have any concrete form, they do not specify a structure for the message, and they do not specify *how* the message is received or delivery is facilitated. The patent at issue in *Ultramercial III* likewise involved steps of "receiving" copyrighted media and "facilitating" the display of a sponsor message, and the Court there held that those steps "describe an abstract idea, devoid of a concrete or tangible application." *Ultramercial III*, 772 F.3d at 712, 715-16; *see also Intellectual Ventures I, LLC v. Motorola Mobiility LLC*, Civ. No. 11-908-SLR, 2015 WL 846532, at *7 (D. Del. Feb. 24, 2015) ("Although [the patentee] argues that the invention consists of more than the application of an

---

[10]     These steps are set forth in a straightforward manner in claim 12. ('475 patent, cols. 24:55-25:12) Claim 1 recites a system with components that are "configured to" perform similar steps. (*Id.*, col. 23:5-34)

abstract concept on a computer by virtue of reciting a 'specific technological solution,' the claims generically recite the steps of 'presenting,' 'sending,' and 'receiving,' with no description of the underlying programming.").

Step b of claim 12 suffers from the same problems. It encompasses the idea of "converting" a message from one layout to another, but it does not specify *how* the layout is converted. ('475 patent, cols. 23:17-34, 24:64-25:10) It states that the message layout is converted based on one of several criteria, but those criteria are identified only in the abstract (such as "criterion related to [the] communication media between [the] originating and destination device[s]"). (*Id.*, col. 25:9-10) The claims are not limited to any specific criteria, any particular kind of messages, or even any method of conversion.[11] (*Id.*) Thus, step b simply encompasses the abstract idea of converting message layouts generally.

To be sure, claim 12 does reference certain seemingly concrete elements, such as the originating and destination communication devices, and the "messaging system" that acts as an intermediary and converts the messages. Similarly, claim 1 includes an "access block" and a "media block[,]" which could be argued to possess a particularized form, depending on their construction. But the mere presence of *some* concrete claim elements—even elements associated with computer- or Internet-based technology—is insufficient to indicate that the claims as a whole are not directed to an abstract idea, if those elements are well overtaken in the claim by the articulation of the abstract idea itself. *See, e.g.*, *Ultramercial III*, 772 F.3d at 715-16 (holding that the claim was abstract even though "certain additional limitations . . . add a degree of

---

[11]     As described in the specification, the actual conversion can done using any conventional prior art system. ('475 patent, col. 16:30-34)

particularity[,]" because "the concept embodied by the majority of the limitations describes only the abstract idea"); *see also Content Extraction*, 776 F.3d at 1345-48 (addressing a claim involving "extracting data from hard copy documents using an automated digitizing unit such as a scanner" and "storing [that] information . . . into memory locations" using software on a computer, and holding that the claim was nevertheless directed toward an abstract idea under step one of the *Alice* test).

The Federal Circuit's holding in *Dealertrack, Inc. v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012), is also helpful in illustrating this point. In *Dealertrack*, the Court addressed a claim that involved sending data between "remote . . . device[s]" using an intermediary. *Id.* at 1331-32. The requirement of such devices and the intermediary in the claim did not deter the Court from concluding that the claim was directed to an abstract idea. *Id.* at 1333. Instead, the *Dealertrack* Court looked at the claimed process "in its simplest form[,]" and found that the claim "includes three steps: receiving data from one source . . . , selectively forwarding the data . . . , and forwarding reply data to the first source[.]" *Id.* at 1333. It found that this amounted to the "'basic concept' of processing information through a clearinghouse"—despite the fact that the claim, as written, involved an electronic message sent between prior art electronic devices, through the computerized intermediary. *Id.*[12] As in *Dealertrack*, here, regardless of the presence

---

[12]    *See also Cyberfone Sys., LLC*, 558 F. App'x at 991-92 (finding that a claim involved an abstract idea—that of "using categories to organize, store, and transmit information"—when the claim involved a method of obtaining data transaction information entered on a telephone, separating it into component parts, and sending those parts to different destinations); *Accenture Global Servs.*, 728 F.3d at 1341 (describing, as to a claim involving a computer-based system for generating tasks in an insurance organization, the abstract idea involved in the claim as "'generating tasks [based on] rules . . . to be completed upon the occurrence of an event.'") (citation omitted).

of certain computer-related limitations, the lion's share of the claim elements in claims 1 and 12 of the '475 patent are directed to the abstract idea, not to any particularized or tangible application of that idea. *See id.; see also Ultramercial III*, 772 F.3d at 714-16.

Lastly, the Court addresses the Federal Circuit's recent opinion in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014). There, the Federal Circuit appeared to suggest that the claims of a patent relating to the handling of Internet hyperlinks in an online store were not directed to an abstract idea under step one of the *Alice* test.[13] The claims in *DDR Holdings*

---

[13]     At no point in *DDR Holdings* does the Federal Circuit *explicitly* state that the claims at issue there are or are not directed to an abstract idea. This has created some confusion regarding whether or not such a conclusion was a part of the holding in the case. *Compare Smartflash LLC v. Apple Inc.*, CASE Nos. 6:13cv447-JRG-KNM, 6:13cv448-JRG-KNM, 2015 WL 661174, at *5 (E.D. Tex. Feb. 13, 2015) (concluding that *DDR Holdings* found that the asserted claims "might be characterized as an allegedly abstract idea" but found that the claims satisfied *Alice*'s step two), *and MyMedicalRecords, Inc. v. Walgreen Co.*, No. 2:13-CV-00631-ODW (SHx), 2014 WL 7339201, at *4 (C.D. Cal. Dec. 23, 2014) (describing *DDR Holdings* as "[h]aving found the [patent's] claims directed to a patent-ineligible idea" under step one of the *Alice* test), *with* (D.I. 43, ex. B at 4, 5-6 (showing, in an excerpt from the PTO's Examination Guidance and Training Materials, that the PTO characterizes *DDR Holdings* as having found that the claims there were patent-eligible under step one of the *Alice* test)), *and KomBea Corp. v. Noguar L.C.*, — F. Supp. 3d. —, 2014 WL 7359049, at *5 (D. Utah Dec. 23, 2014) (determining that *DDR Holdings* "found that the patents were not directed toward an abstract idea").

In the Court's view, the decision in *DDR Holdings*, at a minimum, strongly implies that the claims at issue were not directed to an abstract idea. In every instance in which the *DDR Holdings* Court discusses *Alice*'s step one, it does so by explaining why the claims are *not* like those found, in prior Supreme Court or Federal Circuit cases, to have been directed to an abstract idea. In light of this, although the majority decision in the case ultimately turns on the Federal Circuit's conclusion that the claims "satisfy *Mayo/Alice* step two[,]" *DDR Holdings*, 773 F.3d at 1257, the majority appears to have come to that conclusion after having gone through the following analysis: (1) the claims do not appear to be directed to an abstract idea; (2) despite this, the defendant and the dissent have suggested that they are; and (3) thus, the majority decision explains why, even were the claims to be considered directed to an abstract idea, they nevertheless satisfy *Alice*'s step two (because they add an inventive concept to the asserted abstract idea).

23

related to a "solution" to an "Internet-centric problem": "the problem of retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from a host's website after 'clicking' on an advertisement and activating a hyperlink." *DDR Holdings*, 773 F.3d at 1257, 1259. Once the visitor was transported away from the host's website, the host risked losing "control over the attention of the customer[.]" *Id.* at 1258. The claimed invention was intended to solve this problem by using a destination website that looks and feels like the host's own website:

> [A]sserted claim 19 recites a system that, among other things, 1) stores "visually perceptible elements" corresponding to numerous host websites in a database, with each of the host websites displaying at least one link associated with a product or service of a third-party merchant, 2) on activation of this link by a website visitor, automatically identifies the host, and 3) instructs an Internet web server of an "out-source provider" to construct and serve to the visitor a new, hybrid web page that merges content associated with the products of the third-party merchant with the stored "visually perceptible elements" from the identified host website.

*Id.* at 1257. The representative claim at issue in *DDR Holdings* included specific limitations implementing this system that resulted in the generation of these "new, hybrid web page[s]"—limitations relating to the content and ownership of the web pages at issue, and to the manner in which the computer server at issue received, stored and retrieved certain data relating to those web pages. *Id.* at 1249-50.

The *DDR Holdings* Court held that "these claims stand apart" from those in other recent Section 101 opinions, even though they too "involve both a computer and the Internet[,]" because the claims "do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *Id.* at 1257. It

24

specifically distinguished these claims from those at issue in *Ultramercial III* because the claims in *DDR Holdings* did "not broadly and generically claim 'use of the Internet' to perform an abstract business practice (with insignificant added activity)"; instead, they "specify how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id.* at 1258. Thus, in *DDR Holdings*, the "claimed solution [was] necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* at 1257; *see also Essociate, Inc. v. Clickbooth.com, LLC*, No. SACV 13-01886-JVS (DFMx), 2015 WL 1428919, at \*6 (C.D. Cal. Feb. 11, 2015).

At first blush, the language used in *DDR Holdings* seems helpful to Plaintiffs. Claims 1 and 12, after all, relate to a problem specifically arising in the realm of electronic communication devices (e.g., a realm akin to that of "computer networks"). And those claims appear to be meant to address problems that are specific to communication between those electronic devices.

Yet although the realm of electronic communications provides the *setting* in which the claims are introduced, the clear majority of the claim language that is at issue here is not "necessarily rooted in computer technology[,]" nor in the technology of electronic communications devices. Instead, the majority of that claim language speaks to an abstract idea (converting and forwarding messages, so that the messages are sent in a format and layout in which they can be received by a recipient) that has long been used to resolve problems in the area of communications (electronic and otherwise), and that can potentially be applied in just about any communications context, depending on the means of communication. As Defendant notes, at a basic level, "humans have [utilized this abstract idea] on paper for centuries in fields such as

25

printing, publication, advertising, and architecture—whether it be transcribing ancient texts, organizing content for a newspaper, arranging photographs for a school yearbook, adapting ad copy for a full-sized billboard, or scaling down blueprints for a building permit." (D.I. 8 at 8; *see also* Tr. at 11 (Defendant's counsel suggesting that the abstract idea at issue has been put to use in the past by "taking an Ancient text written in Egyptian hieroglyphics [and sending it] to the New York [P]ublic [L]ibrary [after] translat[ing] it to English")); *cf. Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, Civil Action No. 14-732-RGA, 2015 WL 1744343, at *2-4 (D. Del. Apr. 15, 2015) (holding that a claim involving "receiving a text message[,]" converting the message to an "Internet Protocol (IP) message[,]" and "transmitting the IP message to [an] Internet server" was directed to the abstract idea of "translation" under step one of the *Alice* analysis). The idea has also been put into practice through the use of conventional technologies for years. For example, a legal assistant might receive a letter for an attorney while the attorney is out of the office, and relay the message to the attorney at her home office via a fax machine.[14]

Thus, the Federal Circuit's holding in *DDR Holdings* is not inconsistent with a determination that claims 1 and 12 are directed to an abstract idea under step one of the *Alice* test. And in light of the additional precedent set out above, the Court concludes that the claims are so directed.

---

[14]     As an even older example, one could imagine delivering a written message to a telegraph operator in the 19th or early 20th centuries, who might convert the layout and format of the message to a string of Morse code and transmit the message to another telegraph operator. *See, e.g.*, *W. Union Tel. Co. v. Foster*, 247 U.S. 105, 112 (1918) (discussing a process by which "[stock market] quotations are furnished to [a telegraph company] in New York, telegraphed by it to the office of [a telegraph company] in Boston, translated from the Morse code into English, and thence transmitted by an operator to the tickers in the offices of the [stock] brokers who have subscribed and have been approved.").

## 2.    *Alice*'s step two: Do the claims contain an inventive concept?

Step two of the *Alice* framework asks whether the claims contain an "inventive concept,"

meaning "an element or combination of elements that is sufficient to ensure that the patent in

practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*,

134 S.Ct. at 2355 (internal quotation marks and citation omitted); *buySAFE, Inc. v. Google, Inc.*,

765 F.3d 1350, 1353 (Fed. Cir. 2014) (noting that a claim falls outside of Section 101 when, in

the second step of the *Alice* framework, the "'additional elements' [not involving the ineligible

matter] do not supply an 'inventive concept' in the physical realm of things and acts—a 'new and

useful application' of the ineligible matter in the physical realm—that ensures that the patent is

on something 'significantly more than' the ineligible matter itself.") (quoting *Alice*, 134 S.Ct. at

2355, 2357).  The additional elements within the claims, apart from the abstract idea itself, must

involve more than "'well-understood, routine, conventional activit[ies]' previously known to the

industry." *Alice*, 134 S.Ct. at 2359 (quoting *Prometheus*, 132 S. Ct. at 1294); *see also*

*Prometheus*, 132 S. Ct. at 1300 ("[S]imply appending conventional steps, specified at a high

level of generality, to . . . abstract ideas cannot make those . . . ideas patentable.").  The purpose

of the "inventive concept" requirement is to "ensure that the claim is more than a drafting effort

designed to monopolize the abstract idea." *Alice*, 134 S. Ct. at 2357 (internal quotation marks,

citation and brackets omitted).  Neither "limiting the use of an abstract idea to a particular

technological environment[,]" nor simply stating an abstract idea and adding the words "apply

it[,]" will transform an abstract idea into a patent-eligible invention. *Alice*, 134 S. Ct. at 2358

(internal quotation marks and citations omitted).

The *Alice* Court held that, based on these principles, "the mere recitation of a generic

27

computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.*

"Given the ubiquity of computers," it said, "wholly generic computer implementation is not

generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process

is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* (quoting

*Prometheus*, 132 S. Ct. at 1297).

### a.  Claim 12 lacks an inventive concept.

The Court will examine claim 12 first.  In doing so, it will begin by determining what

portion of the claim is directed towards the abstract idea, and what portion constitutes the

"additional elements."  The abstract idea in this case is, as set forth above, the process of

converting and forwarding messages, so that the messages are sent in a format and layout in

which they can be received by a recipient.

In claim 12, the abstract idea is implemented using conventional technologies and

techniques, each of which the patent's own specification recognizes existed in the prior art.[15]  The

claim describes a method of messaging communication, in which:

> (1) A message is transmitted between "communication devices[,]"
> ('475 patent, col. 24:56-58; *see also id.*, col. 10:27-42);
>
> (2) with the "message having . . . at least . . . a message format and
> [a] message layout," (*id.*, col. 24:61-63; *see also id.*, cols. 2:59-63,
> 3:56-57);
>
> (3) wherein the message is obtained by a "messaging system" and
> then "convert[ed,]" (*id.*, cols. at 24:55-56, 24:60-64; *see also id.*,
> col. 16:30-34), into one with a new layout in accordance with
> certain criterion;

---

[15]     According to the *Ultramercial III* Court, "any novelty in [the] implementation of
[an abstract] idea is a factor to be considered only in the second step of the *Alice* analysis."
*Ultramercial III*, 772 F.3d at 715.

> (4) which criterion relate to "message communication capabilities" or "message displaying capabilities" of the originating or destination communication devices or to the "communication media," (*id.*, cols. 24:64-25:10; *see also id.*, col. 10:47-51);
>
> (5) and the system then "facilitat[es] delivery" of the adapted message to the receiver, (*id.*, col. 25:11-12; *see also id.*, col. 2:7-10).

In attempting to articulate which limitations contained in the claim sufficiently narrow its scope, so that it does not cover the full abstract idea itself, Plaintiffs advance a number of arguments. The Court addresses each below.

First, Plaintiffs point to "the fact that the 'messages' must be electronic messages that are sent and received by electronic 'communication devices' [which] prevents the claims from preempting all forms of 'converting and forwarding messages' that 'humans have done on paper for centuries.'" (D.I. 11 at 19) It is true that the claim, as interpreted by Plaintiffs, at least limits the type of conversion at issue to that involving electronic messages—a narrower field than "all forms" of messages. Yet in *Dealertrack*, for example, the fact that the claimed method of managing credit applications was limited to electronically-processed applications did not impact the Federal Circuit's conclusion that sufficiently meaningful limits had not been imposed on the abstract idea present in the claim. *Dealertrack*, 674 F.3d at 1333-34; *cf. Accenture Global Servs.*, 728 F.3d at 1345 ("Accenture attempts to limit the abstract idea of claim 1 by applying it in a computer environment and within the insurance industry. However, those types of limitations do not 'narrow, confine or otherwise tie down the claim.'"). The prohibition against patenting abstract ideas cannot be circumvented by "attempting to limit the use of the [idea] to a particular technological environment[.]" *Bilski*, 561 U.S. at 610 (citing *Diehr*, 450 U.S. at 191-92); *see also Ultramercial III*, 772 F.3d at 716 (finding that "[n]arrowing the abstract idea of

29

using advertising as a currency to the Internet is an 'attempt[] to limit the use' of the abstract idea 'to a particular technological environment,' which is insufficient to save a claim.") (citation omitted).

Second, Plaintiffs assert that the message conversion at issue is accomplished by an "intermediary" computer (the "messaging system" referenced in the claim). (D.I. 11 at 19) Yet this intermediary computer can simply be a generic computer, which is not sufficient to render the claim patent eligible. ('475 patent, cols. 9:64-10:3; Tr. at 45-46 (acknowledging, at least as to claim 1, that the claim can be met by a "general-purpose computer reconfigured by a computer program")); *see also Dealertrack*, 674 F.3d at 1331-34 (holding that a claim involving a computer-based intermediary was not patent eligible under Section 101); *cf. Alice*, 134 S.Ct. at 2359 ("[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention.").

Third, Plaintiffs argue that "even in the context of a messaging system solution, the claims cover specific functionality for addressing" different electronic message layouts and formats and for forwarding those messages. (D.I. 11 at 19) This argument would carry some weight if it were supported with regard to claim 12. In *DDR Holdings*, for example, the claims were held to be patent eligible under the second step of the *Alice* test because they involved a "solution" to a problem, and which described "*how* interactions with the Internet are manipulated to yield a desired result" and avoided pre-emption by claiming only a "specific way" of performing the task, such that "the claims at issue [did] not attempt to preempt every application of the idea[.]" *DDR Holdings*, 773 F.3d at 1258-60 (emphasis added) (noting that the claims described a specific way of automating "the creation of a composite web page by an 'outsource

30

provider' that incorporates elements from multiple sources in order to solve a problem faced by websites on the Internet"). These "'additional features' . . . ensure[d] the claims [we]re 'more than a drafting effort designed to monopolize the [abstract idea].'" *Id.* at 1259 (quoting *Alice*, 134 S.Ct. at 2357).

But Plaintiffs do not identify any such "specific" functionality here, and an examination of claim 12 reveals none. Claim 12 does not purport to limit itself to a specific *way* of converting a message from one layout to another—it simply covers the act of "converting" messages, based on certain criteria relating to communication or display capabilities of the originating or destination devices or on the relevant communication media. ('475 patent, cols. 24:55-25:12); *see E. Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc.*, Civil No. 12-cv-517-LM, 2015 WL 226084, at *9 (D.N.H. Jan. 15, 2015) (distinguishing *DDR Holdings*, because "[w]ithout a disclosure of how the invention does what it does, neither the specification nor the claim identifies an inventive concept."). The criteria specified in the claim are exactly the criteria that any cross-platform messaging system would have to use.[16] In other words, the patentee recognized the *problem* inherent in cross-platform messaging, but claim 12 is not limited to any particular *solution* to that wide-ranging problem. *Cf. Messaging Gateway Solutions*, 2015 WL 1744343 at *4-6 (holding a similar claim to be patent eligible under step two of the *Alice* analysis where it "specifies *how* an interaction between a mobile phone and a computer is manipulated in order to achieve a desired result which overrides conventional practice[,]" in addition to containing "meaningful limitations that prevent it from preempting the

---

[16]      When asked at oral argument, Plaintiffs' counsel was unable to list any *other* criteria that might be used to convert a message from one layout to another in the context of cross-platform messaging. (Tr. at 73-74)

abstract idea of receiving, translating, and delivering a message" such as being "limited to SMS text messages between a mobile device and the Internet") (emphasis added). Thus, claim 12's limitations are expressed primarily in broad, functional terms and, as a whole, the claim preempts almost any application of the abstract idea to the field of cross-platform messaging. *See Alice*, 134 S.Ct. at 2354-55 (patents that claim the "building blocks of human ingenuity . . . risk disproportionately tying up the use of the underlying ideas, . . . and are therefore ineligible for patent protection") (internal quotation marks and citations omitted); *Dealertrack*, 674 F.3d at 1333 (finding the claim at issue not subject matter eligible under Section 101 in part because the "claims are silent as to how a computer aids the method, the extent to which a computer aids the method, or the significance of a computer to the performance of the method" such that the computer "does not play a significant part in permitting the claimed method to be performed") (internal quotation marks and citation omitted).[17]

Fourth, in their briefing and at oral argument, Plaintiffs pointed most prominently to the Federal Circuit's decision in *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010), arguing that here, as there, the invention is tied to a particular machine. (D.I. 11 at 17-18; Tr. at 75-76) The Federal Circuit in *SiRF* affirmed a district court's determination that several

---

[17]    *Cf. Loyalty Conversion Sys. Corp.*, — F. Supp. 3d —, 2014 WL 4364848, at *13 (describing certain "business method" patents that have been held to be patent ineligible, and noting a common thread: "In short, such patents, although frequently dressed up in the argot of invention, simply describe a problem, announce purely functional steps that purport to solve the problem, and recite standard computer operations to perform some of those steps" such that they recite "functional descriptions of objectives, rather than inventive solutions"); *Amdocs (Israel) Ltd. v. Openet Telecom., Inc.*, — F. Supp. 3d —, 2014 WL 5430956, at *11 (E.D. Va. Oct. 24, 2014) (describing the concerns of the Supreme Court in *Alice* "that claims to abstract ideas would preempt the 'building blocks' of research—in essence, that people who merely had the idea of how to solve a problem, but did not actually know how to solve the problem, would prevent others from performing research and achieving actual solutions").

claims relating to methods for calculating the position of Global Positioning System ("GPS")
receivers were patent eligible under Section 101. *SiRF*, 601 F.3d at 1322-23, 1331-33. The *SiRF*
Court came to this conclusion after applying the machine-or-transformation test, which states that
a claimed process is patent eligible if (1) "it is tied to a particular machine or apparatus"; or (2)
"it transforms a particular article into a different state or thing." *Id.* at 1332 (internal quotation
marks and citation omitted); *Ultramercial III*, 772 F.3d at 716 (noting that this test, while not the
sole test governing a Section 101 analysis, can provide a "useful clue" in the second step of the
*Alice* framework) (internal quotation marks and citation omitted).  The test also requires that the
use of a specific machine or transformation of an article must impose meaningful limits on the
claim's scope to impart patent eligibility, such that (in a claim involving a machine) the machine
plays "a significant part in permitting the claimed method to be performed, rather than
function[ing] solely as an obvious mechanism for permitting a solution to be achieved more
quickly[.]" *SiRF*, 601 F.3d at 1332-33.

In *SiRF*, the Federal Circuit held that "[a] GPS receiver is a machine and is integral to
each of the claims at issue[,]" in that the claims were directed to "calculating an absolute position
of a GPS receiver" through the use of, for example, "pseudoranges[,]" which are the distances or
estimated distances between satellites and a GPS receiver and that could only exist "with respect
to a particular GPS receiver that receives the satellite signals." *Id.* at 1332 (internal quotation
marks and citations omitted).  According to the *SiRF* Court, "the presence of the GPS receiver in
the claims place[d] a meaningful limit on the scope of the claims[,]" as the Court was not faced
with a situation where "there is a method that can be performed without a machine" nor with
calculations that "can be performed entirely in the human mind." *Id.* at 1332-33.

In this case, claim 12 requires the use of an intermediary "messaging system" and certain "communication devices." (*See e.g.*, '475 patent, col. 24:55-58) But these requirements are not tied to a "particular" machine in the way that the claims were in *SiRF*. As the Federal Circuit explained in *SiRF*, "Global Positioning System" is not a generic term—it refers to an individual system "comprising thirty-two satellites orbiting Earth that were placed in orbit by the United States and are operated by the United States." *Id.* at 1322. A GPS receiver, in turn, is a device that calculates its position based on the signals it receives from those 32 satellites, using codes transmitted by the satellites. *Id.* A GPS receiver, in other words, is tied to a specific system that transmits a predetermined set of codes.

In contrast, claim 12's references to a "messaging system" and originating and destination "communication devices" are not references to particular machines. *See Alice*, 134 S.Ct. at 2360 (rejecting claims as abstract that recited computer hardware defined in "purely functional and generic" terms). Although the Court need not look to the specification to resolve the issue, a review of the '475 patent's specification confirms this. The specification notes, for example, that "[t]he term 'communication device' used in this patent specification should be expansively construed to include any kind of CPE (customer premises equipment) device with messaging communication capabilities, including those adapted for coupling with voice, data, video and/or multimedia terminals." ('475 patent, col. 10:27-32) These communication devices can also include "personal and other computers[.]" (*Id.*, col. 10:33-34) This expansive definition contrasts with the GPS devices of *SiRF*. The Court also notes that the "messaging system" at issue can be a general purpose computer, and can be used with "any network architecture facilitating messaging between communication devices." (*Id.*, col. 11:60-61; *see also id.*, col.

10:1-3; Tr. at 45-46) These references in claim 12, then, are more akin to the "remote application entry and display device" and "funding source terminal devices" referenced in the claims at issue in *Dealertrack*. 674 F.3d at 1319-20. Those terms likewise encompassed a "personal computer[,]" *id.* at 1331-32, and as such the court there held that the claims were not "tied to a particular machine[,]" *id.* at 1333-34; *see also Content Extraction*, 776 F.3d at 1347-48 (holding that a claim's requirement of certain hardware—a "generic scanner"—was insufficient to render it patent eligible under step two of the *Alice* test).[18]

Fifth, at oral argument, Plaintiffs emphasized the fact that they "had to overcome 18 prior art references[,]" cited in the specification, in order to obtain the patent-in-suit, a fact that they contend proves that their claims describe a "very specific system with very specific features to solve" the problem of cross-platform messaging. (Tr. at 38; *see also id.* at 51-52, 68-69; '475 patent, cols. 1:20-5:18) Plaintiffs are correct that pre-emption concerns drive the Section 101 analysis. *Alice*, 134 S. Ct. at 2354. With regard to the 18 prior art references that Plaintiffs cite, however, most of them are directed towards other aspects of cross-platform communications. For example, several of the references relate to using "presence" information (such as determining and using the location or availability of the recipient). (*See id.*, cols. 1:57-66, 2:32-46, 3:3-14) Another reference involves "integrating [a] multimedia file into template to construct email message that is transmitted to [a] recipient, and opening [the] file when message is

---

[18]     A similar result was reached by the United States District Court for the Central District of California in *Eclipse IP LLC v. McKinley Equip. Corp.*, No. SACV 14-742-GW(AJWx), 2014 WL 4407592, at *6-7 (C.D. Cal. Sept. 4, 2014), which held a claim ineligible under Section 101 despite its incorporation of a computer-based notification system facilitating communications via a "personal communications device," as such a device amounted to a "broad category" that included a "personal computer" or other "generic hardware[.]"

received[,]" and others relate to things like "server-side management of buddy lists" or a "[u]ser interface for creating [a] multimedia message[.]" (*See id.*, cols. 2:25-31, 3:23-36, 4:24-42 (internal quotation marks and citations omitted))

One of the cited references, U.S. Patent Application No. 2005/15,443, does appear on its face to clearly address the problem of cross-platform electronic messaging between multiple kinds of devices—but Plaintiffs made no effort to describe how that reference differs from the claims. (*See id.*, cols. 2:59-3:2) Even if this prior art system is in some way different from the claimed system, that is not enough to avoid preemption, because a claim need not tie up the entire field to preempt; the underlying concern is whether the claim "tie[s] up *too much* future use" of the abstract idea. *Prometheus*, 132 S.Ct. at 1302 (emphasis added); *see also Walker Digital, LLC v. Google, Inc.*, C.A. No. 11-318-LPS, 2014 WL 4365245, at *3 n.2 (D. Del. Sept. 3, 2014) ("[T]he inquiry on preemption is not whether patents directed at 'building blocks of human ingenuity' would pre-empt an *entire* field but, instead, whether such patents 'would risk *disproportionately* tying up the use of the underlying ideas.'" ) (quoting *Alice*, 134 S.Ct. at 2354) (certain emphasis omitted). In this case, it is clear that claim 12 imposes no significant limitations on the abstract idea, and therefore disproportionately ties up the future use of that idea.

Thus, aside from the abstract idea embedded in it, the remainder of claim 12 amounts to the description of conventional steps, accomplished using computer hardware recited in "purely functional and generic" terms. *Alice*, 134 S. Ct. at 2360. No fact disputes have been raised that need to be resolved before coming to this conclusion of law. Therefore, the Court recommends that as to claim 12, the Motion should be granted.

>        **b.      The patent eligibility of claim 1 turns on claim construction.**

Claim 1 is a system claim that largely mirrors the structure of claim 12.  It is apparent

from an examination of the two claims that they are intended to correspond to one another.  And

so, with the exception of what is articulated below, many of the arguments against patentability

set out as to claim 12 above would also apply to claim 1.

Unlike claim 12, paragraph a of claim 1 requires an "access block"—a claim element

configured to perform functions roughly corresponding to paragraph a and c of claim 12.

Paragraph b of claim 1 likewise calls for a "media block" configured to perform functions

roughly corresponding to paragraph b of claim 12.  The question is whether the additional

"access block" and "media block" elements add any significant limitations to claim 1, such that

they render the claim patent eligible.

Plaintiffs assert that these elements are more than just generic computer hardware or

shorthand for the functions set forth in the claim.  Instead, they argue, these terms represent

specific "structure" that amounts to added limitations essential to the invention.  (Tr. at 48)

At oral argument, (*id.*), for example, Plaintiffs' counsel cited to the following portion of

the specification as providing insight as to what an "access block" is:

> The access block **21** includes a users' gateway **211** and 3rd party
> applications' gateway **214** supporting communication with
> communication devices and 3rd party application(s) via
> corresponding network(s) (e.g. public switched and private fixed
> line networks, cellular networks, broadband networks, data
> communication networks, Internet, cable networks, etc.) via
> available communication standard[s], system[s] and/or protocol[s]
> (e.g. XMPP, HTTP, WAP, SMS, MMS, SMTP, etc.) and variants
> of evolution thereof.  It should be noted that unless specifically
> stated otherwise, the communication with [a] communication
> device includes communication via [the] device's interface(s),
> standard client(s) and/or dedicated client(s) installed at the

communication devices.

('475 patent, col. 13:4-16; *see also id.* at FIG. 2)  The portion of the specification cited by

Plaintiffs primarily refers to generic computer functions, such as communication over networks

using prior art protocols via unspecified "client(s)" on the communication devices (which may

themselves be generic computers).  But it also incorporates several other components, including a

"users' gateway **211**" and "3rd party applications' gateway **214**[.]"  And the specification goes on

to refer to how the "users' gateway **211**" is connected with a "traffic management server **213**" via

a "cashing [sic] layer block **212** also constituting part of the access block."  (*Id.*, col. 13:17-19)

The Court is not now in a position, without the benefit of claim construction, to determine

whether or not these additional components are incorporated into the claim as limitations and, if

so, whether those limitations constitute more than "purely functional and generic" elements or

otherwise supply an "inventive concept" that renders the claim patent eligible.  *Alice*, 134 S. Ct.

at 2360.

Similarly, at oral argument, (Tr. at 48), Plaintiffs' counsel cited to the following portion

of the specification as helping to define a "media block":

> In accordance with certain embodiments of the present invention,
> the media block **23** comprises a transcoder **232** operatively coupled
> with a message manager **231** further optionally comprising a
> template module **51** operatively coupled with the database **26**.  The
> media block is configured to select the format and message layout
> fitting to the destination device and to convert the message
> accordingly before facilitating its delivery to the destination device.

('475 patent, col. 16:20-27; *see also id.* at FIG. 5)  Like the "access block," the media block may

include specific components that tie down the claim to something other than just a claim on the

abstract idea.

38

Based on Plaintiffs' representations, the Court cannot at this time hold that claim 1 is not

patent eligible. (Tr. at 47-48 (Plaintiffs' counsel arguing that the "access block" and "media

block" referenced in claim 1 "do[] more" than simply enable the functions referenced in

paragraph (a) and (b) of the claim, and "are structure"); *id.* at 48-50 (referring to these terms as "a

combination of hardware and software")) Neither party has briefed or addressed in detail their

proposed claim constructions for these terms, nor the legal or factual support for those

constructions. Absent such argument, the Court is not in a position to make a determination as to

what constitutes an "access block" or "media block."

It strikes the Court as plausible that Plaintiffs could put forward reasonable constructions

for those terms that would render the claim patent eligible—*i.e.*, constructions of "access block"

or "media block" that would result in claim 1 representing "significantly more than a patent upon

the ineligible concept itself." *Alice*, 134 S. Ct. at 2355 (internal quotation marks, citation and

brackets omitted); *see, e.g.*, *California Inst. of Tech.*, 2014 WL 5661290, at *17-20 (concluding,

after claim construction, that various "unconventional" claim elements constitute inventive

concepts that "sufficiently limit preemption concerns" with regard to the second step of the *Alice*

test); *cf. Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1323-24 (Fed. Cir. 2012)

(finding that a computer limitation in certain claims at issue did not play a significant part in

permitting the claimed method to be performed, for purposes of a Section 101 analysis, where

"*[a]t the claim construction stage*" it was agreed that the term "using a computer" amounted to

little more than a "broad and general limitation" that did not impose meaningful limits on claim

scope) (internal quotation marks and citation omitted) (emphasis added); *McRO, Inc. v. Atlus*

*U.S.A.*, No. SACV 13-1870-GW(FFMx), 2014 WL 4772196, at *9 (C.D. Cal. Sept. 22, 2014)

(suggesting that "[a]n abstract idea is the extreme case of functional language."). The Court, however, could not make a determination on this point with certainty until the terms are construed.

For these reasons, the Court recommends denial of the Motion without prejudice as to claim 1.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that claim 12 of the '475 patent is not eligible for patent protection under 35 U.S.C. § 101, and therefore recommends that Defendant's Motion to Dismiss be GRANTED as to that claim. The Court recommends that Defendant's Motion to Dismiss be DENIED without prejudice as to the remaining claims of the '475 patent.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: April 28, 2015

_____
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

40