**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| TRIPLAY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 13-1703-LPS-CJB |
| | ) |
| WHATSAPP, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## REPORT AND RECOMMENDATION

In this action filed by Plaintiff TriPlay, Inc. ("Plaintiff" or "TriPlay") against Defendant

WhatsApp, Inc. ("Defendant" or "WhatsApp"), Plaintiff alleges that Defendant directly (and as

to one patent, willfully) infringes four of Plaintiff's patents (the "Asserted Patents" or the

"patents-in-suit"). (D.I. 80) Presently before the Court is the matter of claim construction

regarding terms appearing in two of the Asserted Patents: United States Patent Nos. 8,332,475

(the "'475 patent") and 8,874,677 (the "'677 patent"). The Court recommends that the District

Court adopt the constructions set forth below.

## I.      BACKGROUND

### A.      The Parties

TriPlay is a Delaware corporation with its principal place of business in New York, New

York. (*Id.* at ¶ 2) It and its wholly owned subsidiary, TriPlay Communications, Ltd., were

formed for the purpose of "creating and developing a device agnostic content delivery technology

that would enable users to communicate across devices (mobile or otherwise) regardless of the

device manufacturer." (*Id.* at ¶ 7) TriPlay is the owner of the patents-in-suit. (*Id.* at ¶¶ 1, 11)

Defendant WhatsApp is incorporated in Delaware, and has its principal place of business

in Santa Clara, California. (*Id.* at ¶ 3) WhatsApp offers a "cross-platform messaging product called WhatsApp Messenger[,]" which facilitates communication between users of mobile devices made by various manufacturers. (*Id.* at ¶ 18)

## B.    The Asserted Patents

The two Asserted Patents at issue here—the '475 and '677 patents—are both entitled "Messaging System and Method[;]" they relate to the electronic messaging field, and, "in particular, to cross-platform messaging." ('475 patent, col. 1:5-6; '677 patent, col. 1:5-6) The patents share identical specifications. (D.I. 93 at 2 n.2)[1] The patents provide for, *inter alia*, a system for "message communication via a communication media between one or more originating communication devices assigned to a sender and one or more destination communication devices assigned to a receiver[.]" ('475 patent, col. 5:22-26) The specification describes the system as comprising an "access block" and a "media block[.]" (*Id.*, col. 5:27-36) The patents further set forth various systems and methods that generally involve adapting or converting the layout and/or format of a message based on criteria relating to the capabilities of the destination device or to the communication media being transferred. (*See, e.g., id.*, cols. 5:22-45, 6:36-59, 7:1-19, 7:30-53) The '677 patent varies from the '475 patent, *inter alia*, in that it explicitly recites an "initial message includ[ing] a video[,]" and conversion of that video. (*See, e.g.*, '677 patent, col. 23:23-51)

## C.    Procedural Posture

TriPlay commenced this action on October 15, 2013, alleging that WhatsApp infringed

---

[1]     In light of this, the Court will cite only to the '475 patent unless otherwise noted, and when the Court hereafter refers to "the patent" or "the patent specification," that is a reference to the '475 patent unless otherwise noted.

2

the '475 patent. (D.I. 1)  In lieu of answering TriPlay's Complaint, WhatsApp filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), in which it argued that the claims of the '475 patent fell outside the scope of patentable subject matter under 35 U.S.C. § 101 ("Section 101"). (D.I. 7, 8)  Chief Judge Leonard P. Stark referred that motion (the "First Motion to Dismiss") to the Court for resolution. (D.I. 19)

The Court ultimately issued a Report and Recommendation granting the First Motion to Dismiss as to claim 12 of the '475 patent, and denying the motion without prejudice as to the remaining claims. *TriPlay, Inc. v. WhatsApp Inc.*, Civil Action No. 13-1703-LPS, 2015 WL 1927696, at *19 (D. Del. Apr. 28, 2015).  In doing so, the Court concluded that the patent eligibility of representative claim 1 of the '475 patent could turn on whether the constructions of certain terms transformed an otherwise abstract idea into patent-eligible subject matter. *Id.* at *17-19.  Chief Judge Stark later issued a Memorandum Order adopting, in all substantive respects, the Court's Report and Recommendation; in doing so, Chief Judge Stark agreed that issues of claim construction had to be resolved before any further dispositive Section 101 motion could be filed. *TriPlay, Inc. v. WhatsApp, Inc.*, Civil Action No. 13-1703-LPS, 2015 WL 4730907, at *1 (D. Del. Aug. 10, 2015).

In the interim, TriPlay had filed a Second Amended Complaint, (D.I. 46), in which it alleged that WhatsApp infringed not only the '475 patent but also the '677 patent.[2]  WhatsApp responded with another motion seeking dismissal of the claims of both patents on Section 101 grounds (the "Second Motion to Dismiss"). (D.I. 58)

---

[2]      TriPlay later filed the operative Third Amended Complaint, which adds infringement allegations as to two other patents, not at issue here. (D.I. 80)

3

After he adopted the Court's Report and Recommendation regarding the '475 patent, Chief Judge Stark subsequently ordered, *inter alia*, that the parties submit both "a list of representative claims of [the '475 and '677 patents] that [would] adequately represent all claims of the '475 and '677 patents for purposes of deciding [WhatsApp's] motions to dismiss based on Section 101[,]" and a list of those claim terms or phrases that the "parties believe[d] need[ed] construction and their proposed claim constructions[.]" (D.I. 82)  After receiving the parties' responsive submission, (D.I. 84), Chief Judge Stark ordered that: (1) WhatsApp's motions to dismiss were denied without prejudice to renew; (2) all issues regarding claim construction addressed in the parties' joint submission were referred to the Court for resolution; and (3) any future renewed motions seeking dismissal of the claims on Section 101 grounds were also referred to the Court for resolution, (D.I. 86).

The Court held a scheduling teleconference on October 2, 2015, in which it determined that it would first conduct a *Markman* hearing before considering any renewed Section 101 motions.  Claim construction briefing concluded on November 10, 2015, (D.I. 103), and the Court held a *Markman* hearing on November 19, 2015, (D.I. 105 (hereinafter, "Tr.")).

## II.   STANDARD OF REVIEW

### A.   Principles of Claim Construction

It is well-understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989).  Claim construction is a generally a question of law, although subsidiary fact finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38

4

(2015).

The Court should typically assign claim terms their "'ordinary and customary meaning[,]'" which is "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (citations omitted). However, when determining the ordinary meaning of claim terms, the Court should not extract and isolate those terms from the context of the patent, but rather should endeavor to reflect their "meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321; *see also Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016).

To that end, the Court should look first and foremost to the language of the claims themselves, because "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (internal quotation marks and citations omitted). For example, the context in which a term is used in a claim may be "highly instructive." *Id.* at 1314. In addition, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable" in discerning the meaning of a particular claim term. *Id.* This is "[b]ecause claim terms are normally used consistently throughout the patent, [and so] the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* Moreover, "[d]ifferences among claims can also be a useful guide[,]" as when, for example, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15.

In addition to the words of the claims, the Court should look to other intrinsic evidence.

5

For example, the Court should analyze the patent specification, which "may reveal a special definition given to a claim term . . . that differs from the meaning [that term] would otherwise possess." *Id.* at 1316. In that case, "the inventor's lexicography governs." *Id.* Even if the specification does not contain a special definition of the term at issue, it "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (internal quotation marks and citation omitted). That said, however, the specification "is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

Extrinsic evidence, "including expert and inventor testimony, dictionaries, and learned treatises[,]" can also "shed useful light on the relevant art[.]" *Phillips*, 415 F.3d at 1317 (internal quotation marks and citations omitted). Overall, while extrinsic evidence may be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (internal quotation marks and citations omitted); *accord Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995).

In utilizing these resources during claim construction, courts should keep in mind that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

## B. Definiteness

Another issue that at times arises at the claim construction stage relates to whether a term is indefinite under 35 U.S.C. § 112 ("Section 112"). Section 112 requires that a patent claim

6

"particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2 ("Section 112, paragraph 2").[3] If it does not, the claim is indefinite and therefore invalid. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2125 (2014) ("*Nautilus*"). In *Nautilus*, the Supreme Court of the United States set out the test to be applied in the indefiniteness inquiry: "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* at 2124. Definiteness is to be evaluated from the perspective of someone skilled in the relevant art at the time the patent was filed. *Id.* at 2128.

The primary purpose of the definiteness requirement is to ensure that patent claims are written in such a way that they give notice to the public of what is claimed, thus enabling interested members of the public (e.g., competitors of the patent owner) to determine whether they infringe. *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002). Put another way, "[a] patent holder should know what he owns, and the public should know what he does not." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 731 (2002).

Like claim construction, definiteness is a question of law for the court. *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1332 (Fed. Cir. 2014); *Pi-Net Int'l Inc. v. JPMorgan Chase & Co.*, 42 F. Supp. 3d 579, 585-86 (D. Del. 2014). The United States Court of Appeals

---

[3]    Here, the Court refers to the text of Section 112 as it read prior to the passage of the Leahy-Smith America Invents Act, since the application that led to the issuance of the two patents at issue was filed before September 16, 2012. (D.I. 96 at 3 n.1); *see also Q.I. Press Controls B.V. v. Lee*, 752 F.3d 1371, 1374 n.2 (Fed. Cir. 2014).

7

for the Federal Circuit has stated that "[a]ny fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence." *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003); *see also Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008).[4]

## III. DISCUSSION

The parties set out seven terms (or sets of terms) for the Court to construe.[5] The Court takes up the disputed terms in the order in which the parties addressed them at the *Markman* hearing.

### A. "access block"

The parties first addressed the term "access block," a term appearing, *inter alia*, in representative claim 1 of the '475 patent and representative claim 9 of the '677 patent. Instead of providing a construction, WhatsApp asserts that the term is purely functional, and thus, indefinite under Section 112, paragraph 2 (even if found to invoke means-plus-function claiming under 35

---

[4]     In *Nautilus*, the Supreme Court left open the question of whether factual findings subsidiary to the ultimate issue of definiteness should, in fact, trigger the application of a "clear-and-convincing-evidence standard[,]" noting that it would "leave th[is] question[] for another day." *Nautilus*, 134 S. Ct. at 2130 n.10. In the absence of Supreme Court precedent to the contrary, the Federal Circuit's caselaw (utilizing the clear-and-convincing-evidence standard) controls. *See Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, 35 F. Supp. 3d 1176, 1182 n.4 (C.D. Cal. 2014).

[5]     The parties originally submitted an eighth term for construction—"block," (D.I. 84 at 3)—for which they provided arguments in their claim construction briefing, (D.I. 93 at 9-10; D.I. 96 at 2). During the *Markman* hearing, both sides conceded that the Court need not separately construe the term "block" in light of the Court's consideration of the terms "access block" and "media block." (Tr. at 43, 67) As part of this concession, TriPlay suggested that as to both "access block" and "media block," the Court should understand a "block" to be "a computer[.]" (*Id.* at 67) In light of the parties' positions, the Court will not separately construe the term "block."

8

U.S.C. § 112, ¶ 6 ("Section 112, paragraph 6").  (D.I. 96 at 6-12)  The Court will consider

application of the latter paragraph first.[6]

### 1.    35 U.S.C. § 112, ¶ 6

Section 112, paragraph 6 provided:

> An element in a claim for a combination may be expressed as a
> means or step for performing a specified function without the
> recital of structure, material, or acts in support thereof, and such
> claim shall be construed to cover the corresponding structure,
> material, or acts described in the specification and equivalents
> thereof.

35 U.S.C. § 112, ¶ 6.  This provision allows a patentee to express a claim limitation in terms of

the function to be performed (i.e., means-plus-function claiming), while restricting the scope of

the limitation "to only the structure, materials, or acts described in the specification as

corresponding to the claimed function and equivalents thereof." *Williamson v. Citrix Online,*

*LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015).  A means-plus-function clause is indefinite under

Section 112, paragraphs 2 and 6 "if a person of ordinary skill in the art would be unable to

recognize the structure in the specification and associate it with the corresponding function in the

claim[.]" *Id.* at 1352.  The Federal Circuit has articulated the proper analysis for applying

---

⁶        Both parties devoted substantial portions of their briefing to the question of
whether means-plus-function claiming has been invoked here; WhatsApp argues that Section
112, paragraph 6 applies to both "block" terms ("access block" and "media block"), and TriPlay
argues that it does not.  In light of the fact that Section 112, paragraph 6 was addressed so
substantially by both sides, and because the legal analysis regarding that issue helps to
demonstrate why the relevant claim terms are not indefinite, the Court will undertake the Section
112, paragraph 6 analysis first here. *See Intellectual Ventures I, LLC v. Canon Inc.*, Civ. No. 13-
473-SLR, 2015 WL 307868, at *2 (D. Del. Jan. 23, 2015) (analyzing a claim term to determine
whether Section 112, paragraph 6 had been invoked, finding that the patent described sufficient
structure such that the paragraph did not apply, and then explaining that the Court's analysis of
that issue also demonstrated why the "description provided by the claims and specification [was]
also sufficient" to not be indefinite pursuant to Section 112, paragraph 2).

Section 112, paragraph 6 as follows:

> The overall means-plus-function analysis is a two-step process . . .
> . In the first step, we must determine if the claim limitation is
> drafted in means-plus-function format. As part of this step, we
> must construe the claim limitation to decide if it connotes
> "sufficiently definite structure" to a person of ordinary skill in the
> art, which requires us to consider the specification (among other
> evidence). In the second step, if the limitation is in
> means-plus-function format, we must specifically review the
> specification for "corresponding structure." Thus, while these two
> "structure" inquiries are inherently related, they are distinct.

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1296 (Fed. Cir. 2014), *overruled on other grounds*

*by Williamson*, 792 F.3d 1339; *Sarif Biomedical LLC v. Brainlab, Inc.*, C.A. No. 13-846-LPS,

2015 WL 5072085, at *6 (D. Del. Aug. 26, 2015).

In undertaking the first step of this analysis, whether the claims at issue utilize the term

"means" or "means for" is important; if they do not, then a rebuttable presumption arises that

Section 112, paragraph 6 does not apply. *Williamson*, 792 F.3d at 1349[7]; *M2M Sols. LLC v.*

*Sierra Wireless Am., Inc.*, Civil Action No. 12-30-RGA, 2015 WL 5826816, at *1 (D. Del. Oct.

2, 2015). The party challenging the presumption "bears the burden of overcoming the

presumption that Section 112, [paragraph] 6 does not apply by a preponderance of the evidence."

---

[7]    In *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015), the Federal
Circuit overruled prior precedent that had described this presumption as a "'strong'" one, and
instead held that the presumption does not amount to a "heightened burden" nor does it require a
"heightened evidentiary showing[.]" *Williamson*, 792 F.3d at 1349. Although *Williamson*
altered the strength of the presumption, the Court agrees with TriPlay that it should still utilize
pre-*Williamson* Federal Circuit caselaw in analyzing whether disputed terms convey sufficiently
definite structure to a skilled artisan. (D.I. 98 at 4-5); *cf. M2M Sols. LLC v. Sierra Wireless Am.,*
*Inc.*, Civil Action No. 12-30-RGA, 2015 WL 5826816, at *2-3 (D. Del. Oct. 2, 2015); *Sarif*,
2015 WL 5072085, at *6. And during the *Markman* hearing, although WhatsApp's counsel
suggested that the precedential effect of such cases had been "clouded" by the cases' use of the
(prior) "strong" presumption, he also conceded that such cases could be helpful here, and that
those cases in fact helped "prove[ WhatsApp's] point." (Tr. at 15, 37-38)

*Apple*, 757 F.3d at 1298. To do so, a challenger may "demonstrate[] that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Williamson*, 792 F.3d at 1349 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)); *M2M*, 2015 WL 5826816, at *1. The standard is "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1349; *M2M*, 2015 WL 5826816, at *1. "[I]t is proper to consult the intrinsic record, including the written description, when determining if a challenger has rebutted the presumption that a claim lacking the term 'means' recites sufficiently definite structure." *Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1357 (Fed. Cir. 2011), *overruled on other grounds by Williamson*, 792 F.3d 1339; *see also Apple*, 757 F.3d at 1298.

In taking up the first step of the Section 112, paragraph 6 analysis as to "access block," the Court notes that the claims do not use the words "means" or "means for" in discussing what an "access block" does or how it functions. And so there is a presumption that Section 112, paragraph 6 does not apply.

WhatsApp nevertheless contends that the presumption has been overcome here. (D.I. 96 at 9; D.I. 100 at 3-5) The Court will thus construe the term "to decide if it connotes 'sufficiently definite structure' to a person of ordinary skill in the art[.]" *Apple*, 757 F.3d at 1296.

According to TriPlay, an "access block" is "a [computer] comprising a user's gateway and a third party applications gateway that supports communications with communication devices and third party applications and a traffic manager that is operably connected to the user's gateway [and] manages the message delivery within the messaging system." (D.I. 93 at 10) The

11

Court finds support for much of TriPlay's proposed construction in the intrinsic evidence.

For example, Claim 1 of the '475 patent recites:

> a) an access block configured to receive, directly or indirectly,
> from at least one originating communication device a message
> having initial characteristics comprising, at least message format
> and an initial message layout, and to transmit the message to at
> least one destination communication device[.]

('475 patent, col. 23:11-16)  This claim language provides support for at least the portion of the

proposed construction describing an "access block" as something that "supports communications

with communication devices" and that plays a role in the process of message delivery.

Importantly, the specification provides further support for TriPlay's proposal.  In a

section entitled "Detailed Description of Exemplary Embodiments," the specification explains

that the "processes/devices herein are not inherently related to any particular electronic

component or other apparatus, *unless specifically stated otherwise*." (*Id.*, col. 10:14-16

(emphasis added))  It goes on to note that "[t]he desired structure for a variety of these systems

will appear from the description below." (*Id.*, col. 10:20-21)  The specification then provides

figures and descriptions of embodiments of the invention.

One portion of the specification relating to the "access block" is what is depicted in

Figure 2 of the patent.  Figure 2 represents an embodiment of the invention in which the "Access

Block 21" is shown as containing a "3rd party GW 214[,]" "Users' GW 211[,]" "Caching Block

212[,]" and "Traffic Server 213[.]" (*Id.*, FIG. 2)  The portion of the specification addressing

Figure 2 provides further description, noting that the "access block **21** includes a users' gateway

**211** and 3rd party applications' gateway **214** supporting communication with communication

devices and 3rd party application(s)[.]" (*Id.*, col. 13:4-6)  The "users' gateway **211** is connected

12

with a traffic management server **213** via a cashing layer block **212**[8] also constituting a part of

the access block." (*Id.*, col. 13:17-19) And with respect to the "traffic management server," the

specification describes it as being "configured to manage the message delivery within the

messaging system **16**" and to "serve as an intersection of the system flows and to provide queues

mechanism to manage . . . the flows of internal traffic (between functional and other blocks and

parts thereof)[.]" (*Id.*, col. 14:46-52; *see also id.*, FIG. 3)[9]

In light of the content of the patent specification,[10] then, the Court will recommend that

---

[8]      TriPlay does not include the term "cashing layer block" in its construction. By
way of explanation, TriPlay states that because the specification does not further mention the
structure and does not attach any significance to it with respect to messaging system
functionality, a person of ordinary skill would attach no significance to the "cashing layer block,"
other than to understand that the "access block" requires an "operable connection between the
traffic management server and the users' gateway." (D.I. 93 at 11 (citing D.I. 95, Declaration of
Rajeev Surati, Ph.D. ("Surati Decl.") at ¶ 21)) TriPlay explains that its proposed construction
reflects this understanding by defining the traffic manager as being "operably connected" to the
user's gateway. (*Id.*) TriPlay's explanation in this regard is supported by extrinsic evidence,
(*id.*), and the Court accepts it.

[9]      Additionally, Figures 7-9 similarly depict an "access block" as including the
"users' gateway **211**," and a "traffic server[.]" (*See, e.g.*, '475 patent, cols. 17:47-55, 18:28-34,
19:28-32) Figures 7-9 do not, however, include reference to a "3rd party applications' gateway"
component as part of the depicted "access block." (*See* Tr. at 35, 71) TriPlay argues that a
reference from the specification makes it clear that a "'3rd party application gateway' refers to
the interface supporting communications with applications installed on client devices." (D.I. 93
at 10 n.10 (citing '475 patent, col. 12:26-35)) And during the *Markman* hearing, TriPlay
explained that it is "pretty clear from [the specification] and a general understanding of a gateway
for various third-party applications to connect to the system." (Tr. at 71-72) Yet, in light of the
fact that a number of figures in the patent depict the components of an "access block" but do not
depict the "3rd party applications gateway," it is just not clear enough to the Court that this
gateway is an *absolutely necessary* part of the structure of an "access block." ('475 patent, col.
12:13-16 ("The messaging system **16** *may* . . . communicate with 3rd party applications **29**."
(emphasis added))) As such, the Court is unable to read this limitation into the construction of
the term.

[10]      WhatsApp contends that the specification makes clear that the invention is not
limited to the components that TriPlay asserts comprise an "access block." In support,

the term be construed as "a computer comprising a user's gateway that supports communications

with communication devices and a traffic manager that is operably connected to the user's

gateway and manages the message delivery within the messaging system."[11]

Having construed the term "access block," the question becomes whether that term "lacks

sufficiently definite structure to a person of ordinary skill in the art, [so that] the presumption is

overcome and the patentee has invoked means-plus-function claiming." *Apple*, 757 F.3d at 1300.

Because software does not contain physical structures, persons skilled in the art may understand a

computer-implemented invention's structure "through, for example, an outline of an algorithm, a

flowchart, or a specific set of instructions or rules." *Id.* at 1298-99 (citing cases). A claim term

relating to such an invention may also have sufficient structure where there is a description of the

---

WhatsApp points to the fact that, when describing the configuration of figures in the patent that include an "access block," the specification notes that certain specified components of an "access block" (such as a traffic server) are said to be found in "certain embodiments" of the present invention. (Tr. at 27-28, 41; *see also* '475 patent, cols. 14:27-31, 45-48; 18:9-17) TriPlay counters that the components' absence from figures and accompanying descriptions is due to the fact those examples simply do not reference the "access block," and therefore, "[do not] talk about the components." (Tr. at 68) When the specification uses and discusses the term "access block," TriPlay argues, "it's talking about gateways [and] traffic servers[.]" (*Id.* at 68-69) The Court agrees with TriPlay, finding that, as to the components of an "access block" that are included in the Court's construction of the term, there is a consistent description of those components whenever the specification references the "access block."

[11]      The Court also finds support for defining the "access block" (and, for that matter, the later-addressed term "media block") as a "computer." The claim language indicates that an "access block" (and a "media block") is something that is "configured" to perform the recited functions. ('475 patent, col. 23:10; *see also id.*, col. 23:18) The specification states that the embodiments of the invention may use terms such as "computer" for performing the recited operations, and, when referring to the embodiments of the invention, states that "[t]his may be specially constructed" or "it may comprise a general purpose computer selectively activated or reconfigured by a computer program stored in the computer." (*Id.*, cols. 9:64-10:3; *see also id.*, cols. 11:64-12:3) TriPlay also submitted extrinsic evidence in support of its position in this regard. (Surati Decl. at ¶ 19; D.I. 102, Supplemental Declaration of Rajeev Surati, Ph.D. ("Supp. Surati Decl.") at ¶ 23)

term's "operation, such as its input, output, or connections." *Apple*, 757 F.3d at 1299; *see also Inventio*, 649 F.3d at 1358-59. "The limitation's operation is more than just its function; it is how the function is achieved in the context of the invention." *Apple*, 757 F.3d at 1299.

As construed, an "access block" contains a user's gateway and a traffic manager. Yet WhatsApp asserts that even if this is so, that does not stop the term from being entirely "functional." That is, WhatsApp argues that these components of an "access block" simply amount to additional "empty boxes" that "are described, at most, in terms of what they do, not by how they do it." (D.I. 96 at 7; *see also id.* at 8-9; D.I. 100 at 6-8; Tr. at 28-42) It contends that a patentee has identified specific structure only when "we get out of being purely functional" and when the components of an "access block" called out by the patents "are things that you actually know what they are[.]" (Tr. at 37)

Despite WhatsApp's argument to the contrary, here, the Court concludes that the term "access block" connotes sufficiently definite structure to a person of ordinary skill in the art. As an initial matter, it is important to keep in mind that when the patent is describing what an "access block" is and what it does, it is articulating how certain hardware and software (i.e., a computer configured in a certain way) is meant to work. Thus, it would be "fruitless" to expect such a description to, in all instances, make reference to "traditional 'physical structure[,]'" *Apple*, 757 F.3d at 1298-99; (Tr. at 60), like items that one can pick up at the local Best Buy, (Tr. at 26; D.I. 103 at 1). That the term is "defined partly in terms of its function does not detract from the definiteness of [the] structure it may connote." *Apple*, 757 F.3d at 1301 (internal quotation marks and citation omitted).

And here, important to the Court's conclusion is that the patent not only describes what

15

role the "access block" plays in the overall message communication system and how the "access

block" is connected to various other parts of that system—but crucially, that the patent also

describes what the required components of an "access block" are and how those components

work to take in and send out information. (*See, e.g.*, '475 patent, cols. 13:4-14:62, 17:40-19:47 &

FIGS. 2, 3, 7, 8 & 9); *see also Inventio*, 649 F.3d at 1358 (finding that the claims' reference to a

"modernizing device" was not a purely functional limitation where, *inter alia*, "the written

descriptions depict[ed] the modernizing device and its internal components, namely, the

processor, signal generator, converter, memory, and signal receiver elements[,]" as well as how

those components were connected together and how they were connected to the other parts of the

claimed system); *see also id.* at 1359-60 (concluding the same, as to the term "computing unit");

*cf. Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372-73 (Fed. Cir. 2015)

(finding that Section 112, paragraph 6 did apply, *inter alia*, because "[t]he written description

only depict[ed] and describe[d] how what is referred to as the 'copyright compliance mechanism'

is connected to various parts of the system, how the 'copyright compliance mechanism'

functions, and the potential—though not mandatory—functional components of the 'copyright

compliance mechanism[]'" but "[n]one of [those] passages . . . define[d] 'compliance

mechanism' in specific structural terms" nor explained how its internal components operated as

known structure), *cert. denied*, 136 S. Ct. 1173 (2016). More specifically, the patent describes

(and uses diagrams to show): (1) a message's path into the messaging system via the user's

gateway; (2) how the user's gateway parses the message and sends the message to the traffic

manager (while also communicating with the destination block regarding details about the

originating device); and (3) the traffic manager's role in communicating that message to the

16

"media block," to the destination block and ultimately to the message recipient. (*Id.*, cols. 17:40-19:48)

Further supporting the Court's decision is TriPlay's citation to the declarations of Dr. Rajeev Surati. With respect to the term "access block," Dr. Surati states that a person of ordinary skill in the art would understand, based on the claim language and specification, that the term conveys sufficient structure to avoid being indefinite. (Supp. Surati Decl. at ¶¶ 19-28) As WhatsApp notes, (D.I. 100 at 17-18), some of the content of Dr. Surati's declarations seem to do little more than reiterate the legal conclusions found in TriPlay's briefs or the words of the patents. But the Court considers the declarations to amount to at least some additional support for the notion that a person of skill in the art would understand this term to convey sufficiently definite structure. *Cf. Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1359-60 (Fed. Cir. 2004) ("In considering whether a claim term recites sufficient structure to avoid application of [S]ection 112 [paragraph] 6, we have not required the claim term to denote a specific structure. Instead, we have held that it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function."), *overruled on other grounds by Williamson*, 792 F.3d 1339; *cf. M2M*, 2015 WL 5826816, at *4. And WhatsApp, for its part, provided no supplementary expert testimony or similar declaration demonstrating that a person of ordinary skill in the art would *not* understand "access block" to connote sufficiently definite structure.

17

In light of all of the above, and despite WhatsApp's contentions to the contrary,[12] TriPlay has pointed to a sufficient description of an "access block's" "operation within the context of the invention, including the inputs, outputs, and how certain outputs are achieved." *Apple*, 757 F.3d at 1301. The Court thus finds that WhatsApp has not met its burden for overcoming, by a preponderance of the evidence, the presumption that Section 112, paragraph 6 does not apply.

## 2.   35 U.S.C. § 112, ¶ 2

WhatsApp alternatively argues that the term is functional and indefinite under Section

---

[12]      The Court finds those contentions to be unavailing.  For example, in asserting that an "access block" is described in purely functional terms, WhatsApp likens "access block" to the term ("distributed learning control module" or "DLCM") that was before the *Williamson* Court. (Tr. at 96-101)  In *Williamson*, the Federal Circuit considered whether the district court had properly construed the DLCM term in the context of a Section 112, paragraph 6 analysis (in a case where the claims did not use the term "means," such that the rebuttable presumption was invoked).  *Williamson*, 792 F.3d at 1349-50.  In doing so, the Federal Circuit concluded that the written description "fail[ed] to impart any structural significance to the term" and "[found] nothing in the specification or prosecution history that might [have led it] to construe that expression as the name of a sufficiently definite structure as to take the overall claim limitation out of the ambit of" Section 112, paragraph 6.  *Id.* at 1351.

During the *Markman* hearing in this case, WhatsApp addressed specific portions of the specification of the patent at issue in *Williamson* (United States Patent No. 6,155,840, or the "'840 patent"), asserting that they were similar in kind to the patents-in-suit's description of an "access block" (and "media block").  (Tr. at 98-101)  In the Court's view, however, the comparisons to *Williamson* are not strong.  The '840 patent's written description, unlike that of the patents at issue here, does not *require* specific, named components of the DLCM to implement the claimed functions.  (*See, e.g.*, '840 patent, col. 5:34-65; *see also id.*, cols. 6:46-65, 7:1-19; Tr. at 104)  Nor does the '840 patent provide a diagram identifying any such required components, how those components are connected to each other and/or how they "interact[]" with" other modules or other parts of the claimed distributed learning server.  *Williamson*, 792 F.3d at 1351; (*see also* '840 patent, FIG. 3).  That is, the description of the DLCM in the '840 patent lacks discussion of anything other than a "very high level" description of inputs and outputs, and it has no real discussion of a DLCM's required components.  *Williamson*, 792 F.3d at 1351.  The '840 patent instead tends to simply refer to capabilities of the DLCM and preferred types of operating software suitable for the DLCM.  ('840 patent, col. 5:34-65)  In light of this, the Court finds WhatsApp's comparison to *Williamson* unpersuasive.

112, paragraph 2. (D.I. 96 at 6-8; D.I. 100 at 2-5; D.I. 103 at 1-3) An indefiniteness inquiry under Section 112, paragraph 2 is "'highly dependent on context (*e.g.*, the disclosure in the specification and the knowledge of a person of ordinary skill in the relevant art area).'" *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir.) (citation omitted), *cert. denied*, 136 S. Ct. 569 (2015).

Having concluded above that the term "access block," as construed, connotes sufficient structure to a person of ordinary skill in the art to avoid application of Section 112, paragraph 6, the Court is hard-pressed to find some reason why the term would be otherwise indefinite pursuant to Section 112, paragraph 2. After TriPlay challenged it to do otherwise, (D.I. 98 at 12; Tr. at 91-92), WhatsApp was unable to cite to any instance where a term survived scrutiny under the first step of the Section 112, paragraph 6 analysis, but was still found to have fallen short of the requirements of Section 112, paragraph 2. For these reasons, the Court concludes that the term is not indefinite under Section 112, paragraph 2. *See Intellectual Ventures I, LLC v. Canon Inc.*, Civ. No. 13-473-SLR, 2015 WL 307868, at *2 (D. Del. Jan. 23, 2015) (determining that Section 112, paragraph 6 did not apply, and subsequently, that the "description provided by the claims and specification [was] also sufficient" to avoid being indefinite under Section 112, paragraph 2); *cf. In re Donaldson Co., Inc.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994).[13]

---

[13]  WhatsApp, in asserting that the term fails on functional grounds, relies heavily on two cases: *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244 (Fed. Cir. 2008) and *Cox Commc'ns Inc. v. Sprint Commc'ns Co. L.P.*, Civ. No. 12-487-SLR, 2015 WL 2338091 (D. Del. May 15, 2015). (D.I. 96 at 8) In *Halliburton*, the Federal Circuit concluded, *inter alia*, that two parts of Halliburton's proposed definition for the claim term "fragile gel" were functional, "i.e., the fluid [was] defined by what it does rather than what it is." *Halliburton*, 514 F.3d at 1255 (internal quotation marks and citation omitted). Yet the Court finds *Halliburton* distinguishable for at least two reasons. First, the Court has already construed the term "access block" to be comprised of certain identified components that perform certain functions, such that the

19

### 3. Conclusion

The Court finds that WhatsApp has failed to prove that the term, "access block," is

indefinite. It recommends that the term be construed as "a computer comprising a user's gateway

that supports communications with communication devices and a traffic manager that is operably

connected to the user's gateway and manages the message delivery within the messaging

system."

### B. "media block"

The next disputed term, "media block," appears in both representative claim 1 of the '475

---

construction involves more than purely the invocation of functional language. Second, the *Halliburton* Court faced a term it deemed one of "degree," which the plaintiff proposed should be construed to require, *inter alia*, a gel that "easily transitions to a liquid state upon the introduction of force[.]" *Id.* at 1250; *see also id.* at 1255. The Federal Circuit found the term indefinite "because it [was] ambiguous as to the requisite degree of the fragileness of the gel, the ability of the gel to suspend drill cuttings (i.e., gel strength), and/or some combination of the two." *Id.* at 1256. Here, neither the term "access block" nor the Court's construction of it involves a word of degree. *Cf. Apple, Inc. v. Samsung Elecs. Co., Ltd.*, Case No.: 12-CV-00630-LHK, 2014 WL 252045, at *19 (N.D. Cal. Jan. 21, 2014).

As for *Cox*, there the parties agreed that Section 112, paragraph 6 did not apply, *Cox*, 2015 WL 2338091, at *6 n.9, and so the *Cox* Court simply considered whether the term "processing system" was indefinite under Section 112, paragraph 2, *id.* at *3. The defendant proposed that the term be given its "plain and ordinary meaning" or that it be construed as "'a system that processes signaling to assist in call control.'" *Id.* at *3 (citation omitted). The *Cox* Court acknowledged that the term amounted to a structural limitation, but disagreed with the defendant's arguments as to definiteness, in that "a person of ordinary skill in the art [was] not provided with the bounds of the claimed invention." *Id.* at *5. In so concluding, the *Cox* Court found that there was no established meaning of "processing system" in the art, since the term was used differently in different patents, and the Court could find no established dictionary definition for the term. *Id.* In the end, the term was indefinite because the defendant's proposed construction described the term by its function, and there were no "'objective boundaries'" for those skilled in the art to use to determine the scope of invention. *Id.* at *6. The Court finds *Cox* inapposite here because "access block," as construed, provides meaning to the term (including reference to the term's components *and* their functions). Here, then, there are some "objective boundaries" for a person of skill in the art to use in determining whether something falls within the scope of the invention.

20

patent and representative claim 9 of the '677 patent.  WhatsApp also contends that this term is

indefinite under Section 112.  (D.I. 96 at 2)  TriPlay disagrees, and proposes that the Court

construe the term as "a [computer] comprising a message manager and a transcoder operatively

connected to the message manager, the transcoder being configured to transcode the formats of

media items."  (TriPlay's *Markman* Hearing Presentation, Slide 14)

### 1.    35 U.S.C. § 112, ¶ 6

WhatsApp sets forth similar arguments as it did with "access block" to explain why

reference to the "media block" constitutes means-plus-function claiming.  (D.I. 96 at 9; D.I. 100

at 3-5; Tr. at 48-57)  However, applying the same type of analysis as it did with the term "access

block," the Court concludes that Section 112, paragraph 6 does not apply to the term "media

block" and that the term connotes sufficiently definite structure to a person of ordinary skill.

To start, as with the previous term, here the relevant claims do not use the word "means"

or "means for."  This triggers the rebuttable presumption that Section 112, paragraph 6 does not

apply.  *Williamson*, 792 F.3d at 1349.

Next, the Court finds support for TriPlay's proposed construction of "media block" in the

patent specification, which (as noted above), indicates that "[t]he desired structure for a variety of

these systems will appear from the description below."  ('475 patent, col. 10:20-21)  The

specification then goes on to disclose such "desired" structure for the "media block" to include a

message manager and a transcoder.  Figure 5, for example, depicts the "media block" as

containing a "Message Manager 231" and "Transcoder 232[.]"  (*Id.*, FIG. 5)  In the

accompanying description, the specification provides: "[i]n accordance with certain

embodiments of the present invention, the media block **23** comprises a transcoder **232**

operatively coupled with a message manager **231**[.]" (*Id.*, col. 16:19-22) Figure 2 similarly

depicts "Media Block 23" with a "Messages & Media Manager 231" component and a

"Transcoder 232" component. (*Id.*, FIG. 2) And Figure 8 also depicts the "media block" with

these two components, (*id.*, FIG. 8); in describing that figure, the patent states that the "message

manager constitut[es] a functional part of the media block" and that the process of transcoding

occurs in the "media block **23**," (*id.*, col. 18:31-58).[14]

---

[14]     In arguing that the "media block" is not limited to the asserted components,
WhatsApp noted that Figures 7 and 9 depict a "media block" without the transcoder. (Tr. at 95)
However, the absence of reference to the transcoder in these two figures does not change the
Court's analysis. This is because the patent's description of these two figures explains why the
transcoder component is not there depicted. The portion of the specification describing Figure 7
notes: "In the current example the delivery instructions are the following: deliver the message to
HTTP server without changing the message format/layout, and notify the destination device."
('475 patent, cols. 17:67-18:3) And in Figure 9, the client at the originating device performs the
necessary transcoding. (*Id.*, FIG. 9; *see also id.*, col. 19:24-28) In these examples, then,
depiction of the transcoder is unnecessary because either the message format/layout is not
changed or some other technology performs the transcoding function. (*See id.*, col. 12:35-38 ("In
certain embodiments of the invention some functionality of the messaging system may be
delegated to a client as will be further detailed with reference to FIGS. **7-9**."); Tr. at 107-08) For
these reasons, nothing about the depictions of Figures 7 and 9 changes the Court's view as to the
requirement that "media block" must include a transcoder.

        Relatedly, WhatsApp notes that at one point, the patent states (in describing Figure 5) that
"[i]n accordance *with certain embodiments* of the present invention, the media block **23**
comprises a transcoder **232** operatively coupled with a message manager **231**[.]" (WhatsApp's
*Markman* Hearing Presentation, Slide 75 (emphasis added) (citing '475 patent, col. 16:18-24)) It
then argues that this citation shows that a "media block" may not necessarily include a transcoder
or a message manager. (Tr. at 52-54) But the Court agrees with TriPlay that the cited statement
simply refers to the fact that in some claims of the patent, a "media block" is not invoked;
whenever a "media block" is invoked, however, the patent makes clear that it includes these two
components. (Tr. at 73) Indeed, when this cited passage describes what a "media block"
"comprises" it includes reference to the transcoder and message manager, and then goes on to say
that the "media block" further "*optionally compris[es]* a template module **51** operatively coupled
with the database **26**." ('475 patent, col. 16:22-24 (emphasis added)) This statement reinforces
the idea that the transcoder and message manager are required components of the "media block"
(and articulates that the latter two components are not). (Tr. at 74)

Beyond requiring the inclusion of these two components in a "media block," the specification also clarifies the role of the "transcoder" in the "media block": that the transcoder is configured to "convert the message format."

This is first understood by remembering that, according to the claim language surrounding the term "media block," a "media block" is configured to select "at least one message format and a message layout for each of the at least one message formats" and that "at least said initial message layout" is converted. (*Id.*, col. 23:18-22) The "Summary of the Invention" similarly explains that this "media block" is "configured to adapt, before transmitting, at least one of said initial characteristics of the message[,]" (*id.*, col. 5:32-34), and that the message's initial characteristics "compris[e both] message format and message layout," (*id.*, col. 5:29-30; *see also id.*, col. 16:24-27 ("The media block is configured to select the format and message layout fitting to the destination device and to convert the message accordingly before facilitating its delivery to the destination device.")).[15]

From there, the specification explains the transcoder's role. It notes that the converting of a message includes "*transcoding the message format* and/or adapting the message layout." (*Id.*, col. 16:28-30 (emphasis added)) Since the "message manager" is configured to provide layout adaptation, (*id.*, col. 16:34-36), it is thus the transcoder that is to be "transcoding the message format," (*see, e.g., id.*, col. 16:30-34), based upon communications capabilities between the

---

[15]       The specification similarly provides that the term "message" is to be construed to include "any kind of communication objects[,]" which "are characterized by content, format and layout." ('475 patent, col. 10:43-47)

originating and destination devices, (*see id.*, col. 16:37-39).[16]

Taking all of this intrinsic and extrinsic evidence into account, the Court recommends construction of "media block" to mean "a computer comprising a message manager and a transcoder operatively connected to the message manager, the transcoder being configured to convert the message format of media items." Having thus construed the term, the Court must next determine whether the term "lacks sufficiently definite structure to a person of ordinary skill in the art, [so that] the presumption is overcome and the patentee has invoked means-plus-function claiming." *Apple*, 757 F.3d at 1300.

In undertaking that analysis, the Court notes that the patent specification identifies the components that are a part of the "media block" through the use of both diagrams and descriptions. (*See, e.g.*, '475 patent, FIGS. 2, 5, 8 & cols. 16:19-22, 18:31-55) The patent's figures also show how the "media block" is connected to other parts of the overall communications system. (*Id.*, FIGS. 2, 5 & 8) And the patent claims and (particularly) the patent specification describe how the "media block" works with other parts of the system: (1) how the "media block" receives a message from the traffic server; (2) how its message manager sends certain media items and metadata for storage; (3) how it communicates with the destination block regarding the destination for the message content and associated format and layout instructions; (4) how its components convert (when necessary) the message format and layout to the desired type; and (5) how it then passes a message on through the traffic server.[17] (*Id.*, FIGS.

---

[16]    There is also extrinsic evidence in the record confirming that to "transcode" is to "convert" a file from one encoding format to another. (D.I. 94, ex. 5; Surati Decl. at ¶ 22)

[17]    The specification even indicates, for example, that the transcoder is commercially available in different models, ('475 patent, col. 16:30-34), seemingly belying WhatsApp's

24

7, 8, 9 & cols. 14:55-62, 17:50-19:48; *see also id.*, col. 23:17-25; '677 patent, col. 24:15-29)

Additionally, as with the "access block," TriPlay points to the declaration of Dr. Surati in further support of its argument. Dr. Surati states that a person of ordinary skill in the art would understand, in light of the claim language and specification, that the term "media block" conveys sufficiently definite structure. (Supp. Surati Decl. at ¶¶ 19-28) The Court treats this as at least some further support of its conclusion that Section 112, paragraph 6 is not applicable.

In light of all of this, the Court finds that term "media block" provides sufficient structure to a person of ordinary skill to maintain the presumption against means-plus-function claiming. *Apple,* 757 F.3d at 1303-04 ("Thus, the [patent] recites a claim term with a known meaning and also describes its operation, including its input, output, and how its output may be achieved."); *Inventio,* 649 F.3d at 1358-59 (concluding, based on the claims and written descriptions, that "[t]his is not a case where a claim nakedly recites a 'device' and the written description fails to place clear structural limitations on the 'device').

### 2.    35 U.S.C. § 112, ¶ 2

WhatsApp offers no arguments unique to the term "media block" that would explain why that term is indefinite for functional claiming under Section 112, paragraph 2, were it found to connote sufficiently definite structure pursuant to the first step of the analysis under Section 112, paragraph 6. (D.I. 96 at 6-8; D.I. 100 at 2-5; D.I. 103 at 1-3) For the same reasons provided in Section III.A.2, the Court concludes that WhatsApp has failed to meet its burden of proving that "media block" is otherwise indefinite pursuant to Section 112, paragraph 2.

### 3.    Conclusion

---

assertion that this component is simply another functional "black box," (D.I. 100 at 7).

The Court finds that WhatsApp has failed to prove that the term "media block" is indefinite. It recommends that the term be construed as "a computer comprising a message manager and a transcoder operatively connected to the message manager, the transcoder being configured to convert the message format of media items."

### C.   "layout"

The parties' next disputed term, "layout," appears in all representative claims of the '475 and '677 patents. WhatsApp asks the Court to give the term its plain and ordinary meaning, or alternatively, to construe the term to mean a "[v]isual arrangement (e.g., a 'message layout' is the 'visual arrangement of a message')." (D.I. 96 at 13-14) TriPlay contends that the term means "[r]ules for displaying message items including the computer display characteristics of media items (e.g., size or resolution of image items)[.]" (D.I. 93 at 6) The parties are arguing here about two main issues: (1) whether the term includes "rules"; and (2) whether to include the word "computer," so as to limit the claims to electronic messaging. (Tr. at 118) The Court will address each issue in turn.

### 1.   The "rules" limitation

TriPlay argues that, although not explicitly defined, (Tr. at 109-110), "layout" refers "to rules governing how the media items are to be displayed[,]" (D.I. 93 at 7). It quotes, in support, a portion of the specification providing:

> The media items contained in the message, when received, may be *displayed* as independent objects (e.g. attachments) in accordance with a *predefined layout*, in a predetermined order (e.g. in a synchronized multimedia message) or otherwise. Some messages may also comprise metadata describing, for example, a structure and/or semantics of the contained media items. The metadata may carry *rules and instructions* (e.g. how the message or parts thereof

26

shall be . . . played . . . )[.]

('475 patent, col. 10:58-66 (emphasis added) (quoted in D.I. 93 at 7); *see also* Tr. at 110, 113-
114)  Here, TriPlay particularly points to this passage's invocation of "rules" that are found
within the messages described above.  (Tr. at 110)

For its part, WhatsApp contends that this portion of the specification is "far from a clear
and unmistakable disclaimer" of the ordinary scope of "layout," and that TriPlay is attempting to
import a limitation from the specification.  (D.I. 100 at 10-11)  The "rules" referred to above,
WhatsApp argues, are associated with "templates" referenced in the patent, (*see, e.g.*, '475 patent,
TBL. 2); these templates, says WhatsApp, specify particular kinds of message "layouts," (Tr. at
120-21).

The Court agrees with WhatsApp.  While the portion of the specification above suggests
that the invention "may" include rules for how a message containing a media item may be, *inter
alia*, played, it does not state clearly enough that the message's "layout" is meant to be a
reference to "rules" regarding display of media items.  Instead, the cited portion more strongly
associates the "rules" with the referenced "metadata."  The message's "layout," in contrast,
seems more closely associated with the general idea of the visual "display[]" of the media items.

This conclusion is further underscored by the patent's references to Figures 11 and 12.
The patent states these figures illustrate "an exemplary layout of a message displayed" on either a
cell phone screen or a PC screen.  ('475 patent, col. 9:32-37)  And those figures are, at base,
depictions of a visual image of a message on a screen.  (*Id.*, FIGS. 11 & 12; *see also id.*, col.
22:17-19 ("Referring to FIGS. **11** and **12**, there are illustrated exemplary layouts of messages

27

displayed on cell phone and PC screens."); Tr. at 119-20)[18]

For these reasons, the Court will not include reference to "rules" in its construction of the term "layout."

### 2.    The "computer" limitation

TriPlay argues that a person of ordinary skill would understand the term "layout" to fall within the context of electronic messaging, and that is why it has included the term "computer" in its construction. (D.I. 93 at 6; D.I. 98 at 19; Tr. at 109)[19]  Here, the Court agrees with TriPlay that "layout" relates to the layout of electronic messages.

After all, the "layout" at issue is that of messages that, according to the claims, are sent between "communication *devices*." (*See, e.g.*, '475 patent, col. 23:5-34 (emphasis added); *see also* D.I. 93 at 6; Tr. at 109)  The specification further clearly and unambiguously describes the "Field of the Invention" as the "field of *electronic messaging* and, in particular, [] cross-platform messaging." ('475 patent, col. 1:5-6 (emphasis added))  And the specification further provides

---

[18]    And although the Court is not construing the term "template," it agrees that the patent's description of a "template" tends to support WhatsApp's argument.  Claim 6 of the patent, for example, refers to a system configured to a message "having a layout based on a template, said template characterized by at least a unique identifier[.]" ('475 patent, col. 24:5-7)  The specification also describes a "template-based message having initial characteristics comprising message format and message layout; said template characterized by at least unique identifier and an initial layout" with the "initial layout of the message [adapted] in accordance with the said unique identifier and displaying capabilities of the destination communication device." (*Id.*, col. 7:8-11; *see also id.*, col. 6:4-12)  This all suggests, as WhatsApp contends, that it is the patent's reference to the template (such as in claim 6)—not its reference to the term "layout" itself—that is meant to suggest the "rules" that go into shaping how a message item is displayed.

[19]    The parties agreed that the term "message" means "communication objects capable of being exchanged between communication devices." (D.I. 96 at 13; *see also* D.I. 93 at 6 n.8)

28

that "the invention contemplates a computer program being readable by a computer for executing the method of the invention." (*Id.*, col. 22:60-62)

With all of that said, the Court is not convinced that there is a need to shoehorn the word "computer" into its construction of what a "layout" is. Indeed, in its briefing, TriPlay acknowledged that the "computer" limitation was not, after all, a significant aspect of its proposed construction. (D.I. 98 at 19 n.12; Tr. at 118)

### 3. Conclusion

The Court will adopt WhatsApp's proposed construction, which is undisputedly well in line with the above-discussed concept that a message's "layout" refers to the way a message is displayed (or to the "visual arrangement" of a message). (Tr. at 119) The Court thus recommends construing the term "layout" as "visual arrangement."

### D. "format"

The term "format" appears in all representative claims of both patents. WhatsApp contends that the term should be given its plain and ordinary meaning, but if construed, that the proper construction for the term is "[p]hysical or structural arrangement (e.g., a 'message format' is the 'physical or structural arrangement of a message')[.]" (D.I. 96 at 15) TriPlay argues that the term should be construed as "[d]igital formats utilized to encode messaging objects including audio, video and/or image items." (D.I. 93 at 8) The parties' dispute is over whether the construction should be limited to "[d]igital formats." (Tr. at 115, 122)

Here again (as with the term "layout"), the Court agrees with TriPlay that the intrinsic evidence clearly demonstrates that the "format" at issue is that relating to electronic messages/messaging objects. (*See, e.g.*, '475 patent, cols. 1:5-6, 22:60-62, 23:5-34) But as with

29

the "layout" term, the Court does not see the need to wedge the word "digital" into its construction in order to make this point. Indeed, in doing just that, TriPlay ended up with a proposed construction that includes the very term to be construed ("digital formats utilized . . ."), a circular result that is disfavored. *See Paice LLC v. Hyundai Motor Co.*, Civil No. WDQ-12-0499, 2014 WL 3725652, at *11 (D. Md. July 24, 2014) ("[T]he Defendants' construction does not provide further clarification of the term 'motor' for the jury. The Defendants' use of the word motor in their proposed definition highlights this issue."); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 11-CV-01846-LHK, 2012 WL 2993856, at *6 (N.D. Cal. Jul. 20, 2012).

From there, the Court notes that there is intrinsic and/or extrinsic evidence to support much of the remaining aspects of both sides' proposed constructions. The Court addresses those proposals below, noting where it has (and has not) felt compelled to include the parties' proposed language in the Court's recommended construction.

For example, as to WhatsApp's proposal that the message "format" refers to the "physical or structural arrangement" of a message, the Court finds support for including at least "structural arrangement." In various technical and non-technical dictionaries provided by WhatsApp, "format" tended to be defined by reference to the structure or arrangement of data or information. (D.I. 96, ex. D ("The format of a file (or of any storage medium) refers to *the way the information is stored* in it." (emphasis added)); *id.*, ex. E ("[T]he *structure* or appearance of a unit of data" or "The *arrangement* of data" (emphasis added)); *id.*, ex. F ("The *general order* in which *information* appears on the input medium" or "*Arrangement* of code" or "The *structure* or appearance of an object such as a storage medium, file, field, or page of text" (emphasis added)); *see also* D.I. 96 at 15-16) The Court is not aware of any reason why reference to a "format" as a

30

"structural arrangement" of a message would be in conflict with any other portion of its construction for "format," or of the other terms construed herein. And so, it concludes that inclusion of the phrase "structural arrangement of information" would provide added context as to what a message "format" is.

The Court also finds evidentiary support for construing "format" as that "utilized to encode messaging objects," as TriPlay proposed. The language of certain claims of the '475 patent provides that the message "format" is "select[ed] and convert[ed]," ('475 patent, col. 24:21-23), or "adapted . . . by trans-coding the initial message[,]" ('677 patent, col. 24:33-36). The specification also states that "converting [the message] includes transcoding the message format[.]" ('475 patent col. 16:28-30) And extrinsic evidence in the record defines "transcoding" as "the process of converting a file from one encoding format to another." (D.I. 94, ex. 5) Combined, this evidence indicates that the "format" of a messaging object is "encoded," such that when the format is "transcoded," it is converted from one encoding format to another.

Lastly, as for TriPlay's addition that the "format" "includ[es] audio, video and/or image items[,]" the Court agrees that the specification certainly makes this clear. In perhaps the most prominent reference to what a message "format" is in the written description, the patent explains that the "messaging system is configured to support a variety of message formats, including, but not limiting, text . . . video format . . . audio format . . . image format . . . and others." ('475 patent, col. 12:16-21)[20] Nevertheless, the Court does not see how extending the length of the

---

[20]     During the *Markman* hearing, when the Court asked WhatsApp's counsel where in the patent was there a reference to non-digital formats (i.e., something other than electronic messaging), counsel pointed to the specification's reference to a "text" format here, and argued

construction of "format" by adding reference to some (but not all) types of formats would add anything to the factfinder's understanding of the term. Thus, it will not include this portion of TriPlay's proposal in the final construction.

For these reasons, the Court recommends that the term "format" be construed as "structural arrangement of information utilized to encode messaging objects."

### E. "adapted version of the video"

The next disputed term, "adapted version of the video," appears only in the '677 patent. There it is used as part of the phrase "clickable into an adapted version of the video, wherein the adapted version of the video is adapted to the displaying capabilities of the destination communication device[.]" (*See, e.g.,* '677 patent, col. 24:24-27) TriPlay asks the Court to construe the term to mean "a version of the video that is altered with respect to layout and/or format to meet the display capabilities of the destination device." (D.I. 93 at 12) WhatsApp contends that the term should be given its plain and ordinary meaning, or (to the extent construction is required) that the term means "[m]odified version of the video." (D.I. 96 at 16) The parties' dispute here is over whether the term's construction should include "format" and "layout" limitations. (Tr. at 129, 141)

TriPlay contends that its construction is necessary because the "adapted version of the video" is "adapted" to the "displaying capabilit[ies] of the destination [communication] device." (Tr. at 125-26; *see also* D.I. 93 at 13) Because the specification states that it is the "format" and

---

that "[w]e would maintain that you could submit text from one device to another without it being digital." (Tr. at 123-24) WhatsApp did not further explain this position, and the Court does not read the specification's reference to a "text" format as to anything other than a format of electronic message objects.

32

"layout" of the message that are converted so that the message is "adapted" to the destination device, TriPlay asserts that the "adapted version of the video" must refer to an alteration of the message format and/or layout. (D.I. 93 at 13; Tr. at 126, 129)

The Court, however, agrees with WhatsApp that TriPlay's proposed construction contains elements already recited in the surrounding claim language. (D.I. 100 at 13; Tr. at 142) Thus, adopting this construction would render these other claim elements superfluous.

For example, as noted, TriPlay's construction requires that the "adapted version of the video" is "altered . . . to meet the display capabilities of the destination device." The claim language, however, already sets out to what this version of the video is "adapted" to—"the displaying capabilities of the destination communication device." (*See, e.g.*, '677 patent, col. 24:25-27) Similarly, additional elements recited in the independent and dependent claims already explain what is to be "adapted" (e.g., a message's "layout" or "format"). (*See, e.g., id.*, col. 24:28-29 ("determining, by the media block, an adapted message layout[.]"); *id.*, col. 24:33-36 ("The system of claim **6**, wherein the adapted message is further characterized by adapted message format[.]")) The Court declines to adopt a construction that incorporates further limitations that are already recited in surrounding claim language. *Cf. Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.")); *Novartis Pharms. Corp. v. Actavis, Inc.*, Civil Action No. 12-366-RGA-CJB, 2013 WL 6142747, at *4 (D. Del. Nov. 21, 2013) ("To . . . adopt this portion of Defendants' proposal would render other portions of the claim redundant and inject confusion, rather than clarity, into the understanding of this term's meaning.").

33

With that settled, the Court sees no reason why the plain and ordinary meaning of the term should not govern. Neither TriPlay nor WhatsApp suggested, for example, that there was a meaningful difference between the claims' use of "adapted" and the word "modified" that WhatsApp uses in its proposed construction. (Tr. at 128-29, 141) Nor can the Court discern any such difference.

For these reasons, the Court recommends that the term "adapted version of the video" be given its plain and ordinary meaning.

### F.      "providing, by the media block, a clickable icon" / "a clickable icon"

The next disputed term appears only in the '677 patent (e.g., in claim 6 and in representative claims 9 and 15, which depend from claim 6): "providing, by the media block, a clickable icon."[21] TriPlay contends that the term means "inserting, by the media block, a clickable icon into the initial message to replace the video item(s) in the initial message[,]" where a "clickable icon" is "a visual representation of a link to a data file or program." (TriPlay's *Markman* Hearing Presentation, Slide 47) WhatsApp suggests that only "clickable icon" needs construction, and argues that the Court should construe it as "a pictorial representation that is clickable." (D.I. 96 at 17-18) WhatsApp asserts that the remainder of the term is "separately addressed [by the Court's consideration of other terms] ('media block' and 'adapted version of

---

[21]      The parties originally asked the Court to construe a longer version of the term: "providing, by the media block, a clickable icon . . . clickable into an adapted version of the video." (D.I. 93 at 14; D.I. 96 at 15) At the *Markman* hearing, TriPlay's counsel presented the shorter version of the term and a proposed construction for the first time, with the explanation of wanting to provide a "more focused" construction so as "to make it more user-friendly[.]" (Tr. at 129-30) Also for the first time, TriPlay's counsel offered a construction for "clickable icon" because they did not "think [WhatsApp's construction] was fair." (*Id.* at 130) In light of this, the Court will rely heavily on the parties' arguments presented at the hearing. (*Id.* at 136)

the video') [or are otherwise] common words that require no construction ('providing, by' and 'clickable into')." (*Id.* at 18) The parties' arguments raise two issues: (1) whether a "clickable icon" is limited to "a link to a data file or program"; and (2) whether "providing" means "inserting . . . a clickable icon into the initial message to replace the video items in the initial message." (Tr. at 134, 143)[22] The Court will address each issue in turn.

### 1. The "link" limitation

TriPlay asserts that the specification supports construing the "clickable icon" as providing "a link to a data file or program" because the word "link" is used only in connection with replacing media items (e.g., video). (Tr. at 131-32, 135; TriPlay's *Markman* Hearing Presentation, Slide 52) It cites in support to portions of the specification. One citation states: "The message may be sent as one entity, as multiple entities to be re-assembled when received, *one or more media items may be replaced by corresponding links*, etc." ('677 patent, col. 10:55-58 (emphasis added)) A second citation states: "In accordance with *the delivery decision* the system *provides* . . . appropriate *repackaging* . . . if necessary (*for example*, if limitations by communication media . . . require deleting or *replacing some of media items* comprised in the message)." ('677 patent, cols. 16:64-17:3 (emphasis added)) TriPlay additionally points to dictionary definitions that are said to support the idea that a "clickable icon" is a "link." (Tr. at 131-32; TriPlay's *Markman* Hearing Presentation, Slide 49)

---

[22]    The parties initially disputed whether a "clickable icon" should be described as a "pictorial representation." (D.I. 93 at 17; D.I. 96 at 18; Tr. at 132) By the time of the *Markman* hearing, however, WhatsApp consented to TriPlay's proposed construction of the "clickable icon" as a "visual representation." (Tr. at 143; *see also* D.I. 96 at 18 (stating that the term has the well-known meaning of "a visual representation that is clickable")) The Court agrees with this now-joint proposal, finding support in proffered dictionary definitions of the word "icon." (D.I. 96, exs. B, C & F)

The Court, however, agrees with WhatsApp that the patent does not limit a "clickable icon" to "a link to a data file or program." For one thing, the portions of the specification that TriPlay cites do not expressly equate a "clickable icon" to a "link." And even when those cited portions discuss a "link," the patent uses language that can be read to suggest that a "link" is optional. For example, one such citation, referenced above, states that "one or more media items *may be replaced* by corresponding links[.]" ('677 patent, col. 10:55-58 (emphasis added)) The Court also finds TriPlay's extrinsic evidence unpersuasive. For example, as to the cited dictionary definitions, the only definition of "icon" that TriPlay highlights never actually uses the term "link." Instead, it refers to an "icon" as an "'onscreen symbol[.]'" (TriPlay's *Markman* Hearing Presentation, Slide 49 (citing *Webster's New World Computer Dictionary*))

For all of these reasons, the Court will not construe a "clickable icon" as being limited only to providing "a link to a data file or program." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("We do not read limitations from the specification into claims; we do not redefine words.").

### 2. Whether "providing" means "to replace . . ."

As the second issue in dispute, TriPlay argues that construction of the word "providing" is necessary because the word's meaning is context-dependent, (Tr. at 134; TriPlay's *Markman* Hearing Presentation, Slide 51), and states that the construction should be "inserting . . . a clickable icon into the initial message to replace the video item[(s)] in the initial message." It contends that the "clickable icon" must always *replace* the initial message's video item because "the term cannot [be] read to cover simultaneous delivery of both a video and a [clickable icon]." (TriPlay's *Markman* Hearing Presentation, Slide 54; *see also* D.I. 93 at 156) In support, it points

36

to a portion of the '677 patent specification that describes message delivery scenarios. (TriPlay's *Markman* Hearing Presentation, Slide 54) TriPlay notes that while one scenario expressly confirms that a media item may be *replaced* with a corresponding link (e.g., an icon), none of the three scenarios involve the simultaneous delivery of a video and a link. (*Id.*; *see also* Tr. at 138; '677 patent, col. 10:55-58)

The Court disagrees with TriPlay. Instead, it agrees with WhatsApp that the meaning of "providing" should not be limited to "to replace." (Tr. at 144-45; D.I. 100 at 15, 17)

In support of this conclusion, the Court notes that the claim language at issue simply states that "providing . . . a clickable icon" is an act in which the icon is "based on the video from the initial message[.]" (*See, e.g.*, '677 patent, col. 24:23) The Court finds no basis in that language for requiring that the icon, in all instances, must solely "replace" a video item. Similarly, the Court notes that the portion of the specification TriPlay relied on tends to use the phrase "may be" before describing various ways that messages are delivered; again, this suggests that the patent is not there describing forms of message communication in an intentionally narrowing way. (TriPlay's *Markman* Hearing Presentation, Slide 54 (quoting '677 patent, col. 10:55-58)); *see also Thorner*, 669 F.3d at 1366-67.

### 3. Conclusion

For these reasons, the Court recommends construing only the term "clickable icon" and that the term be construed to mean a "visual representation that is clickable."

### G. "adapted message"

The parties' final term appears in only the representative claims of the '677 patent. TriPlay asks the Court to construe the term as "the initial message after being altered by the

37

replacement of the video item(s) with clickable icon(s) and after conversion of the initial layout to an adapted layout." (TriPlay's *Markman* Hearing Presentation, Slide 55)[23] WhatsApp contends that the term need not be construed; if it does, it offers that the proper construction is "[t]he modified message." (D.I. 96 at 17)

Here, the parties dispute the meaning of the word "adapted." TriPlay asserts that its proposed construction is consistent with the claim language, as well as Figure 12 of the '677 patent. (Tr. at 139; D.I. 93 at 17-18) But the Court again cannot agree.

As an initial matter, the Court finds that adopting TriPlay's construction would, in some regards, create disfavored "redundancies," in light of the surrounding claim language. (D.I. 96 at 17) For example, claim 6 of the '677 patent already provides that the conversion of "an adapted message" requires the addition of a "clickable icon." ('677 patent, col. 24:15-22) Similarly, the claim recites—again as part of the "conversion" of "an adapted message"—the step of "determining . . . an adapted message layout[.]" (*Id.*, col. 24:28-29)

Additionally, as to the portion of TriPlay's proposed construction that includes the term "replacement of the video items[,]" the Court has previously explained, in Section III.F.2, why that limitation is not required by the patent. (*See* D.I. 100 at 13) The Court will thus not import it into a construction here.

With all of this decided, the Court sees no reason to then construe "adapted message" by replacing "adapted" with a synonym like "modified." Instead, it recommends that "adapted

---

[23] TriPlay initially submitted a construction that included the phrase "that includes the clickable icons in place of the video item(s)" at the very end of its current proposed construction. (D.I. 93 at 17) By the time of the *Markman* hearing, it had altered its proposal to that set out above.

message" be given its plain and ordinary meaning.

## IV.   CONCLUSION

For the foregoing reasons, the Court recommends the following constructions:

1.   "access block" means "a computer comprising a user's gateway that supports communications with communication devices and a traffic manager that is operably connected to the user's gateway and manages the message delivery within the messaging system"

2.   "media block" means "a computer comprising a message manager and a transcoder operatively connected to the message manager, the transcoder being configured to convert the message format of media items"

3.   "layout" means "visual arrangement"

4.   "format" means "structural arrangement of information utilized to encode messaging objects"

5.   "adapted version of the video" should be afforded its plain and ordinary meaning

6.   "clickable icon" means a "visual representation that is clickable"

7.   "adapted message" should be afforded its plain and ordinary meaning

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006)*; Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website,

located at http://www.ded.uscourts.gov.

Dated: June 30, 2016

Christopher J. Burke
United States Magistrate Judge

40