# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TRIPLAY, INC.,                    )
                                 )
         Plaintiff,       )
                                 )
        v.              )     Civil Action No. 13-1703-LPS-CJB
                                 )
WHATSAPP INC.,                    )
                                 )
         Defendant.       )

## REPORT AND RECOMMENDATION

Presently pending before the Court is Defendant WhatsApp Inc.'s ("Defendant" or "WhatsApp") motion to dismiss Plaintiff TriPlay, Inc.'s ("Plaintiff" or "TriPlay") Third Amended Complaint ("TAC") for failure to state a claim, filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion"). (D.I. 120) Defendant argues that the claims of Plaintiff's United States Patent Nos. 8,332,475 (the "'475 patent") and 8,874,677 (the "'677 patent," and together with the '475 patent, the "Asserted Patents")[1] are directed to non-patent-eligible subject matter under 35 U.S.C. § 101 ("Section 101"). (D.I. 121 at 1) For the reasons that follow, the Court recommends that Defendant's Motion be DENIED.

## I.    BACKGROUND[2]

### A.    Asserted Patents

---

[1]    Plaintiff's TAC also alleges infringement of two additional patents, U.S. Patent No. 9,055,416 (the "'416 patent") and 9,049,574 (the "'574 patent"). (D.I. 80 at ¶¶ 29-34) Defendant's deadline to answer or otherwise respond to the TAC with respect to the '416 and '574 patents has been stayed pending the Court's resolution of the instant Motion. (D.I. 87 at 2)

[2]    The Court will assume familiarity with the facts and procedural history detailed in its prior opinions in this action. (D.I. 52 at 1-6; D.I. 108 at 1-4) To the extent that certain facts are particularly relevant to the issues raised by the instant Motion, the Court will include them herein.

The two Asserted Patents are both entitled "Messaging System and Method[;]" they relate to the electronic messaging field, and, "in particular, to cross-platform messaging." ('475 patent, col. 1:5-6; '677 patent, col. 1:5-6)[3] The patents share identical specifications. (D.I. 93 at 2 n.2)[4]

At the time of patenting, the "versatility of contemporary electronic messaging services [wa]s growing and giving rise to new message formats and new devices with messaging capabilities." ('475 patent, col. 1:10-12) The specification lists examples of "[e]merging message formats" such as "MMS (Multimedia Message Service)" that complemented "traditional messaging services (e.g., e-mail, Short Message Service, instant messaging, etc.)." (*Id.*, col. 1:12-16) The adoption of these new messaging capabilities sometimes resulted in a situation where communication devices supported "different and not always compatible message and communication formats." (*Id.*, col. 1:16-19) The specification described this as "[t]he problem of cross-platform messaging[.]" (*Id.*, col. 1:20)

The inventions were designed to address this problem. They provide for, *inter alia*, a system for "message communication via a communication media between one or more originating communication devices assigned to a sender and one or more destination communication devices assigned to a receiver[.]" (*Id.*, col. 5:22-26) The specification describes the system as comprising an "access block" and a "media block[.]" (*Id.*, col. 5:27-36) The patents further set forth various systems and methods that generally involve adapting or

---

[3]     The '475 and '677 patents appear on the docket in this action more than once. (*See, e.g.*, D.I. 94, exs. 1-2) Citation to the patents will simply be to the "'475 patent" and the "'677 patent."

[4]     In light of this, the Court will cite only to the '475 patent unless otherwise noted, and when the Court hereafter refers to "the patent" or "the patent specification," that is a reference to the '475 patent unless otherwise noted.

converting the layout and/or format of a message based on criteria relating to the capabilities of the destination device or to the communication media being transferred. (*See, e.g., id.*, cols. 5:22-45, 6:36-59, 7:1-19, 7:30-53) The '677 patent varies from the '475 patent, *inter alia*, in that its claims explicitly recite an "initial message includ[ing] a video[,]" and conversion of that video. (*See, e.g.,* '677 patent, col. 23:23-51)

The specification depicts a generalized flow chart of the messaging system's operation. ('475 patent, FIG. 6) The system is set in motion when Subscriber A sends an electronic message to Subscriber B and Non-Subscriber C. (*Id.*, col. 16:46-49) Prior to delivery of the message, it is rerouted to the claimed messaging system. (*Id.*, col. 16:49-51) Upon receipt of the message, the messaging system identifies the message's originating and destination devices, and analyzes these devices' message layout and format capabilities. (*Id.*, col. 16:51-65) The system then makes a delivery decision as to instructions for the format and/or layout of the message to be delivered. (*Id.*, col. 16:56-65) Pursuant to these instructions, the message will then be converted such that its format will be transcoded and/or its layout will be adapted in accordance with the capabilities of the destination devices. (*Id.*, col. 17:6-8) At this point, any necessary re-packaging of the message will also occur, which can include replacing some of the media items contained in the message with links. (*Id.*, col. 17:8-12) The converted message is then delivered to the destination devices, and the messaging system registers this transaction. (*Id.*, col. 17:13-20)

B.     **Procedural History**

1.     **The District Court Case**

The Court, in resolving Defendant's previous motion to dismiss the claims of the '475

patent as ineligible for patent protection under Section 101, (the "1st Section 101 R&R"), granted that motion as to claim 12 of the '475 patent. (D.I. 52 at 40; D.I. 72 at 2) With respect to claim 1, however, the Court concluded that claim construction was necessary to determine whether the claim was directed to patent-eligible subject matter. (D.I. 52 at 39-40; D.I. 72 at 3) The Court only addressed claims 1 and 12 in that opinion, finding that Defendant had not then carried its burden to demonstrate why any additional claims of the patents should be dismissed. (D.I. 52 at 13) Subsequent to that ruling, Plaintiff added claims for infringement of the '677 patent to the case. (D.I. 46, 80)

Chief Judge Leonard P. Stark referred to the Court all issues of claim construction and any renewed motions to dismiss that were to be filed in the future, (D.I. 86), and stayed discovery in the case (which had not yet begun) until the resolution of the instant Motion, (D.I. 82). Accordingly, the parties engaged in claim construction with respect to terms bearing on the patentability of the '475 and '677 patents. (D.I. 93, 96, 100, 103) After a *Markman* hearing, (D.I. 105), the Court issued a Report and Recommendation regarding the disputed claim terms (the "Claim Construction R&R"), (D.I. 108). Chief Judge Stark subsequently overruled objections to the Claim Construction R&R and adopted it in its entirety. (D.I. 118)

On December 15, 2016, Defendant filed the instant Motion, (D.I. 120), and briefing was completed on January 23, 2017, (D.I. 124). The Court heard oral argument on the Motion on October 11, 2017. (D.I. 142 (hereinafter, "Tr.")) Following that argument, Defendant filed two Notices of Supplemental Authority regarding recently-issued decisions from the United States Court of Appeals for the Federal Circuit. (D.I. 141, 143)

**2.      The IPRs and Their Relationship to the District Court Case**

4

Additionally, on February 14, 2015, Defendant filed a petition for *inter partes* review ("IPR") of certain claims (1, 6, 9, 12, 17, 18, 23, 28, 37 and 39-42) of the '475 patent. (*See* D.I. 117 at 1; D.I. 128 at 2) The United States Patent and Trademark Office's Patent Trial and Appeal Board ("PTAB") instituted IPR on each of the asserted grounds, and on August 17, 2016, ultimately issued a Final Written Decision holding all instituted claims invalid in light of certain prior art. (D.I. 117 at 1; D.I. 128 at 2) Plaintiff did not appeal that decision. (D.I. 128 at 2)

On March 6, 2016, Defendant filed IPR petitions with respect to 21 claims of the '677 patent, and the PTAB instituted IPR for 12 of those 21 claims. (D.I. 128 at 2) On August 28, 2017, the PTAB issued Final Written Decisions upholding the validity of all challenged claims of the '677 patent. (D.I. 136, exs. A & B at 9) Defendant has filed appeals of the PTAB's rulings with respect to the '677 patent with the Federal Circuit. (*See* D.I. 139 at 2 & n.4)

## II.  STANDARD OF REVIEW

### A.  Standard of Review Regarding a Rule 12(b)(6) Motion that Challenges Patent Eligibility Pursuant to Section 101

Pursuant to Rule 12(b)(6), a party may move to dismiss the plaintiff's complaint based on the failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). In assessing the plausibility of a claim, the court must

5

"construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted).

Here though, this Rule 12(b)(6) Motion is used to assert an affirmative defense—that the patents are subject matter ineligible under Section 101. In that scenario, dismissal is permitted only if the well-pleaded factual allegations in the Complaint, construed in the light most favorable to the plaintiff, suffice to establish the defense.[5] *See Jones v. Bock*, 549 U.S. 199, 215 (2007); *Bristol-Myers Squibb Co. v. Merck & Co., Inc.*, Civil Action No. 15-560-GMS, 2016 WL 1072841, at *1 n.1 (D. Del. Mar. 17, 2016); *Genetic Techs. Ltd. v. Agilent Techs., Inc.*, 24 F. Supp. 3d 922, 927 (N.D. Cal. 2014).

Patentability under Section 101 is a question of law. *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), *aff'd*, *Bilski v. Kappos*, 561 U.S. 593 (2010). Yet this question of law is also one that "may be informed by subsidiary factual issues." *CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 715 (D. Del. 2012) (citing *In re Comiskey*, 554 F.3d 967, 976 (Fed. Cir. 2009)). There has been some uncertainty regarding the appropriate standard of proof in Section 101

---

[5]     Although the Court is resolving a motion to dismiss, it may consider not only the allegations in the Complaint, but also, *inter alia*, exhibits attached to the Complaint, documents incorporated into the Complaint by reference, and matters of public record. *See, e.g.*, *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994); *Quest Integrity USA, LLC v. Clean Harbors Indus. Servs., Inc.*, C.A. No. 14-1482-SLR, Civ. No. 14-1483-SLR, 2015 WL 4477700, at *2 (D. Del. July 22, 2015). The Court's decision below considers certain content in Defendant's IPR petitions and the PTAB's rulings in the IPR proceedings. This is permissible here, as IPR records are "matter[s] of public record[.]" *Princeton Dig. Image Corp. v. Konami Dig. Entm't Inc.*, Civil Action No. 12-1461-LPS-CJB, 2017 WL 239326, at 3 n.7 (D. Del. Jan. 19, 2017) (internal quotation marks and citation omitted); *see also Choon's Design, LLC v. Zenacon, LLC*, No. 2:13-cv-13568, 2015 WL 539441, at *5 (E.D. Mich. Feb. 9, 2015) (citing cases).

cases, specifically as to whether a "clear and convincing" standard of proof applies. *See*

*Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 379-80 (D. Del. 2015)

(citing cases), *aff'd in part, rev'd in part*, 838 F.3d 1307 (Fed. Cir. 2016). However, assuming

that the "clear and convincing" standard of proof applies to Section 101 challenges (as the Court

does here), *see Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1342 (Fed. Cir. 2013) ("[A]ny

attack on an issued patent based on a challenge to the eligibility of the subject matter must be

proven by clear and convincing evidence.") (internal quotation marks and citation omitted),

*vacated sub nom. WildTangent, Inc. v. Ultramercial, LLC*, 134 S.Ct. 2870 (2014), it applies only

to the resolution of factual disputes, and not to resolution of pure issues of law, *see MAZ*

*Encryption Techs. LLC v. Blackberry Corp.*, C.A. No. 13-304-LPS, 2016 WL 5661981, at *4 (D.

Del. Sept. 29, 2016); *TriPlay, Inc. v. WhatsApp Inc.*, Civil Action No. 13-1703-LPS, 2015 WL

1927696, at *5 (D. Del. Apr. 28, 2015) (citing cases), *adopted in all substantive respects*, 2015

WL 4730907 (D. Del. Aug. 10, 2015). And as to the instant Motion, which was filed at the

pleading stage (a stage at which any facts of record that are clearly in dispute are to be construed

in the light most favorable to the plaintiff), the "clear and convincing" standard of proof should

not come into play at all. *See Blue Spike, LLC v. Google Inc.*, Case No. 14-cv-01650-YGR, 2015

WL 5260506, at *4 (N.D. Cal. Sept. 8, 2015); *Shortridge v. Found. Constr. Payroll Serv., LLC*,

Case No. 14-cv-04850-JCS, 2015 WL 1739256, at *7 (N.D. Cal. Apr. 14, 2015); *Modern*

*Telecom Sys. LLC v. Earthlink, Inc.*, No. SA CV 14-0347-DOC, 2015 WL 1239992, at *7-8

(C.D. Cal. Mar. 17, 2015); *cf. Modern Telecom Sys. LLC v. Lenovo (United States) Inc.*, Case

No.: SA CV 14-1266-DOC (JEMx), 2015 WL 7776873, at *5 (C.D. Cal. Dec. 2, 2015).[6]

## B. Assessing Patentable Subject Matter

Patent-eligible subject matter is defined in Section 101 of the Patent Act:

> Whoever invents or discovers any new and useful process, machine,
> manufacture, or composition of matter, or any new and useful
> improvement thereof, may obtain a patent therefor, subject to the
> conditions and requirements of this title.

35 U.S.C. § 101. In choosing such expansive terms "modified by the comprehensive 'any,'

Congress plainly contemplated that the patent laws would be given wide scope." *Diamond v.*

*Chakrabarty*, 447 U.S. 303, 308 (1980).

Yet while the scope of Section 101 is broad, there is an "important implicit exception [to

it]: [l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty.*

*Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (internal quotation marks and citation

omitted); *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293

(2012). "Phenomena of nature, though just discovered, mental processes, and abstract

intellectual concepts are not patentable, [because] they are the basic tools of scientific and

---

[6]     As noted above, however, the Court has engaged in claim construction prior to
resolving the instant Motion. It may thus apply its legal analysis as to the meaning of certain
claim terms to the issues at play in the Motion. *See Loyalty Conversion Sys. Corp. v. Am.*
*Airlines, Inc.*, 66 F. Supp. 3d 829, 835 (E.D. Tex. 2014) (Bryson, J., sitting by designation)
(waiting to resolve a Rule 12(c) motion regarding patent eligibility until after the Court first
engaged in claim construction, so as to ensure that "there are no issues of claim construction that
would affect the Court's legal analysis of the patentability issue"); *see also Vehicle Intelligence*
*& Safety LLC v. Mercedes-Benz USA, LLC*, 635 F. App'x 914, 916, 920 (Fed. Cir. 2015)
(affirming district court's grant of Rule 12(c) motion following claim construction); *CertusView*
*Techs., LLC v. S & N Locating Servs., LLC*, 111 F. Supp. 3d 688, 704-05 (E.D. Va. 2015).

technological work." *Prometheus*, 132 S. Ct. at 1293 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

The Supreme Court of the United States has also recognized, however, that "too broad an interpretation of this exclusionary principle could eviscerate patent law." *Id.*; *see also Alice*, 134 S. Ct. at 2354. This is because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Prometheus*, 132 S. Ct. at 1293; *see also Alice*, 134 S. Ct. at 2354. To that end, it has explained that "an *application* of a law of nature, [natural phenomena or abstract idea] to a known structure or process may well be deserving of patent protection." *Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (emphasis in original).

In *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), the Supreme Court provided the framework for assessing whether a patent contains eligible subject matter under Section 101. Under this now familiar two-part test, courts "must first determine whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice*, 134 S. Ct. at 2355. If so, the courts must then determine "[w]hat else is there in the claims" by considering "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (internal quotation marks and citation omitted). The Supreme Court describes this second part of the test as a search for an "inventive concept"—"*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (internal quotation marks and citation omitted).

**C.    Considerations Relevant to Deciding a Rule 12 Motion that Challenges the Eligibility of Multiple Patent Claims, Based on the Analysis of a Single Representative Claim**

In *Cronos Techs., LLC v. Expedia, Inc.*, C.A. No. 13-1538-LPS, 2015 WL 5234040 (D. Del. Sept. 8, 2015), Chief Judge Stark noted "several considerations relevant to deciding a Rule 12 motion that challenges the patent eligibility of multiple patent claims based on analysis of a single representative claim." 2015 WL 5234040, at *2. The District Court set out these considerations as follows:

> First, are all non-representative claims adequately represented by the representative claim (i.e., do *all* of the challenged claims relate to the *same* abstract idea and do any of the non-representative claims add one or more inventive concepts that would result in patent eligibility)?[] Second, are there issues of claim construction that must be decided before resolving the motion? Finally, is there *any* set of facts that could be proven relating to preemption,[] questions of patentability,[] or whether the claims "solve a technological problem,"[] that would result in a determination that one [] or more of the claims are patent-eligible?

*Id.* (citations and footnotes omitted) (emphasis in original); *see also Yodlee, Inc. v. Plaid Techs. Inc.*, Civil Action No. 14-1445-LPS, 2016 WL 2982503, at *3 (D. Del. May 23, 2016).

**III.    DISCUSSION**

For purposes of the Court's Section 101 analysis, the parties have agreed upon representative claims from the two patents, and have agreed on which other claims are properly associated with those representative claims. (D.I. 84 at 2-3)[7] And in arguing that the representative claims of the '475 and '677 patents are patent-eligible, Plaintiff focuses on three

---

[7]    Plaintiff has acknowledged that if its arguments about the eligibility of a representative claim in an Asserted Patent are unsuccessful, that would render all of the claims associated with that representative claim ineligible. (*See* D.I. 84 at 2-3)

elements of the claimed invention that are found in various claims. Plaintiff refers to these elements as: (1) the "access block/media block messaging system solution"; (2) the "message template solution"; and (3) the "video delivery/clickable icon solution." (*See, e.g.*, D.I. 122 at 7) For ease of reference, the Court sets out below a chart of the four representative claims currently at issue in Defendant's Motion (two from each patent), the relevant claims associated therewith, and the purported "technical solutions" (or "elements") that Plaintiff asserts are incorporated within each set of claims.[8]

| Representative Claim | Claims Associated with Representative Claims | Purported Technical Solutions Incorporated Within Claim Set |
|---|---|---|
| '475 patent, claim 1 | 2, 3, 4, 5 | access block/media block messaging system element |
| '475 patent, claim 8 | 7, 8, 19, 20, 29, 30, 36 | access block/media block messaging system element *and/or* message template element |

---

[8]     Plaintiff had originally identified six representative claims, which included four claims from the '475 patent—claims 1, 3, 8 and 12. (D.I. 84 at 2-3; D.I. 122 at 7 & n.3) However, in light of the current state of affairs, only representative claims 1 and 8 of that patent need be addressed in this opinion. With respect to representative claim 3, Plaintiff had argued in its answering brief that claim 3 and its associated claims (which included claims 2, 3, 4 and 5) were patent eligible because they incorporated the access block/media block messaging system element as well as another element referred to as the "multiple device solution." (D.I. 122 at 7) Plaintiff then only devoted a few lines of argument to the "multiple device solution." (*Id.* at 6-7, 18) By the time of oral argument on Defendant's Motion, however, Plaintiff represented that the representative claims of the '475 patent at issue are claims 1 and 8 only. (*See* Plaintiff's Oral Argument Presentation, Slide 16) The Court thereafter ordered Plaintiff to file a supplemental letter indicating which claims should be addressed in this opinion. (Tr. at 98-100) Plaintiff's supplemental letter confirms that Plaintiff is no longer relying on representative claim 3 of the '475 patent for purposes of this Motion. (*See* D.I. 140 (Plaintiff stating that the claims to be addressed included claims 2-5, which contain the elements of representative claim 1 of the '475 patent)) With respect to representative claim 12 of the '475 patent, the Court has already found that claim to be ineligible, and has dismissed any claims of infringement relating to claim 12 from the case.

| '677 patent, claim 15 | 1, 2, 6, 7, 11, 13, 15, 16, 17, 20 and 21 | access block/media block messaging system element *plus* video delivery/clickable icon element |
|---|---|---|
| '677 patent, claim 9 | 3, 4, 5, 8, 9, 10, 12, 18 and 19 | access block/media block messaging system element *plus* video delivery/clickable icon element *plus* message template element |

(D.I. 122 at 7; Plaintiff's Oral Argument Presentation, Slide 16; D.I. 140)

The Court will first provide brief overviews of these three elements. Next, the Court will set out the legal framework for its inquiries at step one and step two of the *Alice* test. Lastly, the Court will turn to the parties' arguments with respect to the patent eligibility of the '475 and '677 patents.

## A.    Key Elements of '475 and '677 Patents

### 1.    Access Block/Media Block Messaging System Element

The access block/media block messaging system element of Plaintiff's invention is recited in all representative claims in the patents at issue here (i.e., representative claims 1 and 8 of the '475 patent, and representative claims 9 and 15 of the '677 patent). The specification explains that the claimed intermediary messaging system is made up of an "access block" configured to receive a message from a sender having initial layout and format characteristics, and to transit the message to a receiver, and a "media block" that is operatively coupled to the access block, and that is configured to adapt the initial layout and/or format characteristics of the message to a layout and/or format that is compatible with the receiver's device. ('475 patent, col. 5:22-45; *see also* FIG. 2) These features of the invention are computers that are configured in a particular way so as to carry out the invention. (*Id.*, cols. 9:64-10:3, 11:64-12:3, 23:10, 17) In short, the "access block" is responsible for receiving and sending the message, and the "media

block" is responsible for selecting a message format and layout that will be compatible with the recipient's device, and for converting the message accordingly.

### 2. Message Template Element

The message template element of Plaintiff's invention is recited in representative claim 8 of the '475 patent, as well as representative claim 9 of the '677 patent. (*See, e.g.*, D.I. 122 at 7) The specification explains that the claimed messaging system and/or client may be configured to provide a subscriber with a pre-defined template for composing messages, which may be personalized pursuant to the subscriber's preferences. ('475 patent, cols. 19:49-51, 20:45-48) Such templates can vary in type (e.g., general, greeting-like, interactive message, e-mail or text) and will have different corresponding content structures. (*Id.*, col. 19:51-57 & Table 1) Each type of template and/or each template has a "unique identifier" capable of being recognized by the messaging system and/or client and stored in the metadata of the message. (*Id.*, col. 19:49-57) For template-based messaging, the media block is configured to convert the initial layout of the message in accordance with the recognized unique identifier and the display capabilities of the receiver's device. (*Id.*, cols. 6:4-12; 21:1-5)

### 3. Video Delivery/Clickable Icon Element

The video delivery/clickable icon element of Plaintiff's invention is recited in representative claims 9 and 15 of the '677 patent, which are directed to receiving, converting and forwarding messages that include a video. (*See, e.g.*, D.I. 122 at 7) The specification of the '677 patent explains that the message manager component of the media block may choose to repackage a message based on the capabilities of the destination device, such as available bandwidth. ('677 patent, col. 16:27-32) To that end, the message manager may choose to send a

13

converted message as one entity or as multiple entities to be reassembled upon receipt. (*Id.*, col. 10:55-56) The specification indicates that when a message contains a media item such as a video, and delivery or successful downloading of the video would be hindered in some way (by, for example, bandwidth), the media manager may choose to replace the video with a corresponding link. (*Id.*, cols. 10:55-58, 16:64-17:3)

While the specification discusses replacing a media item in a converted message, the claims of the '677 patent recite converting a message including a video into a message with a clickable icon based on the video. (*See, e.g., id.*, col. 24:13-24) During claim construction, the Court construed the term "clickable icon" in these claims to mean a "visual representation that is clickable." (Claim Construction R&R at 37) In doing so, it rejected Plaintiff's arguments that: (1) the "providing . . . a clickable icon" term in the claims of the '677 patent is limited *only to* providing "a link to a data file or program"; and (2) the clickable icon must, in all instances, *replace* the video item in a message. (*Id.* at 34-37 (internal quotation marks omitted))

## B. The *Alice* Test

The Court next sets out the legal requirements as to both steps of the *Alice* inquiry.

### 1. *Alice* Step One

Under step one of *Alice*, the claims are considered in their entirety to ascertain not simply whether they *involve* a patent-ineligible concept, but whether "'their character as a whole is directed to excluded subject matter'" (here, an abstract idea). *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (quoting *Internet Patents Corp. v. Active Network, Inc.*,

790 F.3d 1343, 1346 (Fed. Cir. 2015)).[9] Courts look to whether the claims "focus on a specific means or method[, . . .] or are instead directed to a result or effect that itself is the abstract idea[.]" *McRo, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). "The 'abstract ideas' category embodies 'the longstanding rule that [a]n idea of itself is not patentable.'" *Alice*, 134 S. Ct. at 2355 (quoting *Gottschalk*, 409 U.S. at 67) (certain quotation marks omitted).

## 2. *Alice* Step Two

The Supreme Court has explained that step two of the *Alice* framework asks whether the claims contain an "inventive concept," meaning "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (internal quotation marks and citation omitted). The purpose of the "inventive concept" requirement is to "ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Id.* at 2357 (internal quotation marks, citation, and brackets omitted).

Neither "limiting the use of an abstract idea to a particular technological environment[,]"

---

[9]      An abstract idea can be, but need not amount to, a "preexisting, fundamental truth" about the natural world "that has always existed," or a "method of organizing human activity" (such as a "longstanding commercial practice"). *Alice*, 134 S. Ct. at 2356 (internal quotation marks and citations omitted); *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256-57 (Fed. Cir. 2014); *cf. CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (explaining that a claim directed to an abstract idea is one directed to a "'disembodied' concept . . . a basic building block of human ingenuity, untethered from any real-world application") (citation omitted). Beyond that, the concept of an "abstract idea" has not been crisply defined, *see Alice*, 134 S. Ct. at 2357 (declining to "labor to delimit the precise contours of the 'abstract ideas' category"), and the Supreme Court and the Federal Circuit have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases, *see, e.g.*, *Enfish*, 822 F.3d at 1334-35.

15

nor simply stating an abstract idea and adding the words "apply it with a computer[,]" will transform an abstract idea into a patent-eligible invention. *Id.* at 2358 (internal quotation marks and citations omitted). And the additional elements within the claim, apart from the abstract idea itself, must involve more than "'well-understood, routine, conventional activit[ies]' previously known to the industry." *Id.* at 2359 (quoting *Prometheus*, 132 S. Ct. at 1294); *see also Prometheus*, 132 S. Ct. at 1300 ("[S]imply appending conventional steps, specified at a high level of generality, to . . . abstract ideas cannot make those . . . ideas patentable."). The *Alice* Court held that, based on these principles, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358. "Given the ubiquity of computers," it said, "wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* (quoting *Prometheus*, 132 S. Ct. at 1297).

## C.    Parties' Arguments

The Court will now consider the representative claims from the '475 and '677 patents.

### 1.    The '475 Patent

#### a.    Representative Claim 1

In the Court's 1st Section 101 R&R, which found independent claim 12 of the '475 patent patent ineligible, the Court concluded that both that claim and claim 1 (the two claims at issue in the R&R) were directed to the abstract idea of "converting and forwarding messages, so that the messages are sent in a format and layout in which they can be received by a recipient[.]" (1st Section 101 R&R at 25-26; *see also* D.I. 72 at 2; D.I. 121 at 9) Thus, the remaining question

16

with respect to representative claim 1 of the '475 patent is whether it contains an inventive

concept that amounts to significantly more than the abstract idea itself. Representative claim 1

recites:

> **1.** A system for message communication via a communication
> media between one or more originating communication devices
> assigned to a sender and one or more destination communication
> devices assigned to a receiver, the system comprising:
>
> a)     an *access block* configured to receive, directly or indirectly,
> from at least one originating communication device a
> message having initial characteristics comprising, at least
> message format and an initial message layout, and to
> transmit the message to at least one destination
> communication device;
>
> b)     a *media block* operatively coupled to said access block and
> configured to select, before transmitting, at least one
> message format and a message layout for each of the at
> least one message formats fitting to each of said at least one
> destination device, and to then convert at least said initial
> message layout to the selected message layouts, said
> selection and conversion being done in accordance with at
> least one criterion selected from a group comprising:
>
> > i)     criterion related to message communication
> > capabilities of the destination communication device
> > with regard to message communication capabilities of
> > the originating communication device;
> >
> > ii)     criterion related to message displaying capabilities of
> > the destination communication device with regard to
> > message communication capabilities of the originating
> > communication device; and
> >
> > iii)     criterion related to the communication media.

('475 patent, col. 23:6-34 (emphasis added))

     In reserving judgment on whether claim 1 of the '475 patent is directed to patent-

17

ineligible subject matter, the Court explained that—unlike claim 12, which it found to be patent

ineligible—claim 1 requires an "access block" and a "media block" (collectively, the "block

terms"). (1st Section 101 R&R at 37)[10] The Court articulated the question, then, with respect to

claim 1 as "whether the additional 'access block' and 'media block' elements add any significant

limitations to claim 1, such that they render the claim patent eligible." (*Id.*) Because it was

---

[10]     Claim 12, in comparison, recites:

**12.** A method of message communication via a messaging system
between one or more originating communication devices assigned
to a sender and one or more destination communication devices
assigned to a receiver, the method comprising:

a)     before delivery to the receiver, obtaining by a messaging
system a message having initial characteristics comprising,
at least, a message format and an initial message layout;

b)     selecting a message layout and converting at least said
initial message layout to said selected message layout to
form an adapted message layout in accordance with at least
one criterion selected from a group comprising:

   i)     criterion related to message communication
capabilities of the destination communication
device with regard to message communication
capabilities of the originating communication
device;

   ii)     criterion related to message displaying capabilities
of the destination communication device with
regard to message communication capabilities of the
originating communication device; and

   iii)     criterion related to communication media between
originating and destination device; and

c)     facilitating delivery of the adapted message to the receiver.

('475 patent, cols. 24:55-25:12)

plausible that Plaintiff could put forward reasonable constructions for those terms that would "include specific components that tie down the claim to something other than just a claim on the abstract idea" and thus render the claim patent eligible, the Court indicated that claim construction was necessary prior to making a final determination on patent eligibility. (*Id.* at 38-40)

Claim construction has since occurred. The Court construed "access block" to mean "a computer comprising a user's gateway that supports communications with communication devices and a traffic manager that is operably connected to the user's gateway and manages the message delivery within the messaging system." (Claim Construction R&R at 20) "Media block" was construed as "a computer comprising a message manager and a transcoder operatively connected to the message manager, the transcoder being configured to convert the message format of media items." (*Id.* at 26)

During the arguments over claim construction, Defendant fought against Plaintiff's position that these terms should be construed to incorporate particular components (a user's gateway, traffic manager, message manager, and transcoder); alternatively, Defendant contended that even were the block terms limited to containing those components, the terms were still indefinite, because the components are merely "'empty boxes'" described in terms of "'what they do, not . . . how they do it.'" (*Id.* at 15 (internal citations omitted); *see also id.* at 13 & n.10, 21, 22 n.14) The Court ultimately disagreed, and concluded that the terms connote sufficient structure to a person of ordinary skill in the art. The Court found this was so, *inter alia*, because (1) the patent describes the role of the block terms in the overall message communication system and how those blocks are connected to other parts of the system, and (2) the patent further

19

describes "what the required components of an 'access block' [and 'media block'] are and how those components work to take in and send out information." (*Id.* at 15-16; *see also id.* at 21, 24) The Court's constructions for the block terms flowed from the way in which the specification "describ[es] the internal components and operative algorithms" associated with those terms, and thus it incorporated these required internal components. (D.I. 118 at 4-5)

With all of this in mind, the Court now turns to the Section 101 inquiry. In Defendant's view, the "access block" and "media block" limitations recited in claim 1, even as construed by the Court, are "functional" and "conventional" and do not add any significant limitations to the claim that could render the claim patent eligible. (D.I. 121 at 16-17; D.I. 124 at 4; Defendant's Oral Argument Presentation, Slide 57) Even when these limitations are viewed as an ordered combination, Defendant contends that they do not claim an inventive concept, because they fail to reveal a specific improvement in the recited computer technology, and instead recite nothing more than well-understood, routine and conventional activities. (D.I. 121 at 17; D.I. 124 at 6)

Plaintiff disagrees. Plaintiff first posits that the Court's finding that the "access block" and "media block" limitations refer to specific structures compels a conclusion that claim 1 includes an inventive concept. (D.I. 122 at 14-15) That is, according to Plaintiff, these limitations in the claimed system amount to a "discrete implementation of an abstract idea that addresses a particular technological problem[.]" (*Id.* at 15; *see also id.* at 2 (explaining that the representative claims' recitation of an "access block" and a "media block," and the Court's constructions of these terms, help "confirm that all the claims contain an inventive concept because they include specific structural components that ensure the claims amount to significantly more than a patent upon an abstract idea")) Plaintiff also points out that "'an

20

inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces[,]'" (*id.* at 15 (quoting *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016)); it asserts that "an intermediate messaging system including an 'access block' and 'media block' was not conventional" and that, therefore, representative claim 1 is patent eligible, (*id.* at 16; *see also* Plaintiff's Oral Argument Presentation, Slide 19).

It is clear that Plaintiff's argument is *not* that Plaintiff invented any of the particular claimed components of the "access block" or "media block." (*See* Defendant's Oral Argument Presentation, Slide 58; Tr. at 54 (Plaintiff's counsel asserting that "the issue is not whether the individual things are known, but it's whether the combination is known"); *id.* at 70 (Plaintiff's counsel asserting that "[t]he claims that include access block and media block describe problems and solutions in technology and these are unconventional")) In light of this, the Court basically agrees with Defendant that each of the components of these blocks, *in and of themselves*, are "[f]unctional" and "[c]onventional[.]" (Defendant's Oral Argument Presentation, Slides 15-26) That is, the Court agrees that these components can be said to constitute "conventional" (partly software-based) "structures" and/or that they serve as labels for what might be referred to as "functional activity."[11]

---

[11]    For example, with regard to the "gateway" aspect of the access block, the specification teaches that the gateway "may be implemented as physical part(s) of the messaging system, separate unit(s) located in the networks of cellular and/or landline operators and/or service integrator(s), or may be fully or partly integrated with one or more devices comprised in said networks." ('475 patent, col. 18:9-17) The specification's focus on the user's gateway is centered on what the gateway does (i.e., receives a message from a sender, and passes it on to a receiver after conversion), rather than what it must be. (*See, e.g., id.*, cols. 17:47-53, 19:45-48; Defendant's Oral Argument Presentation, Slides 16-17) It appears that the concept of a "gateway" like this was a conventional one, as the patent describes a prior art system that entailed

21

The primary question here though, is whether the *ordered combination* of known, conventional elements of claim 1 are *arranged in a non-conventional way*, thus constituting an inventive concept. Guidance from prior cases teaches that the specification can be key in determining the answer to this question. For instance, in *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016), the Federal Circuit found that claims directed to filtering content on the Internet did not "lend themselves to a step-one finding that they are directed to a nonabstract idea[,]" but that they nevertheless passed step two of the *Alice* test because their ordered combination of limitations recited a specific, discrete implementation of filtering content. 827 F.3d at 1348-50. The *Bascom* Court explained that filtering content on the internet was a known concept, but the patent specification at issue "describes how its particular arrangement of elements is a technical improvement over prior art ways of filtering such content." *Id.* at 1350.[12]

---

a "mail gateway" that "receives and delivers e-mail messages to users of the communications system." ('475 patent, col. 1:44-52) The same holds true for the "traffic manager" component of the "access block." Nowhere does the specification indicate that the patentees invented a "traffic manager" structure or further set out the contours of a physical structure that is a traffic manager. Instead, the specification's focus is on what the traffic manager does—i.e., "manage the message delivery within the messaging system[.]" (*Id.*, col. 14:43-48; Defendant's Oral Argument Presentation, Slides 18-20) This is also the case with respect to the "message manager" component of the "media block"—the specification describes it as a "functional" part of the media block that is configured to provide "layout adaption and/or[] repackaging[,]" to send certain media items and metadata for storage, and to obtain delivery instructions. ('475 patent, cols. 16:34-36, 17:52-67) Finally, as for the "transcoder" component of the "media block," the specification makes clear that such component is available on the market in different models, and tells us that it "transcod[es] the message format" based upon communications capabilities between the originating and destination devices. (*Id.*, col. 16:28-39)

[12]     *See also Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300 (Fed. Cir. 2016) (finding that the claim recited an inventive concept, an enhancing limitation, that was called out by the specification as the "critical advancement over the prior art"); *X One, Inc. v. Uber Techs., Inc.*, 239 F. Supp. 3d 1174, 1197-99 (N.D. Cal. 2017) (explaining that in

22

With regard to the block terms, admittedly, the patent specification does not provide a lot of help on this front. The specification *does* immediately make clear that the problem of cross-platform messaging was known in the prior art. ('475 patent, col. 1:20-21) And then it devotes four columns to summarizing "various systems" that were "developed to provide a solution[.]" (*Id.*, col. 1:20-5:17) Following this prior art summary, the specification describes the claimed invention. But it never really seems to clearly articulate—at least with respect to the "access block" and "media block" components of the invention—what problems remained unsolved as to those prior art systems, and/or how the use of these components as part of a messaging system provided an improvement over the prior art. If the use of these components were said to be a step forward from what was in the prior art, the patentee really is supposed to set that out. *See, e.g.*, U.S. Patent and Trademark Office, *General Information Concerning Patents —*

*Specification [Description and Claims]* (October 2015),

https://www.uspto.gov/patents-getting-started/general-information-concerning-patents#heading-1

7 (explaining that "[t]he specification must set forth the precise invention for which a patent is solicited, in such manner as to distinguish it from other inventions and from what is old"). And

---

determining whether the ordered combination of claim limitations provides an inventive concept, guidance may be found "in the specification regarding what was conventional at the time of the invention[,]" and, in concluding that use of a "buddy list" combined with GPS tracking technology constituted a non-conventional and non-generic arrangement of known, conventional pieces, noting that the specification described this as the "solution" to a particular technological problem); *Fitbit, Inc. v. AliphCom*, 233 F. Supp. 3d 799, 812-13 (N.D. Cal. 2017) (finding that the ordered combination of claim elements, interpreted in the light most favorable to the plaintiff, contains inventive concepts—even though none of the claim elements individually were inventive—where the specification highlighted tapping (a known form of validation) as the element that overcame the problem in the prior art, and the claims added tapping into a portable device pairing process, which "transform[ed] a more abstract device pairing process into something specific").

that makes this issue a difficult one to resolve.

But we are at the pleading stage, and this is Defendant's Motion. And so it needs to carry its burden to demonstrate that, even if facts are construed in the light most favorable to Plaintiff, the claims are ineligible. In the end, Defendant's arguments have not convinced the Court that dismissal of claim 1 and its associated claims is appropriate. *See, e.g., Amdocs (Israel) Ltd.*, 841 F.3d at 1291, 1301 (deeming a claim reciting a program designed to solve an accounting and billing problem faced by network service providers patent-eligible, where the claim was "tied to a specific structure of various components (network devices, gatherers, ISMs, a central event manager, a central database, a user interface server, and terminals or clients)"). The Court below addresses each of Defendant's arguments to the contrary, explaining why it finds them a bit wanting.

The Court first assesses Defendant's assertion that "[t]he features of the 'access block' and 'media block' are simply additional functional labels describing the sort of routine activity and corresponding generic components that *any computer intermediary performing the abstract message conversion idea would likely include*, such as controlling the flow of message traffic (using a 'gateway' and a 'traffic management server' to manage the message traffic) and converting messages (using a 'transcoder' and 'message manager')." (D.I. 121 at 16 (emphasis added)) In doing so, it notes that certain arguments that Defendant's counsel made earlier in the case seem to contradict Defendant's argument here. During the claim construction hearing, for example, Defendant's counsel suggested that Plaintiff will have "very significant infringement problems" if it argues, for example, that Defendant's product includes a "transcoder[.]" (D.I. 105 at 55) That kind of assertion seems at odds with an argument that *any* message conversion

24

system like this would have a "transcoder" component.[13]

Next, in arguing that claim 1's elements (even taken together) are all "[f]unctional" and "conventional[,]" Defendant pointed to the specification's summary of a prior art system ("Ye et al.") that was disclosed in a patent application. (Defendant's Oral Argument Presentation, Slide 27) The specification explains that Ye et al. discloses a method comprising "receiving a message in a first format, adapting the message to a MMS message, and sending the MMS message to a user device." ('475 patent, col. 4:58-64) The Court takes Defendant's point that this description of Ye et al. sounds somewhat similar to what claim 1's system does.

Yet even though the specification does not explicitly state what it is about the invention that is a step forward from Ye et al., the Examiner obviously *granted* the '475 patent over that reference. (*See* Tr. at 55) Admittedly, that fact does not necessarily mean that claim 1 will ultimately be patent-eligible—it may not be. But it does at least suggest to the Court that there is a fact issue as to whether the claim (with its "access block" and media block" elements and their respective operative algorithms that work together to take in, convert, and send out information) solves the problem of cross-platform messaging in a sufficiently particular, non-routine,

---

[13]     It is also worth noting that Defendant's arguments here about "conventionality" seemed to waver during the briefing process. In its opening brief, as noted above, Defendant seemed to be firmly arguing that the features of the "access block" and "media block" described "generic components" that "*any* computer intermediary" performing message conversion "*would likely include*[.]" (D.I. 121 at 16 (emphasis added)) By the time of Defendant's reply brief, though, Defendant was much more circumspect. There it suggested that it had not, in fact, previously "argue[d] that all implementations must include all such components" of the "access block" and "media block," and instead that it had only argued that those components "are routine and non-inventive." (D.I. 124 at 4 n.3)

25

unconventional way.[14] It also suggests that there are genuine fact questions as to whether allowing representative claim 1 would preempt the "building blocks" of research in the cross-platform messaging field and "risk disproportionately tying up the use of the underlying ideas[.]" *Alice*, 134 S. Ct. at 2354-55, 2357 (internal quotation marks, brackets and citations omitted); *see also Internet Patents*, 790 F.3d at 1348 (finding a claim ineligible where it contained "*no restriction* on how the result is accomplished") (emphasis added).[15] If the record ultimately shows that the claim recites a particular, non-conventional implementation of the idea of converting and forwarding messages, then the claim might not foreclose a significant number of other systems for carrying out this idea, and thus would not preempt much of the relevant field.

---

[14]      *Cf. InsideSales.com, Inc. v. SalesLoft, Inc.*, Case No. 2:16CV859DAK, 2017 WL 2559932, at \*1, \*3-4 (D. Utah June 13, 2017) (denying the defendant's motion to dismiss regarding patents directed to methods and systems that allow one to track e-mail correspondence to see if and when an e-mail was opened and whether the recipient clicked through on any hyperlinks contained in the e-mail, as "[t]he arrangements of multiple pieces of software . . . disclosed and claimed in both patents-in-suit are the inventive concepts"); *ART+COM Innovationpool GmbH v. Google Inc.*, 183 F. Supp. 3d 552, 555-56, 559-60 (D. Del. 2016) (finding, on a motion for summary judgement, that the ordered combination of claims directed to a software-implemented method for providing a pictorial representation of space-related data recited not merely what a computer does, but a "specific procedure that is done by a computer" that demonstrated a sufficient inventive concept in reciting "a specific way of overcoming a problem which plagued prior art systems").

[15]      The Supreme Court has declared that the "concern that drives th[e] exclusionary principle [i]s one of pre-emption." *Alice*, 134 S. Ct. at 2354; *see also Bilski*, 561 U.S. at 612 (explaining that if a claim is so abstract so as to "pre-empt use of [the claimed] approach in all fields, and would effectively grant a monopoly over an abstract idea[,]" such a claim is not be patent-eligible); *Bascom*, 827 F.3d at 1350 (finding claims not to be patent ineligible at step two in part because they did not "preempt all ways of filtering content on the Internet; rather, they recite a specific, discrete implementation of the abstract idea of filtering content"). Notably (and sometimes confusingly), however, courts often take pains to note that simply because a claim does not *completely* preempt use of an idea, that does not mean it is patent eligible. *See FairWarning IP, LLC v. Iatric Sys, Inc.*, 839 F.3d 1089, 1098 (Fed. Cir. 2016) ("While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility.") (internal quotation marks and citation omitted).

Lastly, Defendant argues that claim 1 is similar to claims that were held to be ineligible in *EasyWeb Innovations, LLC v. Twitter, Inc.*, 689 F. App'x 969 (Fed. Cir. 2017) and *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016) ("*Symantec*"). (Tr. at 22-24; Defendant's Oral Argument Presentation, Slides 37-38) The Court views these cases as distinguishable, however, at least in light of the current state of the record.

For example, in *EasyWeb*, the representative claim was directed to a system made up of certain hardware and software. Specifically, it recited:

> 1. A message publishing system (MPS) operative to process a message from a sender in a first format, comprising:
> a central processor;
> at least one sender account;
> at least one storage area configured to store at least a first portion of the message; and
> software executing in the central processor to con-figure the processor so as to:
> identify the sender of the message as an authorized sender based on information associated with the message in comparison to data in the sender account, wherein the identification is dependent upon the first format;
> convert at least a second portion of the message from the first format to a second format; and
> publish the converted second portion of the message so as to be viewable in the second format only if the sender has been identified as an authorized sender.

*EasyWeb*, 689 F. App'x at 970. The *EasyWeb* Court rejected plaintiff's argument that an inventive concept arises from the ordered combination of steps in claim 1, and briskly affirmed the district court's holding that the claim "recites the most basic of steps in data collection, analysis, and publication and they are recited in the ordinary order." *Id.* at 971.

Importantly, however, the case in *EasyWeb* was on appeal from a *summary judgment* ruling. *Id.* at 970. And in arguing for affirmance of the district court's decision that the claims

27

as an ordered combination were generic and conventional, the defendant ("Twitter") specifically noted that it was important that:

> [T]his case comes to this Court on appeal from a summary judgment ruling, with the benefit of claim construction, expert testimony, a full set of depositions, and infringement and invalidity contentions. On *that* record, it was eminently possible [Twitter argued, for the district court] to conclude that the claims' generic and conventional additional steps did not contribute to a meaningful inventive concept.

*EasyWeb Innovations, LLC v. Twitter, Inc.*, No. 2016-2066, 2016 WL 6534351, Brief of Plaintiff-Appellee Twitter, Inc., at *59 (Fed. Cir. Oct. 24, 2016) (emphasis in original). Twitter further pointed to certain record evidence demonstrating that "the claims' arrangement of generic computer steps was not inventive"—including expert testimony that a prior art patent disclosed the same message publishing system implementation, as well as an expert report regarding infringement and infringement contentions demonstrating that the claims were not limited to a "particular technologically-rooted arrangement of claim elements." *Id.*[16]

---

[16] As for the decision in *Symantec*, there the trial and appellate court also had the benefit of a full record, as the case had gone to trial. *See* 838 F.3d at 1312. In *Symantec*, the patentee asserted that the patent, which was directed to systems and methods for receiving, screening and distributing e-mail, claimed an invention "'not much different than a United States Postal Service office that processes letters and packages, except that the process is all computer-implemented and done electronically in a matter of seconds.'" *Id.* at 1316, 1318 (internal citation omitted). The patentee argued the representative claim recited an inventive concept because "applying business rules to email is not what computers and the Internet do in the absence of this claim limitation.'" *Id.* at 1318 (internal citation omitted). In rejecting this argument, the *Symantec* Court explained that "the inquiry is not whether conventional computers already apply . . . well-known business concepts like hedging or intermediated settlement[,]" but instead whether each step did no more than require a generic computer to perform generic computer functions; it found that the claim failed the latter inquiry. *Id.* at 1318-19. Here, however, it is at least plausible at this stage that, for the reasons set out above, an intermediary messaging system containing an access block and media block (with various internal components configured to take in, convert, and send out messages) amounted to a non-generic, non-conventional solution to the problem of cross-platform messaging.

In sum, although the decision is a difficult one, the Court cannot conclude as a matter of law at the pleading stage that representative claim 1 of the '475 patent is patent-ineligible. In light of the Court's conclusion, it could simply deny Defendant's Motion without further analysis, since the remaining representative claims at issue each incorporate the "access block" and "media block" limitations. However, the Court will briefly assess the additional key limitations in those claims—the template-based messaging element and the video delivery/clickable icon element.

### b.    Representative Claim 8

Plaintiff asserts that representative claim 8 is patent eligible not only because it incorporates the claimed "access block" and "media block" limitations, but additionally because it recites template-based messaging features. (D.I. 122 at 17) Claim 8 depends from claim 7, which in turn depends from claim 6, which in turn depends from claim 1 of the '475 patent (which was reproduced above). Claims 6, 7 and 8 recite (with the template-related limitations highlighted):

> **6.** The system of claim **1** configured to receive a message having a layout based on a *template, said template characterized by at least a unique identifier, wherein the system is further configured to recognize the unique identifier of the template*, and the media block is further configured to select, before transmitting, at least one message format and a message layout for each of the at least one message formats fitting to each of said at least one destination device, and then convert the initial layout of the message to the selected message layouts, *said selection and conversion being done in accordance with at least one predefined layout corresponding to the recognized unique identifier* and the displaying capabilities of the destination communication device.

('475 patent, col. 24:5-17 (emphasis added))

> **7.** The system of claim **6** *wherein the template is selected from a*

> *group comprising initial interactive message and replying*
> *interactive message.*

(*Id.*, col. 24:18-20 (emphasis added))

> **8.** The system of claim **7** wherein the *unique identifier*
> *corresponding to at least one message is considered as a criterion*
> *for selecting and converting the message format.*

(*Id.*, col. 24:21-23 (emphasis added))

### (1)    *Alice* **Step One**

Defendant contends that all remaining representative claims (i.e., claim 8 of the '475

patent and claims 15 and 9 of the '677 patent) are directed to the same abstract idea as claims 1

and 12 (converting and forwarding messages, so that the messages are sent in a format and layout

in which they can be received by a recipient).  (D.I. 124 at 2-3)  Plaintiff responds that

representative claim 8's incorporation of the template messaging element distinguishes it from

claims 1 and 12 of the '475 patent, and enables it to pass step one of the *Alice* test.  This is

because, according to Plaintiff, "the character of claim 8 as a whole is not directed to the abstract

idea of converting and forwarding messages but, rather, to improving a technological process

[via the use of templates]."  (D.I. 122 at 17)

Plaintiff analogizes the "template" limitation to the limitations in the claims in *Enfish,*

*LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016).  (*Id.*)  In *Enfish*, the Federal Circuit

deemed the claims at issue to be patent eligible because they recited "non-abstract improvements

to computer technology[.]"  822 F.3d at 1335, 1339.  The patents at issue in *Enfish* claimed a

particular type of logical model for a computer database described as a "self-referential" table.

The Court explained that for claims directed to software, the pertinent step one inquiry asks

whether the "focus" of the claims "is on the specific asserted improvement in computer

capabilities (i.e., the self-referential table for a computer database) or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* at 1335-36. As for the specific claims before it, the *Enfish* Court found that their "plain focus" was on a specific improvement to the way computers operate (the self-referential table). *Id.* at 1336. In reaching this conclusion, the Court emphasized that the claims did not broadly cover *any* form of storing tabular data, but rather specifically taught the *self-referential* table for a computer database. *Id.* at 1337. This specificity was reflected in the claim language (which described, in some detail, the table's attributes), but also in the teaching of the specification. *Id.* The specification emphasized how the self-referential table improved upon conventional database structures (e.g., by providing increased flexibility, faster search times, and smaller memory requirements). *Id.* In light of what this demonstrated about the "plain focus" of the claims, the *Enfish* Court found that the claims passed *Alice*'s step one test. Thus, *Enfish* teaches that in applying an *Alice* stage-one filter to a claim, a court should (in addition to looking at the claim language) also inquire into "the focus of the claimed advance over the prior art[.]'" *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375-76 (Fed. Cir. 2016) (*quoted in Enfish*, 822 F.3d at 1335) (internal quotation marks and citation omitted); *see also, e.g., MAZ Encryption Techs., LLC*, 2016 WL 5661981, at \*7 (noting that it is "plain from the reexamination prosecution history (with support in the specification) that the two-table limitations added during reexamination are sufficiently important that they must be included in any accurate description of the nature of claim 31 as a whole").

*Enfish* also explained that, in some cases involving computer-related claims, "there may be close calls about how to characterize what the claims are directed to[.]" *Enfish*, 822 F.3d

1339. In such circumstances, the *Enfish* Court stated, "an analysis of whether there are arguably concrete improvements in the recited computer technology could take place under step two" of the *Alice* test. *Id.*; *see also Bascom*, 827 F.3d at 1349 (finding that the claims and specific limitations did not readily lend themselves to a step-one finding that they are directed to a non-abstract idea, and deferring "consideration of the specific claim limitations' narrowing effect for step two").

Here, the patent specification explains that certain embodiments of the claimed messaging system allow for messages to be composed utilizing the afore-mentioned pre-defined templates. Each template is described as having the "unique identifier" capable of being recognized by the messaging system and/or client and stored in the metadata of the message. ('475 patent, col. 19:49-57) The delivery instructions for such template-based messaging with regard to layout of the message "are based on predefined layout of message matching to template unique identifier and capabilities of destination device." (*Id.*, cols. 21:3-5, 24:12-17)

Importantly, the patent also describes this aspect of the invention as providing a "*novel solution* facilitating ubiquitous templates supporting different types of originating and destination devices and seamlessly matching the template-based messages to capabilities of the originating and/or destination devices and subscriber's preferences." (*Id.* at col. 20:35-40 (emphasis added)) The specification then describes the benefits of using such templates in the claimed messaging system. It explains that this results in a "reduction in need of content analysis [by allowing for the] ability to provide layout-related delivery instructions based on pre-defined rules and parameters (e.g. in a form of a look-up table)." (*Id.* at col. 21:8-12; *see also* D.I. 122 at 6)

In the Court's view, this is one of those close calls, described in *Enfish*, where it makes

sense to defer consideration of the message template element until step two of the *Alice* test. On the one hand, claim 8 (incorporating claims 1, 6 and 7) does recite the use of a template with a unique identifier in converting the message at issue. And, as was just described, there is a portion of the patent specification (albeit a small portion, and one not found until column 20—only three columns before the patent's claims are set out), that touts the message template element as a "novel solution" to certain problems in cross-platform messaging.

On the other hand, much of the content of claim 8 (in light of the claim's incorporation of the text of claim 1 and claim 6) is tied up in a higher-level description of a messaging system that converts and forwards messages. Indeed, that is that (broad) concept that is described in the '475 patent Abstract (which makes no mention of templates). ('475 patent, Abstract) Moreover, the specification provides little specificity about exactly *how* it is that the message template element improved upon a problem in the prior art. And as Defendant points out, (Defendant's Oral Argument Presentation, Slide 76), the specification also notes the existence of a prior art reference known as "Huang" (a patent application), which in turn disclosed a "multimedia sharing method for email message recipient, involving integrating multimedia file into template to construct email message that is transmitted to recipient, and opening file when message is received[,]" ('475 patent, col. 2:26-31).

In light of the mixed record on this question, the Court will defer consideration of the specific claim limitation(s) at issue until step two of the *Alice* test.

### (2) *Alice* **Step Two**

Defendant asserts that representative claim 8's use of templates—which can "just be []
predefined layout[s]"—is merely an inconsequential data-gathering step and extra-solution

33

activity that adds nothing meaningful at step two. (D.I. 121 at 3, 19; D.I. 124 at 7) It states that the limitation does not save the claims here because Plaintiff did not invent the notion of a template with unique identifier, as templates were known in the prior art. (Tr. at 36-37; Defendant's Oral Argument Presentation, Slide 76; D.I. 121 at 19 (Defendant arguing that claim 8's use of a template is "a well-understood concept that adds nothing meaningful"))

But Defendant seems to be talking past Plaintiff. Plaintiff is not contending that it invented the idea of a template. Nor is it contending that it invented the concept of a template with a unique identifier. Rather, Plaintiff is asserting that claim 8 recites a non-conventional "particular use of templates" with unique identifiers *to facilitate the process of converting and forwarding electronic messages* and, in turn, making that process more efficient. (*See, e.g.*, Tr. at 57, 62-63, 65-67; D.I. 122 at 18; Plaintiff's Oral Argument Presentation, Slide 31 (Plaintiff contending that it was "[n]ot conventional to incorporate five elements relating to templates as part of a messaging conversion"))

The Court finds that it cannot conclude, as a matter of law at the pleading stage, that representative claim 8 does not pass muster under step two of *Alice*. As discussed above with respect to representative claim 1 of the '475 patent, it is at least plausible that the combination of the access block and media block (and their internal components working together) contribute a meaningful inventive concept to the field of cross-platform messaging. But it is also plausible that the combination of those features—together with the template-based messaging element (i.e., a system for message conversion that is assisted in the conversion process by a template with a unique identifier)—amounts to the requisite inventive concept. The Court so concludes for a few reasons, set out below.

First, it is worth noting that claim 8 does not *simply* recite creation of a message from a template. Instead, it describes a messaging system that utilizes the template's *unique identifier* to convert the message into one with a layout and format that will be compatible with the recipient's device. The latter is a bit more of a particular solution to the problem of cross-platform messaging than the former.

Second, the record indicates that there are outstanding fact questions regarding the "conventionality" of this type of messaging system, and as to related questions of preemption. Considered in the light most favorable to Plaintiff, these facts suggest that it is plausible that claim 8 could be patent-eligible.

For example, the Federal Circuit has instructed that a patent's "written description is particularly useful in determining what is well-known or conventional." *Symantec*, 838 F.3d at 1317; *see also Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 912 (Fed. Cir. 2017) ("The fact that many of these technologies were well-known can be discerned from Secured Mail's patents themselves."). As noted above, the specification does not robustly describe how the invention's use of templates assist in the message conversion process, or how it improves over prior art systems such as Huang. But it *does* at least state that this element provides a "novel solution" allowing for greater efficiency in message conversion. ('475 patent, cols. 20:36, 21:8-12) And, of course, the claim was granted over Huang.

Moreover, on the question of "conventionality," Plaintiff notes that during the IPR proceedings Defendant did not cite to any prior art "of any messaging system incorporating templates to identify the content structure of messages[.]" (Plaintiff's Oral Argument Presentation, Slide 31; Tr. at 58-59; *see also* D.I. 123, ex. 4 at 18-19) The Court understands that

this fact is not dispositive of the patent-eligibility question. As Defendant notes, (Tr. at 93-95), the Federal Circuit instructed in *Symantec* that "'[t]he novelty of any element or steps in a process, or even of the process itself, is of *no relevance* in determining whether the subject matter of a claim falls within the [Section] 101 categories of possibly patentable subject matter.'" 838 F.3d at 1315 (citing *Diehr*, 450 U.S. at 188-89) (certain internal quotation marks omitted, emphasis added);[17] *see also Amdocs (Israel) Ltd.*, 841 F.3d at 1311 (Reyna, J., dissenting) (noting that the distinction between inventiveness and novelty is that "[n]ovelty is the question of whether the claimed invention is new [and] [i]nventiveness is the question of whether the claimed matter is [an] invention at all, new or otherwise"); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) (noting that "a claim for a *new* abstract idea is still an abstract idea") (emphasis in original). However, the Federal Circuit has also clearly stated that the Section 101 inquiry and considerations relating to invalidity (e.g., "'the [section] 102 novelty inquiry'") "'might sometimes overlap.'" *Synopsis, Inc.*, 838 F.3d at 1151 (quoting *Prometheus*, 132 S. Ct. at 1304); *see also Internet Patents*, 790 F.3d at 1347 (explaining that "pragmatic analysis of [Section] 101 is facilitated by considerations analogous to those of [Sections] 102 and 103 as applied to the particular case"); (Tr. at 95). What is in the prior art (and what is not) as to messaging systems like this one could well impact an analysis of whether claim 8's use of templates amounts to the incorporation of "well-understood, routine, conventional activit[ies] previously known [in an] industry[,]" *Alice*, 134 S.Ct. at 2359 (internal

---

[17]      The *Symantec* Court further explained that "the jury's general finding that [the defendant] did not prove by clear and convincing evidence that three particular prior art references do not disclose all the limitations of or render obvious the asserted claims does not resolve the question of whether the claims embody an inventive concept at the second step of []*Alice*." 838 F.3d at 1315.

36

quotation marks and citation omitted), or "pre-empt [the] use of [the asserted abstract idea] in all [or nearly all] fields," *id.* at 2354; *see also Trading Techs. Int'l, Inc. v. CQG, Inc.*, 675 F. App'x 1001, 1005 (Fed. Cir. 2017) ("Th[e] threshold level of eligibility is often usefully explored by way of the substantive statutory criteria of patentability, for an invention that is new, useful and unobvious is more readily distinguished from the generalized knowledge that characterizes ineligible subject matter."); (D.I. 122 at 19 n.8). The Court would benefit from a more full record exploring these questions of conventionality and preemption (if not "novelty")—one that includes, for example, excerpts from the prosecution history and/or expert testimony regarding the message template element.

Third, while Defendant cited to a few cases in support of its contrary position, the Court finds those cases to be inapposite. That, in turn, strengthens the Court's view that the claim should not be doomed here at step two.

For example, Defendant repeatedly cites for support to the Federal Circuit's decision in *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015). (D.I. 121 at 19; D.I. 124 at 2; Defendant's Oral Argument Presentation, Slide 79) In *Internet Patents*, the Federal Circuit found that patent claims were directed to an abstract idea where they covered the *concept* of retaining information lost while navigating online forms (or maintaining "data state")—but did not describe the *mechanism* to be used to maintain the state information. 790 F.3d at 1348. Certain dependent claims were directed to a method and computer system wherein a dynamically generated online application form set was formed by "combining information from a template file" and a "database or conditional merge file or both[,]" and was then displayed. *Id.* at 1349. The *Internet Patents* Court found that this and other limitations in the dependent claims at issue

37

did not save the claims from ineligibility. Instead, it held (with little discussion) that the above-referenced limitations "represent[ed] merely [a] generic data collection step[.]" *Id.*

As Plaintiff points out, however, the claim reciting a "template" in *Internet Patents* appears distinguishable from the instant claim. The former claim "says nothing more about a template" than "combining information from a template file." (D.I. 122 at 17 n.7; *see also* Plaintiff's Oral Argument Presentation, Slide 34) In that claim, then, the template file did not seem to play much of a role in the end result of maintaining the state. Here, in contrast, the claimed template with a unique identifier is said by the patent to play an important role in the purpose of the claims (the conversion and forwarding of messages) and purportedly makes that process more efficient.

Defendant recently filed a Notice of Supplemental Authority with respect to a just-issued decision from the Federal Circuit, *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905 (Fed. Cir. 2017), (D.I. 141), presumably because it saw similarities between the claims at issue there and those at issue here. Certain claims in *Secured Mail* were directed to a method of verifying the authenticity of a piece of mail by affixing thereto a barcode that "includes at least a unique identifier [that constitutes a number assigned by the sender], sender data, recipient data and shipping method data," storing an authenticating portion of the barcode in a database, and allowing for the recipient to access the database and verify the authenticity of the mail object via the authenticating portion. *Secured Mail Sols. LLC*, 873 F.3d at 908 (citation omitted). There, the patentee had argued that the "'development of a unique, sender-generated identifier *is* the critical invention.'" *Id.* at 911 (citation omitted, emphasis in original). But the *Secured Mail* Court disagreed, finding that the sender-generated identifier is not an inventive concept. This

was because "[t]he claim language does not explain how the sender generates the information, only that the information itself is unique or new" and "[t]he claim language does not provide any specific showing of what is inventive about the identifier or about the technology used to generate and process it." *Id.* at 911-12. Here, in contrast, as discussed above, Plaintiff does not contend that it developed the concept of a template with unique identifier; rather, Plaintiff contends (with some support from the patent) that converting and generating an electronic message using the template and unique identifier as described is what is "inventive."

For all of these reasons, the Court cannot conclude, as a matter of law at the pleading stage, that representative claim 8 of the '475 patent is patent-ineligible.

### 2. '677 Patent

As noted above, while the '677 patent has the same specification as the '475 patent, its claims are directed to receiving, converting, and forwarding messages that include a video. The representative claims of the '677 patent at issue in this Motion are claims 15 and 9.

### a. Representative Claim 15

Plaintiff asserts that representative claim 15 is patent eligible because it incorporates the claimed "access block" and "media block" limitations, and additionally because it recites the video delivery/clickable icon element. (D.I. 122 at 7, 18) Representative claim 15 depends from claim 6. Claims 6 and 15 recite as follows:

> **6.** A messaging system comprising an access block operatively coupled to a media block, wherein:
> the access block is configured to receive an initial message sent by an originating communication device to a destination communication device, the initial message being characterized, at least, by message format, an initial message layout, and data indicative of at least one receiver associated with the initial message, wherein the initial message includes a video;

39

the media block is configured to obtain data indicative of
displaying capabilities of the destination communication device
and enable conversion, in accordance with a criterion related to the
displaying capabilities of the destination communication device, of
the initial message into an adapted message, wherein the
conversion comprises:

a)       providing, by the media block, a clickable icon:

          i)      based on the video from the initial message and

          ii)     clickable into an adapted version of the video,
wherein the adapted version of the video is adapted
to the displaying capabilities of the destination
communication device, and

b)       determining, by the media block, an adapted message
layout, comprising the clickable icon; and

the access block is further configured to enable transmitting the
adapted message to the destination communication device
associated with the at least one receiver.

('677 patent, col. 24:6-32)

> **15.** The system of claim **6**, wherein the media block is configured
> to convert the initial message into the adapted message, and
> wherein the clickable icon is adapted to the displaying capabilities
> of the destination device.

(*Id.*, col. 26:10-14)

### (1)   *Alice* **Step One**

Plaintiff asserts that representative claim 15's incorporation of the video

delivery/clickable icon element enables it to pass step one of the *Alice* test because the claim is

an "improvement to a technological process." (D.I. 122 at 19) However, for much the same

reasons as discussed above with respect to the message template element found in representative

claim 8 of the '475 patent, the Court finds that the eligibility question here is better assessed at

40

step two. Again, this is because there is evidence on both sides as to whether the claim is "directed to" this element.

With regard to claim 15's language, on the one hand, the claim could be viewed as broadly covering the concept of converting and forwarding messages, via the use of an access block and media block (albeit a concept that requires that the initial message to be converted must include a video). On the other hand, the claim (as do all of the other claims of this patent) does include prominent limitations relating to the "clickable icon."

As for what can be gleaned from the '677 patent's specification, the written description does not put the video delivery/clickable icon element front and center. This is not necessarily surprising, in that the specification is identical to the '475 patent's specification—and the '475 patent's claims do not even *require* the message at issue to include a video. In fact, the term "video" is only used in the patent specification a handful of times, and then only in general terms (instead of in a discussion regarding the specific claimed solution). (*See, e.g.*, '677 patent, cols. 10:31, 12:18, 19:55, 21:16) Additionally, while the specification does summarize another prior art system (disclosed in a patent application, and referred to as "Kim") that is directed to "converting a format of a multimedia message and transmitting a uniform resource locator and an access code of the converted multimedia message[,]" ('677 patent, col. 4:9-17), it never explains how the '677 patent attacks a challenge inherent in Kim (or other prior art systems). Beyond this, the specification merely makes one or two passing references to the general concept of a media item in a message being replaced by a link. (*Id.*, cols. 10:55-58, 16:64-17:4)

As it is a "close call" as to whether claim 15 can be said to be directed to the abstract idea at issue, the Court will move on to a step two analysis of the claim.

41

## (2) *Alice* Step Two

The Court cannot conclude that representative claim 15 fails to pass muster under step

two of *Alice*. This is because (in addition to its inclusion of the block terms, discussed in detail

above), it is plausible that claim 15's recitation of the video delivery/clickable icon element

amounts to a sufficiently "[s]pecific" process of converting and forwarding messages that include

a video. (*See* Defendant's Oral Argument Presentation, Slides 46-50 (Defendant noting that the

law requires a "specific" or "particular" improvement for a claim to teach an inventive concept))

Here again, Defendant argues that "converting, forwarding, and displaying video are

routine computer functions" in asserting that inclusion of this element does not make the claims

patent eligible. (D.I. 121 at 19-20; Defendant's Oral Argument Presentation, Slides 84-85

(asserting that "'video" and "'clickable icons'" are, respectively, "[f]unctional and

[c]onventional")) Plaintiff responds that "[i]t was not conventional to incorporate clickable icon

as part of a messaging conversion." (D.I. 122 at 19)

In support of its position, Plaintiff points to the fact that during the IPR, Defendant failed

to cite to any prior art "incorporating clickable icons into a messaging conversion" and that

Defendant was forced to rely "on combining three references to disclose most of [the] video

claim elements." (*Id.*; *see also* D.I. 123, ex. 3 at 27-34 (Defendant, arguing in the IPR

proceeding that a person of ordinary skill in the art would have found it obvious to combine three

references, known as Coulombe, Bellordre and Friedman, which in turn would have disclosed all

aspects of the video delivery/clickable icon element, but acknowledging that none of the

references alone disclose all such aspects); D.I. 136, ex. B at 13-24 (PTAB decision discussing

Defendant's argument and finding it unpersuasive); Tr. at 75-76, 87) The Court agrees with

Plaintiff that this is evidence that the claim recites a sufficiently concrete way of converting a message that include a video: delivering the message with an icon based on the video that is clickable and that ultimately produces an adaptive version of the video. The specification appears to explain (though it does so a bit vaguely) that solutions like this one are meant to address challenging problems in the art regarding message conversion: those relating to bandwidth limitations, or of a video being too large for successful downloading in normal fashion. ('677 patent, cols. 14:1-16, 16:64-17:3; *see also* Tr. at 77-78, 85) Morever, while not dispositive of patent-eligibility, the fact that the Examiner granted the '677 patent over the Kim reference suggests that there are fact issues as to (1) whether the claim solves a problem of cross-platform messaging (involving transmission of a video) in a sufficiently particular, non-routine, unconventional way, and (2) whether allowing representative claim 15 would significantly preempt this field.

Construing these facts in the light most favorable to Plaintiff, the record does not permit the Court to find representative claim 15 patent-ineligible.

### b. Representative Claim 9

Representative claim 9 depends from claim 8, which in turn depends from claim 6. Claim 6 is recited above, and claims 8 and 9 recite as follows:

> **8.** The system of claim **6,** wherein the initial message is characterized by the initial message layout based on a template, the template being characterized by, at least, a unique template identifier; and wherein the media block is further configured to provide the adapted message layout in accordance with the unique template identifier.

('677 patent, col. 24:37-42)

> **9.** The system of claim **8** further comprising a data structure

43

associating at least the unique template identifier with one or more predefined adapted message layouts, and wherein the media block is further configured to select the adapted message layout from among the predefined message layouts based, at least in part, on the unique template identifier and the criterion related to the destination communication device.

(*Id.*, col. 24:43-49)

Because this representative claim includes all three key elements discussed in detail above—the access block and media block components, the message template element, and the video delivery/clickable icon element—the Court need not address it further. For the same reasons as set out above, the record is premature at this stage for the Court to find the claim to be patent-ineligible.

## IV. CONCLUSION

For the foregoing reasons, the Court recommends that Defendant's Motion be DENIED, without prejudice to Defendant's ability to later renew a Section 101 challenge in the form of a summary judgment motion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: November 20, 2017

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE